<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

</div>

**In re:**

                                              **CASE NO. 6:24-bk-06781-GER**

**LINX OF LAKE MARY, LLC**               **CHAPTER 11**

       **Debtor.**                              **Subchapter V Election**

_____/

<div align="center">

**EXPEDITED MOTION TO ENFORCE CONFIRMED PLAN, CONFIRMATION**
**ORDER AND LEASE ASSUMPTION ORDER**

</div>

       LINX OF LAKE MARY, LLC (the "Debtor"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 105(a) the Confirmation Order (defined below, Doc. No. 181), seeks the entry of an order finding that Timacuan Partners, LLC (the "Landlord") has violated the Debtor's confirmed Plan of Reorganization and the Lease Assumption Order (as defined below) and directing Landlord to comply and finding that Debtor is not in default under the Lease (as defined hereinafter) and requests an expedited hearing on the Motion no later than February 28, 2026. In support of this Motion, the Debtor states as follows:

<div align="center">

**Relevant Bankruptcy Procedural History**

</div>

       1.      On December 13, 2024 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and elected to proceed with its reorganization effort under the provisions of Subchapter V.

       2.      On August 27, 2025, the Court entered that certain *Agreed Order Granting Debtor's Motion to Assume Unexpired Non-Residential Lease with Timucuan Partners, LLC* (Doc. No. 172) (the "Lease Assumption Order"). The Lease Assumption Order provides, *inter alia*, that "The parties stipulate that as of the date of entry of this Order, **there were no defaults or facts giving rise to any defaults under the TP Lease.**" (Doc. No. 172, p. 2 of 13, paragraph 3). (Emphasis added).

<div align="center">1</div>

3.       The Lease Assumption Order also provides, "Except as expressly set forth in this Order, Timucuan and Debtor waive any and all claims against each other including but not limited to waiver of the administrative claim filed by Timucuan and any state court claim filed by Debtor against Timucuan or its principal." (Doc. No. 172, p. 2 of 13, paragraph 6).  A true and correct copy of the Lease Assumption Order is attached hereto as **Exhibit "A."**

4.       The Lease Assumption Order limited the narrow issues left open for discussion and subsequent arbitration. (Paragraph 5, Lease Assumption Order).  The parties stipulated that the only issues left were claims based on facts that arose after the entry of the Lease Assumption Order as further narrowed by the specific items articulated in paragraph 5.

5.       Additionally, the Debtor's confirmed its plan of reorganization on September 16, 2025. *See* Plan of Reorganization at Docket No. 180 (the "Plan"). This case was confirmed under Section 1191(a) and the discharge injunction became effective immediately.

6.       An Order confirming the Plan was filed on September 16, 2025, at Docket No.: 181 (the "Confirmation Order").

<u>**The Lease**</u>

7.       Debtor owns and operates an elite championship golf course located in Lake Mary, Florida known as the "Timacuan Club." The Debtor also has a 24,000 square foot clubhouse, which is a popular venue for social and corporate events, and the grill is a frequent spot for lunch. The Debtor leases the grounds from Landlord under a long-term lease executed on or about October 3, 2022 (the "**Lease**"). A copy of the Lease is attached as **Exhibit "B."**  This Lease was assumed pursuant to the Confirmation Order, Lease Assumption Order and Plan.

<u>**The HLI Allowed Claim and Challenge to Property Taxes**</u>

8.       During the course of the Bankruptcy Case, the Landlord and Debtor both agreed to challenge the real property taxes. This challenge is still pending, but the Debtor believes it will

result in cutting the property taxes related to the property in half. This will benefit the Landlord and Debtor by almost $30,000.00 annually. A true and correct copy of the Petition Challenging the assessment signed by both the Debtor and Landlord is attached hereto as **Exhibit "C."**

9.      Additionally, post-confirmation, the Debtor and its secured creditor, HLI, disagreed about the exact amount of the Allowed Secured Claim. The payment to HLI was not due, per operation of the Plan, until the Allowed Secured Claim amount was determined. It could not determine the new principal amount to determine the resulting payment amount until the Allowed Amount was determined (as these are defined terms under the Plan). The Plan also required the parties to sign new loan documents as part of this process.

10.     In fact, on October 15, 2025, the Debtor filed its *Motion to Compel HLI to Comply with the Confirmed Plan.* (Doc. No 191). Subsequent to this time, on February 9, 2026, the Debtor executed the loan documents, the parties agreed to the Allowed Secured Claim Amount and the Debtor paid HLI current from the Confirmation Date for the amounts due under the Plan. The Plan expressly provides that the Allowed Claim Amount shall be paid, once determined to be Allowed. The Debtor complied and HLI never declared any default related to the process.

11.     Meanwhile, after conferring in good faith, the Debtor and the Landlord could not agree to resolution of the Open Issues and proceeded with arbitration. During the arbitration, new counsel for the Landlord began litigating facts and claims that were resolved by the Lease Assumption Order and Plan.  The Debtor objected and informed the Arbitrator that they would seek relief to enforce the Lease Assumption Order and Plan related to these released and resolved claims.

12.     Subsequent to the entry of the Lease Assumption Order, and immediately after the Debtor's counsel made this statement, Landlord issued a lease default and termination letter (the "Lease Termination Letter"). A copy of the Lease Termination Letter is attached as **Exhibit "D."**

13.    In complete disregard for the Lease Assumption Order and the terms of the confirmed Plan, the Lease Termination Letter asserts (incorrectly) three primary reasons for Debtor's alleged default under the Lease. First, that Debtor has failed to pay taxes. Second, that Debtor has failed to pay rent. Third, that the filing of the bankruptcy case, in and of itself, was an event of default under the Lease entitling Landlord to recover possession of the leased premises.

14.    As it relates to the Landlord's first argument, the Lease Termination Letter is highly misleading because it states simply that taxes have not been paid, but it blatantly ignores that the current outstanding taxes are under appeal and the provision of the Lease that expressly provides that the real property taxes are not due if challenged (*See* Paragraph 6.2.1 of the Lease) ("Lessee shall not be required to pay, discharge or remove any Imposition provided that (a) Lesse contests, in good faith, the amount or validity of such Imposition by appropriate proceeding which shall operate to prevent or stay the collection of the Imposition so contested…").

15.    Furthermore, attached as **Exhibit "E"** is a copy of a letter from the Landlord to the Property Appraiser's Office identifying the parties authorized to represent the Landlord in the assessed value process. Because the taxes are under appeal, per the Lease and Plan, they are not presently due so there is no default relating to same.

16.    As it relates to Landlord's second argument, under the confirmed Plan, HLI was to have an allowed claim that would "be repaid in equal monthly payments based on monthly interest only payments based on 10.5%." *See* Article V of the Plan, a copy of which is attached as **Exhibit "F."** Landlord ignores that the process between the Debtor and HLI to come to an agreement on the allowed claim and what the payment amount will be has been under negotiations for several months and only earlier this month did the parties arrive at what that figure will be. HLI has never issued a default notice to Debtor. Accordingly, there is no default under the Plan, and the Debtor is adhering to the Plan terms.

17.     Landlord's third argument is its weakest by far as it is arguing that an unenforceable *ipso facto* clause is a lease default entitling the Landlord to regain possession of the leased premises. It is well established that *ipso facto* clauses are unenforceable in bankruptcy. *See, e.g.*, *In re Braniff*, 118 B.R. 819, 842-43 (Bankr. M.D. Fla. 1989) ("Clauses that purport to terminate agreements when action is taken to further a reorganization are 'ipso facto clauses' that are invalid under Section 365(e) of the Bankruptcy Code. Such clauses hamper the reorganization process."). The Landlord's argument relating to the *ipso facto* provision under the Lease should be dismissed out of hand.

<u>**Relief Requested**</u>

18.     Based upon the foregoing, Debtor seeks a ruling from this Court with findings that it is in compliance with the Lease Assumption Order, the Confirmation Order, the Plan and the Lease, and that no defaults exist under the Lease.

19.     Debtor also seeks an Order from this Court finding that Landlord has willfully violated the Stay and the Lease Assumption Order by seeking to litigate claims that were resolved by the Lease Assumption Order.

20.     In short, the Landlord is desperately attempting to relitigate and find unwarranted ways to try to terminate the Lease. There simply is not any.  As a result, the Landlord should be sanctioned for its unwarranted actions.

21.     The Debtor requests a hearing on or before February 27, 2026 on the Motion.  The Landlord has threatened to take action on its termination letter and immediate relief is needed to prevent this unwarranted action.

**WHEREFORE**, Debtor respectfully requests the Court enter an order: (i) finding that Debtor is in compliance with the Lease Assumption Order, the Confirmation Order, the Plan and the Lease, and that no defaults exist under the Lease; (ii) finding that Landlord has willfully

violated the Lease Assumption Order and ordering sanctions for Landlord's actions in the form of attorneys' fees as provide in the Plan and Lease in relationship to this Motion in the form of an executable judgment; and, (iii) granting such additional and further relief as the Court deems appropriate.

      **RESPECTFULLY SUBMITTED** this 20th day of February, 2026.

<div style="margin-left:40%">

*/s/ Justin M. Luna*
Justin M. Luna, Esq.
Florida Bar No. 0037131
jluna@lathamluna.com
L. William Porter III, Esq.
Florida Bar No. 0116882
bporter@lathamluna.com
**LATHAM, LUNA, EDEN & BEAUDINE, LLP**
201 S. Orange Ave., Suite 1400
Orlando, Florida 32802-3353
Telephone:  407-481-5800
Facsimile:  407-481-5801
Secondary e-mail:
bknotice1@lathamluna.com
*Attorneys for Debtor*

</div>

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

**LINX OF LAKE MARY, LLC**

      Debtor.

_____/

         **CASE NO. 6:24-bk-06781-GER**
         **CHAPTER 11**

         **Subchapter V Election**

## <u>CERTIFICATE OF SERVICE</u>

    **I HEREBY CERTIFY** that a true copy of the forgoing has been furnished either electronically and/or by U.S. First Class, postage prepaid mail and email (if known) to: **Linx of Lake Mary LLC,** 550 Lake Mary Blvd., Lake Mary, Florida 32746; **Timacuan Partners, LLC**, 550 Timacuan Blvd. Lake Mary, Florida 32746, Attn: Claire Zhang; 20 largest creditors listed on the attached mailing matrix; and the **Office of the United States Trustee**, 400 West Washington Street, Suite 1100, Orlando, Florida 32801, this 20th day of February, 2026.

                /s/ Justin M. Luna_____
                **Justin M. Luna, Esq.**

EXHIBIT "A"

**ORDERED.**

**Dated: August 26, 2025**

Grace E. Robson
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                              **CASE NO. 6:24-bk-06781-GER**

**LINX OF LAKE MARY LLC,**                          **CHAPTER 11**

       **Debtor.**                                 **Subchapter V Election**

_____/

### AGREED ORDER[1] GRANTING DEBTOR'S MOTION TO ASSUME UNEXPIRED NON-RESIDENTIAL LEASE WITH TIMACUAN PARTNERS, LLC

**THIS CASE** came before the Court on August 26, 2025 at 9:30 a.m. (the "Hearing") on

the *Motion to Assume Unexpired Non-Residential Lease with Timacuan Partners, LLC* (Doc. No.

51) (the "Motion") pursuant to 11 U.S.C. §§ 105(a) and 365, and Federal Rule of Bankruptcy

Procedure 6006, filed by **LINX OF LAKE MARY LLC** ("Debtor"). On March 27, 2025,

Debtor's landlord, **TIMACUAN PARTNERS, LLC** ("Timacuan"), filed an Objection to the

Motion (Doc. No. 62) (the "Objection"). On April 17, 2025, Debtor filed its response to the

Objection (Doc. No. 80) (the "Response"). Upon review of the Motion, the Objection and the

Response, noting the agreement of the parties with respect to the stipulated terms incorporated into

---

[1] Edits to the proposed order were discussed on the record at the Hearing and made in Chambers. Any edits made by the Court are not intended to modify the parties' agreement. To the extent the Court's edits do not accurately reflect the parties' agreement, the parties are permitted to submit a proposed amended order without the need to file a motion.

this Order, and noting that the party submitting this Order has verified that it has the consent of the other party as to the form and substance of this Order, the Court finds it appropriate to grant the Motion as set forth herein. Accordingly, it is

**ORDERED**:

1.      The Motion (Doc. No. 51) is **GRANTED** as set forth herein.

2.      Debtor's assumption of the lease by and between Debtor and Timacuan (the "TP Lease"), as modified pursuant to this Order, is **APPROVED** pursuant to 11 U.S.C. § 365.

3.      The parties stipulated that as of the date of the entry of this Order, there were no defaults or facts giving rise to any defaults under the TP Lease.

4.      Based on the parties' agreement, the TP Lease is modified as follows:

i.      Debtor shall make monthly payments to HLI[2] on account of its Allowed Secured Claim as provided for in Class 1 pursuant to Debtor's Plan[3] until payoff pursuant to the Plan. A default under the Plan for non-payment to HLI shall be a default under the TP Lease if not paid by any cure period provided for by the Plan and if not timely paid after such cure period, such non-payment shall give rise to termination under the TP Lease.

ii.      Unless approached by HLI after default by Timacuan,[4] no officer, director or shareholder (or affiliate/insider/relative) of Debtor shall purchase the HLI debt. The deadline for the payoff of HLI debt is extended to June 2028 if approved by the Court or by HLI as incorporated in the Plan. However, in the event of a refinance that takes out the HLI debt prior to June 2028, Timacuan shall timely work with Debtor to refinance the HLI debt in full including

---

[2] "HLI" refers to HLI Investments and Funding-Fund 2, LLC.
[3] "Plan" refers to the *Subchapter V Plan of Reorganization* (Doc. No. 55), as modified by Doc. Nos. 151, 155, and 159. As announced at the Hearing, Debtor will file a single integrated plan with the Court. *See* Local Rule 3020-1(a).
[4] The Plan, as modified, provides that Timacuan (and Debtor) shall execute loan documents consistent with the terms of the Plan that relate back to the recording of a mortgage by Timacuan in favor of HLI.

providing the same collateral that is currently provided by Timacuan under the HLI debt if desired by Debtor and in no event shall maturity or payoff of any such loan extend past June 2028.

       iii.      Timacuan shall timely assist and cooperate with Debtor to challenge any property tax assessments.

       iv.      By August 25, 2025, Timacuan shall inspect the collateral subject to Lease 1 and Lease 3 (copies of which are attached to this Order as **Exhibit A**) (collectively, the "PNC Leases"). By August 25, 2025, Timacuan may elect one of two options. Option A includes retaining Lease 1 and Lease 3 and Debtor shall not be responsible for any further obligation related to Lease 1 or Lease 3. Option B requires Debtor to make any and all remaining payments due under Lease 1 and Lease 3 except that Timacuan shall pay a lump sum payment of $25,000.00 towards any past due amounts under Lease 1 and Lease 3 with Debtor being responsible for the remainder. Timacuan shall timely transfer and assign the PNC Leases within 10 days if Option B is exercised. If Timacuan exercises Option B, and Debtor fails to timely make the required payments under the PNC Leases, after cure period under the PNC Leases, it shall be a default under the TP Lease.

       5.      Furthermore, Timacuan and Debtor are directed to resolve the open litigation issues (the "Open Issues") by first meeting in person in the next 30 days to resolve the Open Issues. If any of the remaining Open Issues are not resolved by mutual agreement in this time period, Timacuan and Debtor shall submit themselves to binding arbitration with Mike Tessitore, Esq., with such arbitration being conducted in accordance with the AAA rules with the prevailing party able to tax their reasonable attorneys' fees and costs associated with such Open Issues. The Open Issues are as follows: (i) enforcement of Section 5.5(e) of the TP Lease and its existing terms (as it relates to extent and timeline of potential improvement or repair to tee boxes, greens and

irrigation system) and any alleged amount necessary to be expended to comply with Section 4.4 and 4.5 of the TP Lease; (ii) the amount owed by Timacuan or its principal for unpaid food, beverage, merchandise, golf balls, and rounds; (iii) the extent, if any, Timacuan may develop lots under Section 4.3 of the TP Lease; (iv) the rights granted, if any, under Section 5.3 of the TP Lease; and (v) whether the previous Timacuan members who accepted an offer from Debtor to accept a new membership can successfully sue for damages; and (vi) entitlement to compensation for use of Debtor's property.

6.        Except as expressly set forth in this Order, Timacuan and Debtor waive any and all claims against each other including but not limited to the waiver of the administrative claim filed by Timacuan[5] and any state court claim filed by Debtor against Timacuan or its principal.

# # #

Attorney Justin M. Luna is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of the order.

---

[5] *Timacuan Partners, LLC's Application for Allowance and Payment of Administrative Expense Claim* (Doc. No. 142).



E20

**Exhibit A**

May 6, 2021

Timacuan Partners, LLC
550 Timacuan Blvd.
Lake Mary, FL 32746

RE:   Lease Agreement No. **1172797-1** ("Lease Agreement"), by and between
      **PNC Equipment Finance, LLC** ("Lessor") and **Timacuan Partners, LLC** ("Lessee")

Dear Lessee:

PNC Equipment Finance, LLC is in receipt of the final invoice for the equipment that was ordered in connection with the above-referenced Lease Agreement.  Please be advised that the following information that may have been incomplete or incorrect on the Lease Agreement has been updated:

☒     The Payment Schedule has been changed from:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2021 | | | | | $20,207.02 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 |
| 2022 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 |
| 2023 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 |
| 2024 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 |
| 2025 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 |
| 2026 | $3,457.44 | $3,457.44 | $3,457.44 | $3,457.44 | | | | | | | | |

Plus applicable taxes. Payment on invoice could be different based on applicability of sales and use tax.

To:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2021 | | | | | $20,415.33 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 |
| 2022 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 |
| 2023 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 |
| 2024 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 |
| 2025 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 |
| 2026 | $3,665.75 | $3,665.75 | $3,665.75 | $3,665.75 | | | | | | | | |

Includes applicable taxes. Payment on invoice could be different based on applicability of sales and use tax.

All other terms and conditions of the Lease Agreeement shall remain unchanged and in full force and effect.

PNC Equipment Finance, LLC

By:  **Kristine Lofrese**   Digitally signed by
Print Name:  Kristine Lofrese
Title:  Date: 2021.05.06
10:58:32 -04'00'

# PNC
## EQUIPMENT FINANCE

February 11, 2021

Timacuan Partners, LLC
Course Name: Timacuan Golf Course
550 TIMACUAN BLVD.
LAKE MARY, FL 32746

RE: Lease Number 1172797-1

To Whom It May Concern:

Thank you for choosing PNC Equipment Finance, LLC as your financing source. Enclosed you will find the following documentation:

- **Equipment Lease Agreement:** Please sign, print name, title and date.

- **Schedule A:** Please initial at the bottom of the page.

- **Certificate of Acceptance:** Please date, sign and insert title.

- **Payment Schedule:** Please sign, print name, title and date in the lower left hand corner of the page.

- **Insurance:** Please note the page detailing instructions regarding the certificate of insurance required under the terms of the lease. Simply forward a copy of the signed page to your insurance carrier, so that they may issue the appropriate certificate on a timely basis.

- **Customer Information Form:** Please complete and return.

- **Notification of Tax Treatment:** Please complete and return.

- **PNC Automatic Payment Authorization (Required): Please complete and return with a voided check.**

We appreciate this opportunity to serve you and look forward to working with you in the future. Should you have any questions before sending the documents, please feel free to contact me at brian.sauermelch@leaserv.com.

Sincerely,

Brian Sauermelch
Sales Specialist

## PNC EQUIPMENT FINANCE

# Equipment Lease Agreement
## (Cars and Turf)

## Lessee Information

**Lease Number: 1172797-1**

**Date: February 11, 2021**

Commencement Date: May 15, 2021

| Full Legal Name: Timacuan Partners, LLC | | | | |
|---|---|---|---|---|
| Street Address: 550 TIMACUAN BLVD. | County: SEMINOLE | City: LAKE MARY | State: FL | Zip: 32746 |

## Equipment Description and Location

See Schedule A

## Advance Payments

☒   $250.00 Documentation Fee

## Payment Schedule

Security Deposits will be refunded upon expiration of the Lease provided Lessee is not in default of any of the terms of the Lease.

| Initial Term: 60 months | Rental Payment (plus applicable taxes): See Attached Payment Schedule | Payment Frequency: ☐ Monthly ☐ Quarterly ☒ See Attached Payment Schedule | ☐ FMV- Car   ☒ Rental   ☐ PUT - _____ ☐ FMV- Turf (Annual Hours ____)   ☒ $1 Out |
|---|---|---|---|

## Terms and Conditions

1.  **Agreement.** PNC Equipment Finance, LLC ("Lessor") agrees to lease to Lessee the equipment listed above or on any attached Schedule A ("Equipment"), which is made a part hereof. Lessee promises to pay Lessor the rental payments according to the Payment Schedule shown above, plus all other charges. By signing this lease agreement ("Lease"), Lessee acknowledges and agrees that: it has read and understands the terms and conditions of this Lease; this Lease becomes effective only upon written acceptance by an authorized employee of Lessor; this is a net lease; it cannot terminate or cancel this Lease; it has an UNCONDITIONAL OBLIGATION to make all payments due under this Lease; it cannot withhold, set off or reduce such payments for any reason; it will use the Equipment only for business purposes; the person signing this Lease has the authority to do so; and it entered into this Lease rather than purchase the Equipment.

2.  **Term and Rent.** The term of this Lease commences upon the date on which the Equipment is delivered to Lessee (whether or not accepted). The "Rental Commencement Date" shall be the date when the Lessor signs this Lease. The Lessee shall pay as rent the rental payment indicated on the front of this Lease plus applicable taxes ("Rent"). Lessee acknowledges that the actual rental payment due could be different than rental payment stated above based on applicable taxes. The first rental payment is due on the Rental Commencement Date, and each remaining periodic rental payment is due on the same day of each payment period thereafter for the initial term of lease as stated above (the "Initial Term"). Additionally, Lessee shall, upon demand, pay, as Rent, daily interim rent, on all Equipment subject to this Lease, for the period from the date of delivery of Equipment (or any part thereof) to and including the day immediately preceding the Rental Commencement Date. The daily rent will be calculated on a 360-day year. No portion of any rental payments shall be deemed to constitute payment for any equity interest in the Equipment. If any payment due under this Lease is not paid within five days of its due date, Lessee shall pay Lessor a late charge not to exceed 10% of each late payment (or such lesser rate as is the maximum rate allowed by applicable law).

3.  **Ordering Equipment; Delivery and Acceptance.** If Lessee entered into any purchase or supply contract with any supplier, Lessee assigns to Lessor Lessee's rights under the supply contract, but none of Lessee's obligations, except for the obligation to pay for Equipment if it is accepted by Lessee according to the terms of this Lease. If Lessee has not entered into a supply contract, Lessee authorizes Lessor to enter into a supply contract. Lessee shall arrange for the delivery of the Equipment to Lessee. Lessee shall inspect the Equipment immediately upon Lessee's receipt of the Equipment to determine if it is in good working condition. The Equipment will be deemed irrevocably accepted by Lessee upon the earlier of: (i) the date of delivery of the Equipment to Lessee unless Lessee notifies Lessor in writing, within ten days after equipment delivery, of Lessee's non-acceptance (ii) the delivery to Lessor of a written certificate of acceptance if requested by Lessor, or (iv) a verbal verification of acceptance if requested by Lessor ("Acceptance Date").

4.  **Termination by Lessor.** Lessor shall have the exclusive option to terminate this Lease if within 90 days after Lessee has signed this Lease, the Equipment has not been delivered to Lessee, or Lessee has not accepted the Equipment as provided above.

5.  **Forum, Law & Jury Waiver.** This Lease shall be construed in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania without giving effect to its conflicts of laws principles. Lessee hereby irrevocably consents to the exclusive jurisdiction of any state or federal court within the Commonwealth of Pennsylvania; provided that nothing contained in this Lease will prevent Lessor from bringing any action, enforcing any award or judgment or exercising any rights against Lessee individually, against any security or against any of Lessee's property within any other county, state or other foreign or domestic jurisdiction. LESSEE AND LESSOR EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY.

6.  **NO WARRANTY.** LESSOR TRANSFERS TO LESSEE FOR THE TERM OF THIS LEASE ANY WARRANTIES MADE BY THE MANUFACTURER OR THE SUPPLIER. LESSOR IS LEASING THE EQUIPMENT TO LESSEE "AS IS." LESSEE ACKNOWLEDGES THAT LESSOR DOES NOT MANUFACTURE THE EQUIPMENT. LESSEE ACKNOWLEDGES THAT LESSOR DOES NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND THAT LESSEE HAS SELECTED THE EQUIPMENT AND THE SUPPLIER BASED ON LESSEE'S OWN JUDGMENT. LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS LEASE. LESSEE AGREES TO CONTINUE MAKING PAYMENTS TO LESSOR UNDER THIS LEASE, REGARDLESS OF ANY CLAIMS LESSEE ASSERTS AGAINST THE MANUFACTURER OR SUPPLIER.

7.  **EQUIPMENT LOCATION, USE, AND REPAIR.** Lessee will keep and use the Equipment only at the Equipment Location stated above. Lessee may not move the Equipment without Lessor's prior written consent. At Lessee's own cost and expense, Lessee will keep the Equipment eligible for any manufacturer's certification, in compliance with all applicable laws and in good condition, except for ordinary wear and tear. Lessee will not make any alterations, additions or replacement to the Equipment without Lessor's prior written consent. All alterations, additions and replacements will become part of the Equipment and Lessor's property at no cost or expense to Lessor. Lessor may inspect the Equipment at any reasonable time.

| **Lessor:  PNC Equipment Finance, LLC** | **Lessee:  Timacuan Partners, LLC** |
|---|---|
| Signature: Digitally signed by Kristine Lofrese Date: 2021.05.06 10:58:49 -04'00' | Signature: X _Kevin Parker_ |
| Print Name: | Print Name: Kevin Parker |
| Title: | Title: Controller |
| Date: | Date: 3/30/21 |

**THIS LEASE IS NON-CANCELABLE**

**8. RETURN.** Unless Lessee purchases the Equipment at the end of this Lease, Lessee will immediately, upon expiration of the Initial Term or any extension, at Lessee's sole cost and expense, deliver all but not less than all of the Equipment to Lessor to any place in the continental United States determined by the Lessor. Lessee will pay all expenses of de-installing, crating, and shipping. Lessee shall insure the Equipment for its full replacement value during shipping. The following return conditions shall apply to the Equipment regardless of type and end of term option selected: (a) all safety equipment must be in place and meet applicable federal, state and other governmental standards; (b) all covers and guards must be in place with no sheet metal, plastic or cowling damage; (c) all parts, pieces, components and optional equipment must be installed and operational; (d) all accessories shall be returned in proper order; (e) all electronic controls shall operate per manufacturer's specifications and controls which bypass normal operations shall be repaired at Lessee's expense; (f) all electrical systems shall be able to provide electrical output as specified by the manufacturer; (g) all Equipment must have a relatively clean appearance; (h) all Equipment shall be free from excessive wear necessitating major component repair or replacement caused by lack of recommended maintenance as detailed in customer operation/maintenance manuals; (i) all Equipment shall be free from structural damage or bent frames; (j) any usage or metering devices must not have been altered in any way; and (k) all Equipment attachments, if any, must be in good operating condition;: (l) all motors shall operate smoothly without overheating and shall have good bearings and bushings; (m) all batteries shall be in good, safe operating condition with no dead cells or cracked cases and all batteries shall hold a charge and provide adequate power to operate the Equipment; (n) all Equipment shall have serviceable tires, with 50% remaining tread, retaining proper air pressure, and without repair patches; (o) all oil and grease seals must contain lubrication in the manufacturers designed reservoir; and (p) all hydraulic cylinders must be bent, nicked, gouged or leaking. In addition; (ea) hare of Equipment regardless of type must be able to complete the following tests: (q) have all functions and controls work in normal manner; and (r) perform its designed functions in a satisfactory manner. In addition each item of Turf Equipment must be able to complete the following tests: (s) operate normally in forward and reverse directions through all its speed ranges or gears; (t) steer normally right and left in both forward and reverse; (u) be able to stop with its service brakes in a safe distance in both forward and reverse; (v) operate without leaking any fluids; and (w) all cutting units (if applicable) must be able to lower, turn on, run, raise and shut off as they are designed to do. If any item of Equipment is damaged or does not meet the standards set forth above for the return condition of such Equipment or if the Lessee fails to discharge Lessee's obligations set forth above with regard to any item of Equipment, Lessee shall pay to Lessor, immediately upon demand, the Stipulated Loss Value (as defined below) of such item of Equipment.

**9. RENEWAL AND END OF TERM OPTIONS.** Unless the end of term purchase option is $1.00, PUT or Rental, this Lease will automatically renew on a month-to-month basis until Lessee delivers the Equipment to Lessor or purchases the Equipment. During such renewal(s) the amount of each rental payment will remain the same. Lessor may cancel the automatic renewal terms with 90 days written notice by sending Lessee a written notice that Lessor does not want this Lease to renew. If this Lease has any FMV end of term option, Lessee may, upon 90 days' prior written notice, select one of the following options at the end of the Initial Term or any renewal term, provided no event of default under the Lease has occurred and is continuing: 1) renew or continue the Lease; 2) purchase the Equipment for the Fair Market Value as defined below ("Fair Market Value"); or 3) return the Equipment to Lessor at Lessee's expense. Fair Market Value shall be the retail in-place value of the Equipment as determined solely by Lessor. If the end of term option is $1.00 or PUT, provided that Lessee is not in default, Lessee shall purchase the Equipment for $1.00 at the end of the Initial Term for a $1.00 end of term option and the PUT amount stated above for a PUT end of term option. Upon payment of the purchase option price to Lessor plus all applicable taxes, Lessor shall transfer its interest in the Equipment to Lessee "AS IS, WHERE IS" without any representations or warranties whatsoever. If the end of term option is Rental, the Lease shall only continue for up to 60 days after the end of the Initial Term and if Lessee fails to deliver the Equipment to Lessor on or before the 60th day after the end of the Initial Term, Lessor shall charge Lessee the Stipulated Loss Value (as defined below). For FMV - Turf Leases depending on the amount listed above, the hours of use of an item of Equipment shall be determined by the hour meter attached to said item of Equipment with usage as noted is limited to 600 hours per year with a $10.00 per hour on each item of Equipment for each hour of excess use or 900 hours per year with an excess hour charge of $5.00 per hour on each item of Equipment for each hour of excess use. Lessee shall pay such supplemental lease payment within ten days of Lessor's written demand If any such hour meter becomes inoperable or inaccurate, Lessee shall immediately repair or replace same, and shall immediately notify Lessor in writing of such event and of the correct hours of usage for the Equipment during the period of time the hour meter was inoperable or inaccurate. Lessee shall promptly furnish Lessor such information as Lessor may reasonably request from time to time in order to document the hours of usage of the Equipment.

**10. CREDIT INFORMATION; FINANCIALS.** Lessee authorizes Lessor and its agents to obtain credit bureau reports and make other credit inquiries that Lessor deems necessary. Lessee shall at Lessor's request, deliver to Lessor, Lessee's future quarterly and annual reports of financial condition, which reports Lessee represents and warrants shall be prepared in accordance with generally accepted accounting principles.

**11. OWNERSHIP OF EQUIPMENT.** Lessor is the owner of the Equipment and has title to the Equipment. Lessee will keep the Equipment free of all liens and encumbrances. If this transaction is deemed to be a lease intended for security and to provide additional security for other obligations to Lessor and its affiliates, Lessee grants to Lessor a purchase money security interest in the Equipment (including any replacements, substitutions, additions, attachments and proceeds). Lessee authorizes Lessor to record a UCC-1 financing statement.

**12. LOSS OR DAMAGE.** Lessee shall bear all risk of loss associated with an item of Equipment, including theft, destruction, or damage. No such loss shall relieve Lessee from any of its obligations under this Lease. In the event of any loss with respect to particular Equipment, Lessee shall either: (a) place such Equipment in good repair, condition and working order, (b) replace such Equipment with like equipment (of the same year, make, model and accessories or better) in good repair, condition and working order, or (c) pay to the Lessor the Stipulated Loss Value of such Equipment. The "Stipulated Loss Value" for particular Equipment shall be an amount equal to: (i) the total of all Rent and any other amounts, if any, due with respect to such Equipment as of the date of the loss (ii) the present value of all future Rent with respect to such Equipment discounted at 2%, plus (iii) the then

estimated fair market value of such Equipment as of the end of the Initial Term of Lease for such Equipment (assuming no loss or damage).

**13. INSURANCE.** Lessee will provide, at its expense, property insurance for the Equipment, naming Lessor as loss payee. Lessee will also obtain a comprehensive general liability insurance policy covering any personal injury or third party property damage, naming Lessor as an additional insured. Lessee will provide Lessor evidence of such insurance when requested. Lessee shall notify Lessor of any cancellation, non-renewal or material change to such insurance 30 days prior to such change. If Lessee fails to maintain the required insurance on the Equipment, or provide proof of same to Lessor, Lessor may, at its sole discretion, obtain insurance to protect its interest in the Equipment and add an insurance charge to Lessee's monthly payment (of which Lessor may make a profit). Lessee appoints Lessor as Lessee's attorney-in-fact to request required insurance coverage, make claims, receive payments and execute and endorse all documents, checks, drafts or other instruments necessary or advisable to secure payments due under any policy contemplated hereby.

**14. TAXES AND FEES.** Lessee agrees to pay when due all license and registration fees, sales and use taxes, personal property taxes, fines and penalties and all other taxes and charges relating to the ownership, leasing, rental, sale, purchase, possession or use of the Equipment, excluding any taxes based on Lessor's net income. If Lessor pays any taxes or fees for Lessee, Lessee agrees to reimburse Lessor immediately upon receipt of Lessor's invoice. At Lessor's option, Lessee agrees to remit, along with Lessee's rental payments under this Lease, an amount equal to a percentage of Lessor's reasonable estimate of the personal property taxes that will be assessable against the Equipment. Any such amounts remitted to Lessor will be credited by Lessor against Lessee's obligations under this paragraph. The provisions of this paragraph shall survive the expiration of the Lease.

**15. ASSIGNMENT.** LESSEE MAY NOT ASSIGN, SELL, TRANSFER (INCLUDING, WITHOUT LIMITATION, ANY TRANSFER RESULTING FROM A DIVISION OF LESSEE INTO TWO OR MORE ENTITIES), OR SUBLEASE THE EQUIPMENT OR LESSEE'S INTEREST IN THIS LEASE. Lessor may, without notifying Lessee, sell, assign, or transfer this Lease or its rights in the Equipment. Lessee agrees that if Lessor sells, assigns, or transfers this Lease, the new owner will have the same rights and benefits that Lessor has now and the new owner will not be subject to any claims, defenses or setoffs that Lessee may have against Lessor.

**16. DEFAULT.** Lessee will be in default if: (i) Lessee fails to pay any payment within ten days of its due date; (ii) Lessee does not perform any of Lessee's other obligations under this Lease or in any other agreement with Lessor or Lessor's affiliates; (iii) Lessee or any guarantor becomes insolvent, dissolves, or assigns its assets for the benefit of creditors, or enters any bankruptcy or reorganization proceeding; (iv) any guarantor of this Lease dies or does not perform its obligations under the guaranty; or (v) Lessee undergo a change in ownership or control of any type, including without limitation a division into two or more entities.

**17. REMEDIES.** If a default occurs, Lessor may do one or more of the following: (i) Lessor may cancel or terminate this Lease or any other agreement that Lessor has entered into with Lessee; (ii) Lessor may require Lessee to immediately pay Lessor, as compensation for loss of Lessor's bargain and not as a penalty, a sum equal to (a) the total of all unpaid Rent and any other amounts, if any, due under the Lease as of the date of default, plus (b) the present value of all future Rent due under the Lease discounted at 2%, plus (c) the Equipment's anticipated residual value, as determined by Lessor's books at the commencement of the Lease; (iii) Lessor may require Lessee to deliver the Equipment to Lessor as set forth above; (iv) Lessor or its agent may peacefully repossess the Equipment without court order and without liability for such entry or for damage to property or otherwise; and (v) Lessor may exercise any other right or remedy available at law or in equity. Lessee agrees to pay all of Lessor's costs of enforcing Lessor's rights against Lessee including reasonable attorney's fees and Lessee will not make any claims against Lessor for damages or trespass or any other reason. If Lessor takes possession of the Equipment, Lessor may sell or otherwise dispose of it with or without notice, at a public or private sale, and apply the net proceeds (after deducting all costs related to the sale or disposition of the Equipment) to the amounts that Lessee owes Lessor. Lessee agrees that if notice of sale is required by law to be given, ten days' notice shall constitute reasonable notice. Lessee will remain responsible for any amounts that are due after Lessor has applied such net proceeds.

**18. INDEMNITY.** Lessee assumes the risk of liability arising from possession, operation, or use of the Equipment. Lessee shall indemnify, defend and hold harmless the Lessor from any and all claims, costs, taxes, expenses, damages, and liabilities arising from or pertaining to the use, possession, or operation of the Equipment.

**19. FINANCE LEASE; ARTICLE 2A WAIVER.** Lessee agrees that if Article 2A-Leases of the Uniform Commercial Code applies to this Lease, this Lease will be considered a "finance lease" as that term is defined in Article 2A. By signing this Lease, Lessee agrees that either (a) Lessee has reviewed, approved, and received, a copy of the supply contract or (b) Lessor has informed Lessee of the identity of the supplier that Lessee may have rights under the supply contract, and that Lessee may contact the Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A (SECTIONS 508-522) OF THE UNIFORM COMMERCIAL CODE ("UCC").

**20. REPRESENTATIONS AND WARRANTIES.** Lessee represents and warrants to Lessor that: (i) the making of this Lease by Lessee is duly authorized on the part of Lessee and upon execution thereof by Lessee and Lessor shall constitute valid obligations binding upon, and enforceable against, Lessee; (ii) neither the making of this Lease nor the due performance thereof by Lessee, including the commitment and payment of the Rent, shall result in any breach of, or constitute a default under, or violation of, Lessee's certificate of incorporation, by-laws, or any agreement to which Lessee is a party or by which Lessee is bound; (iii) Lessee is in good standing in its state of incorporation and in any jurisdiction where the Equipment is located, and is entitled to own property and to carry on business therein; and (iv) all financial information provided by Lessee to Lessor is true, accurate and provides a good representation of Lessee's financial condition.

**21. PERFORMANCE OF LESSEE'S OBLIGATIONS BY LESSOR.** If Lessee fails to make any payment or perform any obligation required hereunder, Lessor may, but need not, make such payment or perform such obligation at the expense of Lessee. Any such expense incurred by Lessor shall constitute additional Rent due hereunder, payable upon demand. Such action by Lessor shall not be deemed a cure or waiver of any default by Lessee.

**22.** ANTI-MONEY LAUNDERING/INTERNATIONAL TRADE COMPLIANCE. Lessee represents, warrants and covenants to Lessor, as of the date of this Lease, the date of each advance of proceeds under the Lease, the date of any renewal, extension or modification of this Lease, and at all times until this Lease has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (a) no Covered Entity (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Jurisdiction or in the possession, custody or control of a Sanctioned Person; (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Jurisdiction or Sanctioned Person; (b) the proceeds of this Lease will not be used to fund any unlawful activity; (c) the funds used to repay the Lease are not derived from any unlawful activity; (d) each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws; and (e) no Equipment is or will become Embargoed Property. Lessee covenants and agrees that (a) it shall immediately notify Lessor in writing upon the occurrence of a Reportable Compliance Event; and (b) if, at any time, any Equipment becomes Embargoed Property, in addition to all other rights and remedies available to Lessor, upon request by Lessor, Lessee shall provide substitute Equipment acceptable to Lessor that is not Embargoed Property.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means Lessee, its affiliates and subsidiaries, all other obligors, all owners of the foregoing, and all brokers or other agents of Lessee acting in any capacity in connection with this Lease; "**Embargoed Property**" means any property (a) in which a Sanctioned Person holds an interest; (b) beneficially owned, directly or indirectly, by a Sanctioned Person; (c) that is due to or from a Sanctioned Person; (d) that is located in a Sanctioned Jurisdiction; or (e) that would otherwise cause any actual or possible violation by Lessor of any applicable Anti-Terrorism Law if Lessor were to obtain an encumbrance on, lien on, pledge of or security interest in such property or provide services in consideration of such property; "**Reportable Compliance Event**" means (1) any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; (2) any Covered Entity engages in a transaction that has caused or may cause Lessor to be in violation of any Anti-Terrorism Laws, including a Covered Entity's use of any proceeds of the Lease to fund any operations in, finance any investments or activities in, or, make any payments to, directly or indirectly, a Sanctioned Jurisdiction or Sanctioned Person; or (3) any Equipment becomes Embargoed Property; "**Sanctioned Jurisdiction**" means a country subject to a sanctions program maintained by any Compliance Authority; and "**Sanctioned Person**" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**23.** USA PATRIOT ACT NOTICE. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each lessee that opens an account. What this means: when the Lessee opens an account, Lessor will ask for the business name, business address, taxpayer identifying number and other information that will allow the Lessor to identify Lessee, such as organizational documents. For some businesses and organizations, Lessor may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization.

**24.** MISCELLANEOUS. Lessee agrees that the terms and conditions contained in this Lease make up the entire agreement between Lessee and Lessor regarding the Lease of Equipment. The declaration of invalidity of any provision of this Lease and/or Guaranty shall not affect any part of the remainder of the provisions of this Lease and Guaranty. Any change in any of the terms and conditions of this Lease must be in writing and signed by Lessor. Lessee agrees however, that Lessor is authorized, without notice to Lessee, to insert the Lease Number, and to supply missing information or to correct obvious errors in this Lease. Lessee authorizes Lessor to adjust the amount of each rental payment by not more than 15% if either (i) the final Total Cash Price (which is all amounts Lessor has paid in connection with the purchase, delivery and installation of the Equipment, including any upgrade and buyout amounts) differs from the estimated Total Cash Price, or (ii) comparable U.S. Treasury Note yields increase between the date Lessee signs this Lease and the Acceptance Date. Lessor shall not be obligated to purchase the Equipment if the actual Total Cash Price varies more than 15% from the Total Cash Price listed above. If Lessor delays or fails to enforce any of Lessor rights under this Lease, Lessor will still be entitled to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective when deposited in the U.S. Mail or a nationally recognized overnight delivery service, addressed to the party receiving the notice at its address shown on the front of this Lease (or to any other address specified by that party in writing) with postage prepaid. All of Lessor's right and remedies shall survive and remain in full force and effect and be enforceable after the expiration or termination of the Lease for any reason. It is the express intent of the parties not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Rent in inverse order to maturity, and any remaining excess will be refunded to Lessee. Lessee agrees that Lessor may furnish Lessee's payment history relating to this Lease and all other leases between Lessee and Lessor to authorized third parties. If more than one Lessee has signed this Lease each of the Lessees agree that Lessee's liability is joint and several. Lessee agrees to promptly, at Lessee's expense, deliver such other reasonable documents and assurances, and take such further action as Lessor may request, in order to effectively carry out the intent and purpose of this Lease. LESSEE AGREES TO PAY LESSOR AN ORIGINATION FEE ON THE DATE THE FIRST RENTAL PAYMENT IS DUE TO COVER THE EXPENSES OF ORIGINATING THIS LEASE. This Lease may be signed in any number of counterparts.

Lessee agrees that a facsimile or scanned copy of this Lease with facsimile or scanned signatures may be treated as an original and will be admissible as evidence of this Lease.

**25.** IMPORTANT INFORMATION ABOUT PHONE CALLS. By providing telephone number(s) to Lessor, now or at any later time, Lessee authorizes Lessor and its affiliates and designees to contact Lessee regarding Lessee account(s) with Lessor or its affiliates, whether such accounts are Lessee's individual accounts or business accounts for which Lessee is a contact, at such numbers using any means, including but not limited to placing calls using an automated dialing system to cell, VoIP or other wireless phone number, or leaving prerecorded messages or sending text messages, even if charges may be incurred for the calls or text messages. Lessee consents that any phone call with Lessor may be monitored or recorded by Lessor.

**26.** ELECTRONIC SIGNATURES AND RECORDS. Notwithstanding any other provision herein, Lessee agrees that this Lease, any amendments thereto, and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at Lessor's option, be in the form of an electronic record. Any Communication may, at Lessor's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by Lessor of a manually-signed, paper Communication which has been converted into electronic form (such as a scanned into PDF format) for transmission, delivery and/or retention.

**27.** BENEFICIAL OWNERSHIP CERTIFICATION. If applicable, Lessee represents and warrants, as of the date hereof, and as of the date of execution of this Lease, that the information in the Certification of Beneficial Owner(s) ("**Certification of Beneficial Owners**") executed and delivered to Lessor on or prior to the date of this Lease, if any, as updated from time to time in accordance with this Lease, is true, complete and correct as of the date hereof and as of the date any such update is delivered. Lessee agrees that from the date of execution of this Lease until this Lease has been terminated, Lessee will provide: (i) confirmation of the accuracy of the information set forth in the most recent Certification of Beneficial Owners provided to Lessor, as and when requested by Lessor; (ii) a new Certification of Beneficial Owners in form and substance acceptable to Lessor when the individual(s) identified as a controlling party and/or a direct or indirect individual owner on the most recent Certification of Beneficial Owners provided to Lessor have changed; and (iii) such other information and documentation as may reasonably be requested by Lessor from time to time for purposes of compliance by Lessor with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by Lessor to comply therewith.

# PNC
## EQUIPMENT FINANCE

**Schedule A**

**Lease Number 1172797-1**

| Quantity | Description |
|---|---|
| 2 | Toro Greensmaster 3150-Q |
| 1 | Toro Groundsmaster 1200 |
| 1 | Toro ProPass 200 Wireless |
| 1 | Toro Workman - (HDX) - (Kubota Gas) |
| 1 | Toro Workman - (HDX) - 2WD Kubota Diesel |
| 1 | Club Car Carryall 502 Gas |
| 1 | Club Car Carryall 700 Gas |

Together with all attachments, tooling, accessories, appurtenances, and additions thereto.



**Certificate of Acceptance**

In compliance with the terms, conditions and provisions of Lease Agreement #1172797-1 ("**Lease**") by and between the undersigned Timacuan Partners, LLC ("**Lessee**") and PNC Equipment Finance, LLC ("**Lessor**"), Lessee hereby:

1. Certifies and warrants that all Equipment described in the Lease referenced above ("**Equipment**") is delivered, inspected and fully installed, and operational as of the Acceptance Date as indicated below;

2. Accepts all the Equipment for all purposes under the Lease and all attendant documents as of the date of return of this Certificate to Lessor ("**Acceptance Date**"); and

3. Restates and reaffirms, as of such Acceptance Date, each of the representations, warranties and covenants heretofore given to Lessor in the Lease.

Lessor is hereby authorized to insert serial numbers on the Lease.

**Lessee: Timacuan Partners, LLC**

| | |
|---|---|
| **Signature** X | *Kevin Parker* |
| **Print Name** | Kevin Parker |
| **Title** | Controller |
| **Date** | 5/30/21 |



E20

May 17, 2021

Timacuan Partners, LLC
550 Timacuan Blvd.
Lake Mary, FL 32746

RE:   Lease Agreement No. **1172797-3** ("Lease Agreement"), by and between
      **PNC Equipment Finance, LLC** ("Lessor") and **Timacuan Partners, LLC** ("Lessee")

Dear Lessee:

PNC Equipment Finance, LLC is in receipt of the final invoice for the equipment that was ordered in connection with the above-referenced Lease Agreement.  Please be advised that the following information that may have been incomplete or incorrect on the Lease Agreement has been updated:

☒      The Payment Schedule has been changed from:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2021 |     |     |     |     | $3,659.75 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 |
| 2022 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 |
| 2023 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 |
| 2024 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 |
| 2025 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 | $626.18 |
| 2026 | $626.18 | $626.18 | $626.18 | $626.18 |     |     |     |     |     |     |     |     |

Plus applicable taxes. Payment on invoice could be different based on applicability of sales and use tax.

To:

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2021 |     |     |     |     |     | $3,698.18 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |
| 2022 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |
| 2023 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |
| 2024 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |
| 2025 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |
| 2026 | $664.61 | $664.61 | $664.61 | $664.61 | $664.61 |     |     |     |     |     |     |     |

Includes applicable taxes. Payment on invoice could be different based on applicability of sales and use tax.

All other terms and conditions of the Lease Agreement shall remain unchanged and in full force and effect.

**PNC Equipment Finance, LLC**

By: _Kristine Lofrese_

Digitally signed by
Kristine Lofrese
Date: 2021.05.17
10:27:47 -04'00'

Print Name: _____

Title: _____

February 10, 2021

Timacuan Partners, LLC
Course Name: Timacuan Golf Course
550 TIMACUAN BLVD.
LAKE MARY, FL 32746

RE: Lease Number 1172797-3

To Whom It May Concern:

Thank you for choosing PNC Equipment Finance, LLC as your financing source.  Enclosed you will find the following documentation:

- **Equipment Lease Agreement:**  Please sign, print name, title and date.

- **Schedule A:**  Please initial at the bottom of the page.

- **Certificate of Acceptance:**  Please date, sign and insert title.

- **Payment Schedule:**  Please sign, print name, title and date in the lower left hand corner of the page.

- **Insurance:**  Please note the page detailing instructions regarding the certificate of insurance required under the terms of the lease.  Simply forward a copy of the signed page to your insurance carrier, so that they may issue the appropriate certificate on a timely basis.

- **Customer Information Form:**  Please complete and return.

- **Notification of Tax Treatment:**  Please complete and return.

- **PNC Automatic Payment Authorization (Required): Please complete and return with a voided check.**

We appreciate this opportunity to serve you and look forward to working with you in the future.  Should you have any questions before sending the documents, please feel free to contact me at brian.sauermelch@leaserv.com.

Sincerely,


Brian Sauermelch
Sales Specialist

# PNC
## EQUIPMENT FINANCE

# Equipment Lease Agreement
## (Cars and Turf)

## Lessee Information

| | |
|---|---|
| | **Lease Number: 1172797-3** |
| | **Date:  February 10, 2021** |

| Full Legal Name: Timacuan Partners, LLC | | | | Commencement Date: June 1, 2021 |
|---|---|---|---|---|

| Street Address: 550 TIMACUAN BLVD. | County: SEMINOLE | City: LAKE MARY | State: FL | Zip: 32746 |
|---|---|---|---|---|

## Equipment Description and Location

See Schedule A

## Advance Payments

☒  $250.00 Documentation Fee

Security Deposits will be refunded upon expiration of the Lease provided Lessee is not in default of any of the terms of the Lease.

## Payment Schedule

| Initial Term: **60** months | Rental Payment (plus applicable taxes): See Attached Payment Schedule | Payment Frequency: ☐ Monthly  ☐ Quarterly  ☒ See Attached Payment Schedule | ☐ FMV- Car  ☐ Rental  ☐ FMV- Turf  (Annual Hours ___) | ☐ PUT- _____  ☒ $1 Out |
|---|---|---|---|---|

## Terms and Conditions

1.  Agreement.  PNC Equipment Finance, LLC ("Lessor") agrees to lease to Lessee the equipment listed above or on any attached Schedule A ("Equipment"), which is made a part hereof.  Lessee promises to pay Lessor the rental payments according to the Payment Schedule shown above, plus all other charges.  By signing this lease agreement ("Lease"), Lessee acknowledges and agrees that: it has read and understands the terms and conditions of this Lease; this Lease becomes effective only upon written acceptance by an authorized employee of Lessor; this is a net lease; it cannot terminate or cancel this Lease; it has an UNCONDITIONAL OBLIGATION to make all payments due under this Lease; it cannot withhold, set off or reduce such payments for any reason; it will use the Equipment only for business purposes; the person signing this Lease has the authority to do so; and it entered into this Lease rather than purchase the Equipment.

2.  Term and Rent.  The term of this Lease commences upon the date on which the Equipment is delivered to Lessee (whether or not accepted).  The "Rental Commencement Date" shall be the date when the Lessor signs this Lease.  The Lessee shall pay as rent the rental payment indicated on the front of this Lease plus applicable taxes ("Rent").  Lessee acknowledges that the actual rental payment due could be different than the rental payment stated above based on applicable taxes.  The first rental payment is due on the Rental Commencement Date, and each remaining periodic rental payment is due on the same day of each payment period thereafter for the initial term of lease as stated above (the "Initial Term").  Additionally, Lessee shall, upon demand, pay, as Rent, daily interim rent, on all Equipment subject to this Lease, for the period from the date of delivery of Equipment (or any part thereof) to and including the day immediately preceding the Rental Commencement Date.  The daily rent will be calculated on a 360-day year.  No portion of any rental payments shall be deemed to constitute payment for any equity interest in the Equipment.  If any payment due under this Lease is not paid within five days of its due date, Lessee shall pay Lessor a late charge not to exceed 10% of each late payment (or such lesser rate as is the maximum rate allowed by applicable law).

3.  Ordering Equipment; Delivery and Acceptance.  If Lessee entered into any purchase or supply contract with any supplier, Lessee assigns to Lessor Lessee's rights under the supply contract, but none of Lessee's obligations, except for the obligation to pay for Equipment if it is accepted by Lessee according to the terms of this Lease.  If Lessee has not entered into a supply contract, Lessee authorizes Lessor to enter into a supply contract.  Lessee shall arrange for the delivery of the Equipment to Lessee.  Lessee shall inspect the Equipment immediately upon Lessee's receipt of the Equipment to determine if it is in good working condition.  The Equipment will be deemed irrevocably accepted by Lessee upon the earlier of:  (i) the date of delivery of the Equipment to Lessee unless Lessee notifies Lessor in writing, within ten days after equipment delivery, of Lessee's non-acceptance of it, (iii) the delivery to Lessor of a written certificate of acceptance if requested by Lessor, or (iv) a verbal verification of acceptance if requested by Lessor ("Acceptance Date").

4.  Termination by Lessor.  Lessor shall have the exclusive option to terminate this Lease if within 90 days after Lessee has signed this Lease, the Equipment has not been delivered to Lessee, or Lessee has not accepted the Equipment as provided above.

5.  Forum, Law & Jury Waiver.  This Lease shall be construed in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania without giving effect to its conflicts of laws principles.  Lessee hereby irrevocably consents to the exclusive jurisdiction of any state or federal court within the Commonwealth of Pennsylvania; provided that nothing contained in this Lease will prevent Lessor from bringing any action, enforcing any award or judgment or exercising any rights against Lessee individually, against any security or against any of Lessee's property within any other county, state or other foreign or domestic jurisdiction.  LESSEE AND LESSOR EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY.

6.  NO WARRANTY.  LESSOR TRANSFERS TO LESSEE FOR THE TERM OF THIS LEASE ANY WARRANTIES MADE BY THE MANUFACTURER OR THE SUPPLIER.  LESSOR IS LEASING THE EQUIPMENT TO LESSEE "AS IS."  LESSEE ACKNOWLEDGES THAT LESSOR DOES NOT MANUFACTURE THE EQUIPMENT.  LESSEE ACKNOWLEDGES THAT LESSOR DOES NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND THAT LESSEE HAS SELECTED THE EQUIPMENT AND THE SUPPLIER BASED ON LESSEE'S OWN JUDGMENT.  LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE IN CONNECTION WITH THIS LEASE.  LESSEE AGREES TO CONTINUE MAKING PAYMENTS TO LESSOR UNDER THIS LEASE, REGARDLESS OF ANY CLAIMS LESSEE ASSERTS AGAINST THE MANUFACTURER OR SUPPLIER.

7.  EQUIPMENT LOCATION, USE, AND REPAIR.  Lessee will keep and use the Equipment only at the Equipment Location stated above.  Lessee may not move the Equipment without Lessor's prior written consent.  At Lessee's own cost and expense, Lessee will keep the Equipment eligible for any manufacturer's certification, in compliance with all applicable laws and in good condition, except for ordinary wear and tear.  Lessee will not make any alterations, additions or replacement to the Equipment without Lessor's prior written consent.  All alterations, additions and replacements will become part of the Equipment and Lessor's property at no cost or expense to Lessor.  Lessor may inspect the Equipment at any reasonable time.

## Lessor:  PNC Equipment Finance, LLC

| | |
|---|---|
| Signature: Kristine Lofrese | Digitally signed by Kristine Lofrese Date: 2021.05.17 10:28:05 -04'00' |
| Print Name: | |
| Title: | |
| Date: | |

## Lessee:  Timacuan Partners, LLC

| |
|---|
| Signature: X _Kevin Parker_ |
| Print Name: Kevin Parker |
| Title: Controller |
| Date: 3/30/21 |

### THIS LEASE IS NON-CANCELABLE

**8.** RETURN. Unless Lessee purchases the Equipment at the end of this Lease, Lessee will immediately, upon expiration of the Initial Term or any extension, at Lessee's sole cost and expense, deliver all but not less than all of the Equipment to Lessor to any place in the continental United States determined by the Lessor. Lessee will pay all expenses of de-installing, crating, and shipping. Lessee shall insure the Equipment for its full replacement value during shipping. The following return conditions shall apply to the Equipment regardless of type and end of term option selected: (a) all safety equipment must be in place and meet applicable federal, state and other governmental standards; (b) all covers and guards must be in place with no sheet metal, plastic or cowling damage; (c) all parts, pieces, components and optional equipment must be present, installed and operational; (d) all accessories shall be returned in proper order; (e) all electronic controls shall operate per manufacturer's specifications and controls which bypass normal operations shall be repaired at Lessee's expense; (f) all electrical systems shall be able to provide electrical output as specified by the manufacturer; (g) all Equipment must have a relatively clean appearance; (h) all Equipment shall be free from excessive wear necessitating major component repair or replacement caused by lack of recommended maintenance as detailed in customer operation/maintenance manuals; (i) all Equipment shall be free from structural damage or bent frames; (j) any usage or metering devices must not have been altered in any way; and (k) all Equipment attachments, if any, must be in good operating condition;: (l) all motors shall operate smoothly without overheating and shall have good bearings and bushings; (m) all batteries shall be in good, safe operating condition with no dead cells or cracked cases and all batteries shall hold a charge and provide adequate power to operate the Equipment; (n) all Equipment shall have serviceable tires, with 50% remaining tread, retaining proper air pressure, and without repair patches; (o) all oil and grease seals must contain lubrication in the manufacturers designed reservoir; and (p) all hydraulic cylinders must be packed, no leaked, gouged or leaking. In addition, each item of Equipment regardless of type must be able to complete the following tests: (q) have all functions and controls work in normal manner; and (r) perform its designed functions in a satisfactory manner. In addition each item of Turf Equipment must be able to complete the following tests: (s) operate normally in forward and reverse directions through all its speed ranges or gears; (t) steer normally right and left in both forward and reverse; (u) be able to stop with its service brakes in a safe distance in both forward and reverse; (v) operate without leaking any fluids; and (w) all cutting units (if applicable) must be able to lower, turn on, run, raise and shut off as they are designed to do. If any item of Equipment is damaged or does not meet the standards set forth above for the return condition of such Equipment or if the Lessee fails to discharge Lessee's obligations set forth above with regard to any item of Equipment, Lessee shall pay to Lessor, immediately upon demand, the Stipulated Loss Value (as defined below) of such item of Equipment.

**9.** RENEWAL AND END OF TERM OPTIONS. Unless the end of term purchase option is $1.00, PUT or Rental, this Lease will automatically renew on a month-to-month basis until Lessee delivers the Equipment to Lessor or purchases the Equipment. During such renewal(s) the amount of each rental payment will remain the same. Lessor may cancel the automatic renewal terms with 90 days written notice by sending Lessee a written notice that Lessor does not want this Lease to renew. If this Lease has any FMV end of term option, Lessee may, upon 90 days' prior written notice, select one of the following options at the end of the Initial Term or any renewal term, provided no event of default under the Lease has occurred and is continuing: 1) renew or continue the Lease; 2) purchase the Equipment for the Fair Market Value as defined below ("Fair Market Value"); or 3) return the Equipment to Lessor at Lessee's expense. Fair Market Value shall be the retail in-place value of the Equipment as determined solely by Lessor. If the end of term option is $1.00 or PUT, provided that Lessee is not in default, Lessee shall purchase the Equipment for $1.00 at the end of the Initial Term for a $1.00 end of term option and the PUT amount stated above for a PUT end of term option. Upon payment of the purchase option price to Lessor plus all applicable taxes, Lessor shall transfer its interest in the Equipment to Lessee "AS IS, WHERE IS" without any representations or warranties whatsoever. If the end of term option is Rental, the Lease shall only continue for up to 60 days after the end of the Initial Term and if Lessee fails to deliver the Equipment to Lessor on or before the 60th day after the end of the Initial Term, Lessor shall charge Lessee the Stipulated Loss Value (as defined below). For FMV - Turf Leases depending on the amount listed above, the hours of use of an item of Equipment shall be determined by the hour meter attached to said item of Equipment with usage as noted is limited to 600 hours per year with a $10.00 per hour on each item of Equipment for each hour of excess use or 900 hours per year with an excess hour charge of $5.00 per hour on each item of Equipment for each hour of excess use. Lessee shall pay such supplemental lease payment within ten days of Lessor's written demand If any such hour meter becomes inoperable or inaccurate, Lessee shall immediately repair or replace same, and shall immediately notify Lessor in writing of such event and of the correct hours of usage for the Equipment during the period of time the hour meter was inoperable or inaccurate. Lessee shall promptly furnish Lessor such information as Lessor may reasonably request from time to time in order to document the hours of usage of the Equipment.

**10.** CREDIT INFORMATION; FINANCIALS. Lessee authorizes Lessor and its agents to obtain credit bureau reports and make other credit inquiries that Lessor deems necessary. Lessee shall at Lessor's request, deliver to Lessor, Lessee's future quarterly and annual reports of financial condition, which reports Lessee represents and warrants shall be prepared in accordance with generally accepted accounting principles.

**11.** OWNERSHIP OF EQUIPMENT. Lessor is the owner of the Equipment and has title to the Equipment. Lessee will keep the Equipment free of all liens and encumbrances. If this transaction is deemed to be a lease intended for security and to provide additional security for other obligations to Lessor and its affiliates, Lessee grants to Lessor a purchase money security interest in the Equipment (including any replacements, substitutions, additions, attachments and proceeds). Lessee authorizes Lessor to record a UCC-1 financing statement.

**12.** LOSS OR DAMAGE. Lessee shall bear all risk of loss associated with an item of Equipment, including theft, destruction, or damage. No such loss shall relieve Lessee from any of its obligations under this Lease. In the event of any loss with respect to particular Equipment, Lessee shall either: (a) place such Equipment in good repair, condition and working order, (b) replace such Equipment with like equipment (of the same year, make, model and accessories or better) in good repair, condition and working order, or (c) pay to the Lessor the Stipulated Loss Value of such Equipment. The "Stipulated Loss Value" for particular Equipment shall be an amount equal to: (i) the total of all Rent and any other amounts, if any, due with respect to such Equipment as of the date of the loss (ii) the present value of all future Rent with respect to such Equipment discounted at 2%, plus (iii) the then

estimated fair market value of such Equipment as of the end of the Initial Term of Lease for such Equipment (assuming no loss or damage).

**13.** INSURANCE. Lessee will provide, at its expense, property insurance for the Equipment, naming Lessor as loss payee. Lessee will also obtain a comprehensive general liability insurance policy covering any personal injury or third party property damage, naming Lessor as an additional insured. Lessee will provide Lessor evidence of such insurance when requested. Lessee shall notify Lessor of any cancellation, non-renewal or material change to such insurance 30 days prior to such change. If Lessee fails to maintain the required insurance on the Equipment, or provide proof of same to Lessor, Lessor may, at its sole discretion, obtain insurance to protect its interest in the Equipment and add an insurance charge to Lessee's monthly payment (of which Lessor may make a profit). Lessee appoints Lessor as Lessee's attorney-in-fact to request required insurance coverage, make claims, receive payments and execute and endorse all documents, checks, drafts or other instruments necessary or advisable to secure payments due under any policy contemplated hereby.

**14.** TAXES AND FEES. Lessee agrees to pay when due all license and registration fees, sales and use taxes, personal property taxes, fines and penalties and all other taxes and charges relating to the ownership, leasing, rental, sale, purchase, possession or use of the Equipment, excluding any taxes based on Lessor's net income. If Lessor pays any taxes or fees for Lessee, Lessee agrees to reimburse Lessor immediately upon receipt of Lessor's invoice. At Lessor's option, Lessee agrees to remit, along with Lessee's rental payments under this Lease, an amount equal to a percentage of Lessor's reasonable estimate of the personal property taxes that will be assessable against the Equipment. Any such amounts remitted to Lessor will be credited by Lessor against Lessee's obligations under this paragraph. The provisions of this paragraph shall survive the expiration of the Lease.

**15.** ASSIGNMENT. LESSEE MAY NOT ASSIGN, SELL, TRANSFER (INCLUDING, WITHOUT LIMITATION, ANY TRANSFER RESULTING FROM A DIVISION OF LESSEE INTO TWO OR MORE ENTITIES), OR SUBLEASE THE EQUIPMENT OR LESSEE'S INTEREST IN THIS LEASE. Lessor may, without notifying Lessee, sell, assign, or transfer this Lease or its rights in the Equipment. Lessee agrees that if Lessor sells, assigns, or transfers this Lease, the new owner will have the same rights and benefits that Lessor has now and the new owner will not be subject to any claims, defenses or setoffs that Lessee may have against Lessor.

**16.** DEFAULT. Lessee will be in default if: (i) Lessee fails to pay any payment within ten days of its due date; (ii) Lessee does not perform any of Lessee's other obligations under this Lease or in any other agreement with Lessor or Lessor's affiliates; (iii) Lessee or any guarantor becomes insolvent, dissolves, or assigns its assets for the benefit of creditors, or enters any bankruptcy or reorganization proceeding; (iv) any guarantor of this Lease dies or does not perform its obligations under the guaranty; or (v) Lessee undergo a change in ownership or control of any type, including without limitation a division into two or more entities.

**17.** REMEDIES. If a default occurs, Lessor may do one or more of the following: (i) Lessor may cancel or terminate this Lease or any other agreement that Lessor has entered into with Lessee; (ii) Lessor may require Lessee to immediately pay Lessor, as compensation for loss of Lessor's bargain and not as a penalty, a sum equal to (a) the total of all unpaid Rent and any other amounts, if any, due under the Lease as of the date of default, plus (b) the present value of all future Rent due under the Lease discounted at 2%, plus (c) the Equipment's anticipated residual value, as determined by Lessor's books at the commencement of the Lease; (iii) Lessor may require Lessee to deliver the Equipment to Lessor as set forth above; (iv) Lessor or its agent may peacefully repossess the Equipment without court order and without liability for such entry or for damage to property or otherwise; and (v) Lessor may exercise any other right or remedy available at law or in equity. Lessee agrees to pay all of Lessor's costs of enforcing Lessor's rights against Lessee including reasonable attorney's fees and Lessee will not make any claims against Lessor for damages or trespass or any other reason. If Lessor takes possession of the Equipment, Lessor may sell or otherwise dispose of it with or without notice, at a public or private sale, and apply the net proceeds (after deducting all costs related to the sale or disposition of the Equipment) to the amounts that Lessee owes Lessor. Lessee agrees that if notice of sale is required by law to be given, ten days' notice shall constitute reasonable notice. Lessee will remain responsible for any amounts that are due after Lessor has applied such net proceeds.

**18.** INDEMNITY. Lessee assumes the risk of liability arising from possession, operation, or use of the Equipment. Lessee shall indemnify, defend and hold harmless the Lessor from any and all claims, costs, taxes, expenses, damages, and liabilities arising from or pertaining to the use, possession, or operation of the Equipment.

**19.** FINANCE LEASE; ARTICLE 2A WAIVER. Lessee agrees that if Article 2A-Leases of the Uniform Commercial Code applies to this Lease, this Lease will be considered a "finance lease" as that term is defined in Article 2A. By signing this Lease, Lessee agrees that either (a) Lessee has reviewed, approved, and received, a copy of the supply contract or (b) Lessor has informed Lessee of the identity of the supplier that Lessee may have rights under the supply contract, and that Lessee may contact the Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A (SECTIONS 508-522) OF THE UNIFORM COMMERCIAL CODE ("UCC").

**20.** REPRESENTATIONS AND WARRANTIES. Lessee represents and warrants to Lessor that: (i) the making of this Lease by Lessee is duly authorized on the part of Lessee and upon execution thereof by Lessee and Lessor shall constitute valid obligations binding upon, and enforceable against, Lessee; (ii) neither the making of this Lease nor the due performance thereof by Lessee, including the commitment and payment of the Rent, shall result in any breach of, or constitute a default under, or violation of, Lessee's certificate of incorporation, by-laws, or any agreement to which Lessee is a party or by which Lessee is bound; (iii) Lessee is in good standing in its state of incorporation and in any jurisdiction where the Equipment is located, and is entitled to own property and to carry on business therein; and (iv) all financial information provided by Lessee to Lessor is true, accurate and provides a good representation of Lessee's financial condition.

**21.** PERFORMANCE OF LESSEE'S OBLIGATIONS BY LESSOR. If Lessee fails to make any payment or perform any obligation required hereunder, Lessor may, but need not, make such payment or perform such obligation at the expense of Lessee. Any such expense incurred by Lessor shall constitute additional Rent due hereunder, payable upon demand. Such action by Lessor shall not be deemed a cure or waiver of any default by Lessee.

**22.** ANTI-MONEY LAUNDERING/INTERNATIONAL TRADE COMPLIANCE. Lessee represents, warrants and covenants to Lessor, as of the date of this Lease, the date of each advance of proceeds under the Lease, the date of any renewal, extension or modification of this Lease, and at all times until this Lease has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (a) no Covered Entity (i) is a Sanctioned Person; (ii) has any of its assets in a Sanctioned Jurisdiction or in the possession, custody or control of a Sanctioned Person; (iii) does business in or with, or derives any of its operating income from investments in or transactions with, any Sanctioned Jurisdiction or Sanctioned Person; (b) the proceeds of this Lease will not be used to fund any unlawful activity; (c) the funds used to repay the Lease are not derived from any unlawful activity; (d) each Covered Entity is in compliance with, and no Covered Entity engages in any dealings or transactions prohibited by, any laws of the United States, including but not limited to any Anti-Terrorism Laws; and (e) no Equipment is or will become Embargoed Property. Lessee covenants and agrees that (a) it shall immediately notify Lessor in writing upon the occurrence of a Reportable Compliance Event; and (b) if, at any time, any Equipment becomes Embargoed Property, in addition to all other rights and remedies available to Lessor, upon request by Lessor, Lessee shall provide substitute Equipment acceptable to Lessor that is not Embargoed Property.

As used herein: "**Anti-Terrorism Laws**" means any laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering, or bribery, all as amended, supplemented or replaced from time to time; "**Compliance Authority**" means each and all of the (a) U.S. Treasury Department/Office of Foreign Assets Control, (b) U.S. Treasury Department/Financial Crimes Enforcement Network, (c) U.S. State Department/Directorate of Defense Trade Controls, (d) U.S. Commerce Department/Bureau of Industry and Security, (e) U.S. Internal Revenue Service, (f) U.S. Justice Department, and (g) U.S. Securities and Exchange Commission; "**Covered Entity**" means Lessee, its affiliates and subsidiaries, all other obligors, all owners of the foregoing, and all brokers or other agents of Lessee acting in any capacity in connection with this Lease; "**Embargoed Property**" means any property (a) in which a Sanctioned Person holds an interest; (b) beneficially owned, directly or indirectly, by a Sanctioned Person; (c) that is due to or from a Sanctioned Person; (d) that is located in a Sanctioned Jurisdiction; or (e) that would otherwise cause any actual or possible violation by Lessor of any applicable Anti-Terrorism Law if Lessor were to obtain an encumbrance on, lien on, pledge of or security interest in such property or provide services in consideration of such property; "**Reportable Compliance Event**" means (1) any Covered Entity becomes a Sanctioned Person, or is indicted, arraigned, investigated or custodially detained, or receives an inquiry from regulatory or law enforcement officials, in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or self-discovers facts or circumstances implicating any aspect of its operations with the actual or possible violation of any Anti-Terrorism Law; (2) any Covered Entity engages in a transaction that has caused or may cause Lessor to be in violation of any Anti-Terrorism Laws, including a Covered Entity's use of any proceeds of the Lease to fund any operations in, finance any investments or activities in, or, make any payments to, directly or indirectly, a Sanctioned Jurisdiction or Sanctioned Person; or (3) any Equipment becomes Embargoed Property; "**Sanctioned Jurisdiction**" means a country subject to a sanctions program maintained by any Compliance Authority; and "**Sanctioned Person**" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person or entity, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any order or directive of any Compliance Authority or otherwise subject to, or specially designated under, any sanctions program maintained by any Compliance Authority.

**23.** USA PATRIOT ACT NOTICE. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each lessee that opens an account. What this means: when the Lessee opens an account, Lessor will ask for the business name, business address, taxpayer identifying number and other information that will allow the Lessor to identify Lessee, such as organizational documents. For some businesses and organizations, Lessor may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization.

**24.** MISCELLANEOUS. Lessee agrees that the terms and conditions contained in this Lease make up the entire agreement between Lessee and Lessor regarding the Lease of Equipment. The declaration of invalidity of any provision of this Lease and/or Guaranty shall not affect any part of the remainder of the provisions of this Lease and Guaranty. Any change in any of the terms and conditions of this Lease must be in writing and signed by Lessor. Lessee agrees however, that Lessor is authorized, without notice to Lessee, to insert the Lease Number, and to supply missing information or to correct obvious errors in this Lease. Lessee authorizes Lessor to adjust the amount of each rental payment by not more than 15% if either (i) the final Total Cash Price (which is all amounts Lessor has paid in connection with the purchase, delivery and installation of the Equipment, including any upgrade and buyout amounts) differs from the estimated Total Cash Price, or (ii) comparable U.S. Treasury Note yields increase between the date Lessee signs this Lease and the Acceptance Date. Lessor shall not be obligated to purchase the Equipment if the actual Total Cash Price varies more than 15% from the Total Cash Price listed above. If Lessor delays or fails to enforce any of Lessor rights under this Lease, Lessor will still be entitled to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective when deposited in the U.S. Mail or a nationally recognized overnight delivery service, addressed to the party receiving the notice at its address shown on the front of this Lease (or to any other address specified by that party in writing) with postage prepaid. All of Lessor's right and remedies shall survive and remain in full force and effect and be enforceable after the expiration or termination of the Lease for any reason. It is the express intent of the parties not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Rent in inverse order to maturity, and any remaining excess will be refunded to Lessee. Lessee agrees that Lessor may furnish Lessee's payment history relating to this Lease and all other leases between Lessee and Lessor to authorized third parties. If more than one Lessee has signed this Lease each of the Lessees agree that Lessee's liability is joint and several. Lessee agrees to promptly, at Lessee's expense, deliver such other reasonable documents and assurances, and take such further action as Lessor may request, in order to effectively carry out the intent and purpose of this Lease. LESSEE AGREES TO PAY LESSOR AN ORIGINATION FEE ON THE DATE THE FIRST RENTAL PAYMENT IS DUE TO COVER THE EXPENSES OF ORIGINATING THIS LEASE. This Lease may be signed in any number of counterparts.

Lessee agrees that a facsimile or scanned copy of this Lease with facsimile or scanned signatures may be treated as an original and will be admissible as evidence of this Lease.

**25.** IMPORTANT INFORMATION ABOUT PHONE CALLS. By providing telephone number(s) to Lessor, now or at any later time, Lessee authorizes Lessor and its affiliates and designees to contact Lessee regarding Lessee account(s) with Lessor or its affiliates, whether such accounts are Lessee's individual accounts or business accounts for which Lessee is a contact, at such numbers using any means, including but not limited to placing calls using an automated dialing system to cell, VoIP or other wireless phone number, or leaving prerecorded messages or sending text messages, even if charges may be incurred for the calls or text messages. Lessee consents that any phone call with Lessor may be monitored or recorded by Lessor.

**26.** ELECTRONIC SIGNATURES AND RECORDS. Notwithstanding any other provision herein, Lessee agrees that this Lease, any amendments thereto, and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at Lessor's option, be in the form of an electronic record. Any Communication may, at Lessor's option, be signed or executed using electronic signatures. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by Lessor of a manually-signed, paper Communication which has been converted into electronic form (such as a scanned into PDF format) for transmission, delivery and/or retention.

**27.** BENEFICIAL OWNERSHIP CERTIFICATION. If applicable, Lessee represents and warrants, as of the date hereof, and as of the date of execution of this Lease, that the information in the Certification of Beneficial Owner(s) ("**Certification of Beneficial Owners**") executed and delivered to Lessor on or prior to the date of this Lease, if any, as updated from time to time in accordance with this Lease, is true, complete and correct as of the date hereof and as of the date any such update is delivered. Lessee agrees that from the date of execution of this Lease until this Lease has been terminated, Lessee will provide: (i) confirmation of the accuracy of the information set forth in the most recent Certification of Beneficial Owners provided to Lessor, as and when requested by Lessor; (ii) a new Certification of Beneficial Owners in form and substance acceptable to Lessor when the individual(s) identified as a controlling party and/or a direct or indirect individual owner on the most recent Certification of Beneficial Owners provided to Lessor have changed; and (iii) such other information and documentation as may reasonably be requested by Lessor from time to time for purposes of compliance by Lessor with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti-money laundering rules and regulations), and any policy or procedure implemented by Lessor to comply therewith.

**PNC**
**EQUIPMENT FINANCE**

<div align="right">

**Schedule A**

</div>

**Lease Number 1172797-3**

| Quantity | Description |
|----------|-------------|
| 1 | Kubota Tractor |

Together with all attachments, tooling, accessories, appurtenances, and additions thereto.



**Certificate of Acceptance**

In compliance with the terms, conditions and provisions of Lease Agreement #1172797-3 ("**Lease**") by and between the undersigned Timacuan Partners, LLC ("**Lessee**") and PNC Equipment Finance, LLC ("**Lessor**"), Lessee hereby:

1.   Certifies and warrants that all Equipment described in the Lease referenced above ("**Equipment**") is delivered, inspected and fully installed, and operational as of the Acceptance Date as indicated below;

2.   Accepts all the Equipment for all purposes under the Lease and all attendant documents as of the date of return of this Certificate to Lessor ("**Acceptance Date**"); and

3.   Restates and reaffirms, as of such Acceptance Date, each of the representations, warranties and covenants heretofore given to Lessor in the Lease.

Lessor is hereby authorized to insert serial numbers on the Lease.

**Lessee:  Timacuan Partners, LLC**

| | |
|---|---|
| **Signature** X | *Kevin Parker* |
| **Print Name** | Kevin Parker |
| **Title** | Controller |
| **Date** | 3/30/21 |

11/20 SE Certificate of Acceptance

EXHIBIT "B"

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Agreement" or the "Lease Agreement") dated as of the 9 day of October, 2022 (the "Commencement Date") is made by and between TIMACUAN PARTNERS, LLC, a Florida limited liability company (herein referred to as "Lessor"), and LINX OF LAKE MARY, LLC, a Florida limited liability company (herein referred to as "Lessee").

## RECITALS:

A. Lessor is the fee owner of Timacuan Golf Club (the "Club") located on the Land described in Exhibit A attached hereto (the "Land") and made a part hereof for all purposes.

B. Lessor desires to lease the Property (as defined herein) to Lessee, and Lessee desires to lease the Property from Lessor under the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements set forth herein, Lessor and Lessee agree as follows:

Lessor, in consideration of the payments, covenants and agreements to be performed by Lessee, as hereinafter set forth, does hereby LEASE, DEMISE and LET unto Lessee the Property for the term hereinafter set forth. The Property is leased by Lessor to Lessee and is accepted and is to be used and possessed by Lessee upon and subject to the following terms, provisions, covenants, agreements and conditions:

## ARTICLE 1.
## DEFINITION OF TERMS

1.1. Definitions. Unless otherwise defined, all capitalized terms used in this Agreement shall have the meanings given in Exhibit B attached hereto and made a part hereof.

## ARTICLE 2.
## TERM

2.1. Term. Lessor hereby leases to Lessee and Lessee hereby leases from Lessor the Property on the terms set forth herein. This Agreement shall be for a term of fifty (50) years (herein called the "Term") commencing on November 15, 2022 (the "Commencement Date") and terminating on the date that is fifty (50) years thereafter. In the event, Lessee does not acquire or payoff Lessor's Mortgage Loan within sixty (60) months from the Commencement Date, the Term shall be thirty (30) years. Each "Year" under the Lease Agreement shall be a successive period of twelve (12) months, with the first Year commencing on the Commencement Date, and each successive Year commencing on the applicable anniversary of the Commencement Date.

2.2. Extended Term. Provided there is no default under the Lease Agreement, the Term may be extended for four (4) consecutive five (5) year renewal terms by delivery of a notice at least one-hundred eighty (180) days prior to the then-scheduled expiration of the Term. Each renewal term is referred to as an "Extended Term" and, when timely and properly exercised, shall be included in the Term. Failure by Lessee to timely and properly give notice to exercise the right

Timacuan Partners, LLC Lease Agreement
C:\Users\PDouglas\WPos\Documents\Timacuan - signature copy lease_11-2-2022execution copy- Timacuan Partners, LLC.docx

Page 1

to an Extended Term shall render such Extended Term and all additional unexercised Extended Terms void and of no further force and effect.

## ARTICLE 3.
## PRE-LEASE MATTERS

3.1.    Performance Prior to Commencement Date. Prior to the Commencement Date, Lessee will perform certain due diligence with respect to the Club and the Property, and Lessee shall have certain other conditions precedent (all "Conditions Precedent") as follows:

3.1.1.    Title. Lessee has examined the title to the Property, including the encumbrances which Lessee approves and has listed as the "Permitted Encumbrances" as described in Exhibit D.

3.1.2.    UCC Search on Personal Property. Lessee may perform a Uniform Commercial Code search for each city, county, and state in which any of the Property, Improvements, or Tangible Personal Property is located and where Lessor has its principal place of business and is incorporated (collectively, the "UCC Searches"). Lessee shall examine the UCC Searches and confirm that there are no liens on the Property that are inconsistent with the terms of this Agreement.

3.1.3.    Water. Lessee shall have conducted all inquiries and investigations regarding any water agreements, permits and any other information regarding the water rights for the Property.

3.1.4.    Contracts. On or before the Commencement Date, Lessee will notify Lessor of the contracts listed on Exhibit E (the "Contracts"), which Lessee desires to accept (the "Approved Contracts") shall be assigned to Lessee on the Commencement Date. Notwithstanding the above, Lessee shall (i) assume all of Lessor's maintenance requirement and golf cart leases and refinance same or have Lessor's personal guarantees related to the same terminated and (ii) shall use reasonable efforts to limit Lessor's liability for the cancellation of any Contracts that are not included in the Approved Contracts and assumed by Lessee.

3.1.5.    Club Credits. Lessor has sold multi-year prepaid ("Multi-Year Memberships") and Lifetime Memberships to Members of the Club ("Lifetime Memberships"). A list of the persons holding Lifetime Memberships and Multi-Year Memberships is attached hereto and incorporated herein as Exhibit F. Lessee shall offer a new membership to those persons listed with Lifetime Memberships and a membership agreement for each of those persons to so convert their memberships. Lessee shall have entered into agreements with the Members holding Multi-Year Memberships to convert such memberships to dues paying members upon such terms as are acceptable to Lessee. Any amounts that Lessee must credit to the Members holding Lifetime Memberships or Multi-Year Memberships to provide for a termination or conversion of such memberships in excess of Seventy-Five Thousand Dollars ($75,000) shall be included in the Rent Credit.

Timmerman Partners, LLC Lease Agreement
C:\Users\Whoadya\White\Documents\Timmerman - Signatory copy Issue  11-2-2022\document copy- Timmerman Partners, LLC docx

Page 7

3.1.6.   Consents to Assignments. Lessor shall have obtained any consents required in connection with the assignment of the Approved Contracts or any licenses and permits or water rights.

3.1.7.   Deposit. Within two (2) business days of the date of this Agreement, Lessee shall deposit Fifty Thousand Dollars ($50,000) (the "Deposit") with the Title Company. The Title Company shall be authorized to break escrow upon Lessor providing proof of funds, acceptable to Lessee the greater of Two Hundred and Fifty Thousand Dollars or an amount mutually agreed upon by Lessor and Lessee, hereinafter (the "Closing Funds"). The funds shall be paid first to delinquent interest to HLI Investments and Funding- Fund 2, LLC and second to Golf Partners, LLC. These amounts shall be attributable to Rent Credits.

3.1.8.   Title Policy. The Title Company shall be prepared to issue the Leasehold Title Policy insuring the lease of the Property to Lessee subject only to the Permitted Encumbrances.

3.1.9.   Lessor's Loan. Lessee shall have received assurances in a form acceptable to Lessee from Lessor's mortgage lender related to the loan secured by a mortgage on the property ("Lessor's Mortgage Loan") and further described in Exhibit C regarding (i) a forbearance of the lender's rights due to Lessor's existing defaults and/or this Agreement, and (ii) a payoff amount and schedule for satisfying the balance of Lessor's Mortgage Loan.

3.1.10.   Representations.   Seller's representations and warranties made in Article 14 shall be free and correct in all material respects.

3.1.11.   Compliance. The Property and the Club are in compliance to all applicable laws.

3.1.12.   No Adverse Developments. Lessor shall have verified in wiring that no material or adverse matters impacting the Property have arisen since July 18, 2022.

3.1.13.   Approvals. Lessor shall have obtained and provided copies to Lessee of approval of the transition contemplated by this Agreement and shall have provided to the Title Company such documents and agreements as the Title Company needs to issue the Leasehold Title Policy.

3.1.14.   Department of Revenue. Lessor shall have provided evidence of satisfying any outstanding amounts owed to the Florida Department of Revenue in a form satisfactory to Lessee.

3.1.15.   State Unemployment Payments. Lessor shall have provided to Lessee evidence of satisfying all amounts owed related to state unemployment in a form satisfactory to Lessee.

Timacuan Partners, LLC Lease Agreement
C:\Users\Douglas\Box\Documents\Timacuan - agreement copy lease - 11-3-2022transaction copy- Timacuan Partners, LLC.docx

Page 3

3.1.16. Property Taxes. Lessor shall have provided to Lessee evidence of payment of any outstanding ad valorem taxes related to the Property on a form satisfactory to Lessee.

3.1.17. Property and Club Operation Restrictions. Lessor shall operate the Club and the Property in a manner consistent with past practices, including any routine golf course maintenance or overseeding. From the date of this Agreement and until the Commencement Date, Lessor shall not, except pursuant to existing agreements to which Lessor is bound, (i) increase the salary of any employee of Lessor other than in accordance with Lessor's past practices, or (ii) enter into any oral or written agreement with any individual or firm concerning employment or providing services to the Property or the Club, other than in the ordinary course of business, or (iii) enter into any new agreement with the membership of the Club or modify any existing membership agreement or the membership bylaws of the Club, if any or change the amount of the initiation fees or deposits, greens fees or cart fees or otherwise alter the pricing structure of the Club in any manner. Lessor shall not (i) offer, transfer, or sell any membership in the Club for an amount less than the initiation fees or deposits as of the date of this Agreement, (ii) offer memberships or other rights to access the Property or the Club through payment plans which accelerate the amounts which would otherwise be due prior to the Commencement Date or reduce or abate amounts which would otherwise be due after the Commencement Date, (iii) offer any new membership sales programs or other rights to access the Property or the Club prior to the Commencement Date which utilize Lessee's trade names, trademarks, or other identifying symbols or mentions the sale of the Property or the Club without the written consent of Lessee, (iv) enter into any new contracts of agreements impacting the Property or the Club (other than memberships sold in the ordinary course of business), (v) or sell or remove any items of personal property other than sales of inventory in the ordinary course of business.

If any of the Conditions Precedent are not satisfied to Lessee's sole satisfaction, Lessee shall have the right to terminate this Agreement upon written notice to Lessor on or before the Commencement Date, and the parties shall be released from any obligations under this Agreement, and the Title Company shall refund the Deposit to Lessee.

## ARTICLE 4.
## PAYMENT AND CAPITAL IMPROVEMENT RESERVE DEPOSIT

4.1.  Payment. Commencing after Year 6, Lessee shall start accruing and shall pay three and one half percent (3.5%) of Gross Revenues from the immediately prior Year to Lessor as annual rent for the Property (hereinafter referred to as "Annual Rent Payment"), payable within sixty (60) days following the end of each Year during the Term (*e.g.*, the first Annual Rent Payment shall be due on or before the 60th day of Year 7, based on the Gross Revenues for Year 6, the second Annual Rent Payment shall be due on or before the 60th day of Year 8, based on the Gross Revenues for Year 7, etc.). In addition, commencing on the Commencement Date, Lessee shall pay (a) the Impositions applicable to the Property and (b) the premiums for the insurance coverages with respect to the Property as those coverages are described in Section 6.3, plus the cost and premiums for any insurance maintained by Lessee. Lessee may apply any Rent Credit to any Annual Rent Payment.

*Timacuan Partners, LLC Lease Agreement*
*C:\Users\IFThing\AppData\Local\Documents\Timacuan - signature copy form. 11.3.2022\execution copy. Timacuan Partners, LLC.docx*

Page 4

Once Gross Revenues in any Year have met or exceeded Three Million Five Hundred Thousand Dollars ($3,500,000.00), the percentage of Gross Revenues that Lessee shall pay as Annual Rent Payments shall increase one quarter percent (0.25%) for each successive $500,000 incremental increase in Gross Revenues. The increase in the Annual Rent Payment commences upon the Gross Revenues reaching each threshold, and the increase in the applicable percentage used to calculate the Annual Rent Payment shall only apply to Gross Revenues in excess of each threshold amount (*i.e.*, if (i) Gross Revenues for a Year reach $4,000,000, then the Annual Rent Payment shall be 3.50% of Gross Revenues up to $3,500,000 and 3.75% of Gross Revenues from $3,500,000 to $4,000,000; and if (ii) Gross Revenues for a Year reach $4,500,000, then the Annual Rent Payment shall be 3.50% of Gross Revenues up to $3,500,000, 3.75% of Gross Revenues from $3,500,001 to $4,000,000, and 4.0% of Gross Revenues from $4,000,001 to $4,500,000). There shall be no abatement, diminution or reduction (a) of the Annual Rent Payments, or (b) of Lessee's other payment obligations hereunder under any circumstances or for any reason whatsoever with the exception of any Rent Credits. Commencing in Year 1, Lessee shall provide to Lessor statements of Gross Revenues no less frequently than quarterly, and annual depreciation reports on or before January 31 of each year for the prior calendar year in the form of Exhibit Q attached hereto.

The Annual Rent Payments that would otherwise be payable during the first five Years are being abated in consideration for Lessee's covenant related to Lessor's Mortgage Loan contained in Section 6.5. Lessee shall keep adequate accounting records for determining such Annual Rent Payments. In the event Lessee defaults under Section 6.5, then the Annual Rent Payments for the first five Years will be due and payable on or before ninety (90) days following the beginning of the sixth Year.

    4.2.   Net Agreement. Lessor and Lessee acknowledge and agree that both parties intend that this Agreement shall be and constitute what is generally referred to in the real estate industry as a "triple net" or "absolute net" lease, such that Lessee shall be obligated hereunder to pay all costs and expenses incurred with respect to, and associated with, the Property and all personal property thereon and therein and the business operated thereon and therein, including, without limitation, all taxes and assessments, utility charges, insurance costs, maintenance costs and repair, replacement and restoration expenses (all as more particularly herein provided), together with any and all other assessments, charges, costs and expenses of any kind or nature whatsoever related to, or associated with, the Property, the use, occupation or operation thereof, and the business operated thereon, and any federal, state or local tax or charge with respect to the Annual Rent Payment (except for income tax) and other amounts received by Lessor under this Agreement. Except as expressly provided herein, Lessor shall bear no cost or expense of any type or nature with respect to, or associated with, the Property, the Club, or the use, occupation or operation thereof unless if its actions directly impact cost to Lessee of operating the Property.

    4.3   Land Sales. Lessor and Lessee have generally identified areas of the Land which are generally identified on Exhibit G attached hereto that may be available for development and/or sale to third parties ("Development Parcels"). During the Term, Lessor shall have the option to carve out the Development Parcels from this Agreement by delivery to Lessee of metes and bounds descriptions of the boundaries of Development Parcels along with a survey depicting proximate golf course improvements for the Lessee's approval which approval shall not be unreasonably

Timacuan Partners, LLC Lease Agreement
C:\Users\Wjmugh\ofTice\Documents\Timacuan - ofplates copy lease-11-2-2027\version copy- Timacuan Partners, LLC.docx

Page 5

withheld, conditioned or delayed. The boundaries of the Development Parcels (a) shall be set in a way that does not unreasonably compromise or interfere with golf play at the Club; (b) violate generally recognized industry standards for safety relative to proximity of development to golf play, or (c) adversely impact the aesthetics of any golf holes of the Club (collectively the "Standards"). It shall not be unreasonable for Lessee to disapprove the boundary of a proposed Development Parcel that violates the Standards. Lessor shall not sell the Development Parcels for a use that directly competes with the Club and any proposed use other than for residential building lots shall be subject to the prior written approval of Lessee, which shall not be unreasonably withheld, conditioned or delayed. Any residential sales shall (i) contain a restrictive covenant recorded against title to each lot providing for an easement for golf balls, golf course operation and noise, and maintenance activities, including without limitation, overspray of irrigation water and chemicals and (ii) contain a restrictive covenant requiring each lot owner to procure and maintain a special membership at the Club with applicable initiation fees and monthly dues, as set by Lessee (collectively, the "Lot Covenants"). The Lot Covenants shall be subject to review and approval by Lessee, not to be unreasonably withheld, conditioned or delayed.

4.4.    Capital Improvements Plan. Prior to the Commencement Date, Lessee shall submit to Lessor a proposed ten (10) year capital improvements plan ("Initial Capital Improvements Plan"). The Initial Capital Improvements Plan is attached as Exhibit H. For the initial 24 months when Lessee is responsible for contributing the 50% of Initiation Fees, Lessee upon request from Leesor at the end of each Quarter shall provide Lessor a statement of Capital Improvements in process of completed for the Quarter.

4.5.    Initial Capital Reserve Payment and Annual Capital Reserve Deposits. In the first Year, Lessee shall spend a minimum of Five Hundred Thousand Dollars ($500,000.00) plus fifty-percent (50%) of the initiation fees collected from new Members in the first twenty-four monthsr for capital improvements to the Property, including the Initial Capital Improvement Plan. The foregoing payments by Lessee are, collectively, the "Initial Capital Payments".

Commencing after thirty-six (36) months from the Commencement Date, Lessee shall begin to reserve three percent (3%) of monthly Gross Revenues to be used for capital improvements and repairs for the Property (the "Capital Reserve Payments").

Commencing in Year 3, Lessor shall have the right to access all books and records pertaining to the Club's Gross Revenues, and the Capital Reserve Account, and any other information as Lessor shall reasonably require, and Lessee agrees to provide same upon Lessor's request.

ARTICLE 5.
USE

5.1.    Exclusive Use. Lessor grants Lessee exclusive use of the Property to be used in connection with the operation of the Club during the Term of this Agreement for the purposes set forth herein. During the Term of this Agreement, Lessor agrees that it may not in any event remove or prohibit Lessee's use and possession of the Property or interfere with Lessee's operation or management of the Property, except due to an Event of Default by Lessee which allows termination of the Agreement, or as otherwise provided herein.

Timacuan Partners, LLC Lease Agreement
C:\Users\Bingler\WorkDa ... ... ... signature copy loose- 11 2 2017 version copy- Timacuan Partners, LLC doc

Page 6

5.2.    Permitted Use. Lessee shall use the Property for Members, guests of Members, unaccompanied guests and nonmembers to conduct golf tournaments and outings, supplemental golf play, golf and shop merchandise retail sales, golf practice, tennis (if tennis facilities are constructed in the future), fitness training, recreational and sporting activities, social, dining, food, beverage, hospitality, general office and other incidental purposes consistent with the operations of a for-profit private member club.

5.3.    Lessor Members Use and Access. Lessee shall provide Lessor documentation of Memberships for Lessor for use by Lessor's assignees ("Lessor's Memberships") to the persons listed on Exhibit R ("Lessor Members"). Lessor's Memberships shall not pay monthly recurring fees, (member monthly and capital dues), but will be responsible for payment of all incidental charges throughout the Term to include guest of member rate for any guests. Only Lessor's family memberships may sponsor unaccompanied guests. There shall be no change of assignees, except at the beginning of the calendar year without the consent Lessee, shall not be unreasonably withheld. Lessor's family memberships to include family members of Lessor provided to Lessor by Lessee will include a family membership with no membership dues, but shall require payment of cart fees for any guests and ancillary charges for food and beverage and merchandise. Unaccompanied guests shall pay the guest of member rate and accompanied guests shall pay cart fee only. Lessor's Memberships shall entitle Lessor to accompanied and unaccompanied guests for guest of member rate, subject to availability. Lessee shall not limit Lessor Members' use of the Club as a Member, and as such Lessee shall act in good faith and at a commercially responsible manner to ensure that Lessor is treated in the same manner as any other Member of the Club. Lessee shall timely and reasonably address any actions from its Members affecting Lessor that are not consistent with the rules and regulations of the Club. Lessor Members' use of Club is subject to availability and the Club's hours and operations.

5.4.    Practice Area and Lessor's Use. Lessor agrees that Lessors Use of the Practice Area shall be limited to daily usage of up to four (4) hitting bays, in no event more than six (6) without the approval of Lessee. The chipping and short game area may be restricted from member access during times of instruction. Each hitting bay is limited to one (1) instructor and three (3) others, unless approved by the Golf Professional or General Manager. At any day the hitting bays are not utilized by Members, the Golf Professional may increase the limitation on a space available basis. Lessee shall provide signage for all designated hitting bays, which may be under any range coverings, and such signage shall indicate For Private Instruction. Lessor's Private Instructors shall provide Lessee proof of insurance acceptable to Lessee. On any day that the designated hitting bays are not being used by Lessors' Private Instructors, Lessee shall have full access for use by Members. Access to Member areas by Lessors Private Instructors, including the practice putting green will be approved by the Golf Professional.

5.5.    Standard of Operation for Lessee. Throughout the Term of this Agreement, Lessee shall operate the Property (except during the continuance of a Force Majeure Event) in full compliance with the terms hereof in a manner consistent with the level of operation of comparable country club facilities in the Orlando area with annual dues requirement of approximately $5,000 ("Comparable Clubs"), including, without limitation, the following ("Operating Standards"):

      (a)    operate the Property and the Club in a prudent manner and in compliance with applicable laws (including accessibility laws) and regulations relating thereto and

Timacuan Partners, LLC Lease Agreement
C:\Users\WThoughts\WorkDocuments\Timacuan - signature copy Jetter 11-2-2022\execution copy: Timacuan Partners, LLC.docx

Page 7

obtain and maintain all permits and any other agreements necessary for the use and operation of the Club;

(b)   maintain sufficient Tangible Personal Property, including inventories, of types and quantities to enable Lessee adequately to operate the Club;

(c)   keep all Tangible Personal Property located on the Property or used in connection with the Club in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions and improvements thereto to keep the same in good operating condition;

(d)   maintain sufficient working capital to operate the Club as a private membership club similar to the manner for Comparable Clubs;

(e)   operate the Club and use the Property to standards consistent with the Comparable Clubs;

(f)   follow and conform to all of the same insurance, risk management and management standards and practices employed at Comparable Clubs;

(g)   recruit, train and employ appropriate personnel, or retain management services from an Affiliate or other qualified service provider, provided Lessee shall not enter into any agreement with an Affiliate or otherwise which survives the expiration or earlier termination of this Agreement without the prior written approval of Lessor; and

(h)   provide prompt written notice to Lessor of material or extraordinary developments, lawsuits, violation of any legal requirements and fines relating to the use and operation of the Property.

5.5.1   Standards Not Control/Specific Action. Lessor and Lessee stipulate and agree that Lessee is obligated to undertake such actions as are reasonably necessary to properly achieve the Operating Standard, and although Lessor shall have the right to undertake all enforcement rights as provided herein in the event that the Operating Standard is not maintained by Lessee, the means, pricing, policies and methods used and actions taken to operate the Club are within the sole control and election of Lessee, and are not specified by or under the control of Lessor. Accordingly, Lessor shall have no responsibility for any action taken by Lessee in order to manage or operate the Club. The Operating Standard shall be evaluated on an "overall basis" and the failure of Lessee to have or provide any particular item or items or service or services shall not in and of itself constitute a violation of the Operating Standard.

5.6.   Continuous Use.   Except for customary seasonal limitations, normal weekly closures (i.e., Mondays), events of Force Majeure and necessary repairs and alterations to the Property made pursuant to this Agreement, the Property, including, without limitation, the dining facilities, golf, club, tennis facilities (if such are constructed in the future), and other buildings

Timacuan Partners, LLC Lease Agreement
C:\Users\Douglas\ddsc\Documents\Document - signature copy form - 11.2.2022 executing copy - Timacuan Partners, LLC.docx

Page 8

throughout the Property and shall remain open and available for use during customary hours of operation as determined by Lessee in its reasonable discretion.

5.7.    Licenses. Lessee shall maintain all licenses and permits necessary for the continual operation of the Property, including, without limitation, a liquor license; and shall pay all taxes and license renewal costs payable by reason of its use and the conduct of its services on the Property. Lessor shall reasonably cooperate with Lessee in connection with obtaining or transferring all licenses and permits. If necessary, Lessor shall maintain any licenses, permits and agreement required to be held by Lessor, including building and construction permits and water permits and agreements.

5.8.    Compliance with Laws. Lessee shall use commercially reasonable efforts to comply with all laws and ordinances and all valid rules and regulations of governmental authorities, including, without limitation, the Americans with Disabilities Act of 1990 and Applicable Environmental Laws (as defined in Exhibit B) as the same apply to the Property. Lessor and Lessee acknowledge that during the course of Lessee's investigation of the Property prior to the Commencement Date it discovered certain facts or conditions that may constitute a breach of the foregoing obligation, which facts or conditions are described in Exhibit I attached hereto and along with any other fact or condition that may constitute a breach of the foregoing obligation, shall be referred to in this Agreement as the "Possible Existing Defects" or singularly as a "Possible Existing Defect." Notwithstanding any other provision of this Agreement, the Possible Existing Defects shall not be deemed an Event of Default. Lessor shall use reasonable efforts to cure, remove or remedy the Possible Existing Defects (to the extent reasonably practical) by Lessor on or before, as to any particular Possible Existing Defect, the date that such Possible Existing Defect is required to be cured, removed or otherwise remedied by any governmental agency, court or administrative body having jurisdiction over such Possible Existing Defect.

Without limiting the foregoing, during the Term, Lessee covenants not to place or store, handle or dispose of any hazardous substances in, on or under the Property, except as permitted by Applicable Environmental Laws and appropriate governmental authorities. Lessee shall permit Lessor and its agents and contractors to access the Property to the extent necessary to monitor the Possible Existing Defect and shall not cause or permit any damage to or interference with any of the facilities or conditions associated with the Possible Existing Defect. Lessee shall promptly notify Lessor in the event of Lessee's discovery of, or Lessee's receipt of notice concerning, any hazardous substances which are located on or under or adjacent to, or are being or have been released from, the Property. Without limiting any of Lessee's other indemnification or other obligations, Lessee hereby indemnifies Lessor and holds Lessor harmless from and against all loss, liability, damage, expense, claim, cost, fine or penalty, including costs of investigation and remediation, and reasonable attorney's fees and costs of settlement suffered or incurred by Lessor as a result of (i) the violation by Lessee (or Lessee's subtenants or assignees, or the agents, contractors, customers or employees of same during the Term) of any Applicable Environmental Law, (ii) any hazardous substances placed or disposed of on or under the Property during the Term by Lessee or its agents or contractors, or (iii) any environmental condition first existing after the Commencement Date and caused by Lessee or its agents or contractors. The foregoing indemnities shall survive and remain in effect following the termination of this Lease Agreement. Lessor's remedies hereunder against Lessee are not exclusive of common law and statutory remedies

Timacuan Partners, LLC Lease Agreement
C:\...\D...\D... : sigmate copy basic 11-2-202Sectenter copy- Tauveue Partners, LLC doc

Page 9

otherwise available to Lessor and shall not be affected in any way if the liability or claim for which indemnification is sought arises by reason of strict liability.

5.9.    Governmental Notices. Lessor and Lessee shall promptly provide each other with copies of all notices, requests, orders, demands or communications from any federal, state or local governmental or quasi-governmental office, agency or board with respect to the Property or Lessee's operations or use thereof.

5.10.    Lessee's Use of the Name. Lessee shall have all rights to use of the Club Name as further defined in the Definitions - Exhibit B and all Club logos.

5.11.    Lessor's Use of Practice Facilities and Instructor Qualifications.    Lessor may only add more Students than exist as of the Commencement Date, with Lessee's written consent..  . Lessor shall provide Lessee evidence acceptable to Lessee for all appropriate Insurance coverages as required by Lessee at minimum limits of $1,000,000 in General Liability.

5.12.    Limitations for use by Lessor's Representatives of Club Amenities and Services. Any programs of multiple month instruction, hereinafter teaching or private instruction of ("Students") shall be limited to twelve, unless approved Lessee, which shall not be unreasonably withheld.  Private Instructors shall have use of the back tees upon the approval of the Golf Professional and General Manager.  It is anticipated that this use would be primarily during the Club's hosting of outside events or Member events. "Private Instructors" shall be those individuals that provide Lessee the prerequisite insurance as set forth herein. Lessor's Private Instructors shall have access to the golf course while teaching on a space availability basis and shall register for a tee time the day of the requested date of use. Lessor's Private Instructors will not be charged any fees for usage and access to the golf course. All play shall originate from the #1 or #10 tee, or as directed by the Golf Professional.

(a)    Access shall be granted to those Students that are 16 years of age and have a valid driver's license. If the Student is enrolled in multiple month instruction, cart fees shall not apply. For those Students that are not 16 years of age, they shall have access to the golf course by registering in the golf shop and for walking only. there shall be no cart feesCart rules of the club shall be strictly enforced to include number of cart riders, two per golf cart.  Carts usage is restricted to golf play and carts will not be issued for transportation to and from the practice facility.  Anyone under the age of sixteen and without a valid driver's license, must be accompanied by an adult or a golf instructor when using a golf cart. Golf cart usage is restricted to playing a round of golf and shall not be utilized for transportation to and from the Club facilities. Lessor's Private Instructors and students shall be responsible for all other charges.

(b)    Lessee shall approve all signage for the instruction area, which approval shall not be unreasonably withheld.

(c)    Lessee shall provide a menu for daily meals for Students receiving private instruction. Lessor shall be billed on a monthly basis for each meal served those receiving private instruction and such fees shall be due and payable by the 10th of the following

Timacuan Partners, LLC Lease Agreement
C:\Users\RDingle\WhorDocuments\Timacuan - Ignatius contract-11-2-2022 executive copy- Timacuan Partners, LLC.docx

Page 10

month. Lessor and Lessee may agree to a set monthly meal plan fee "Meal Plan" for those that are scheduled for long-term private instruction.

Any fees not paid by Lessor to Lessee shall be paid to Lessee in the form of Rent Credits for such amounts that remain unpaid at the time of Lessee's Annual Rent Payment is due.

Only those participating in private instruction that are Members of the Club will be permitted in the Clubhouse food and beverage facilities or unless accompanied by their Private Instructor for a special event.

5.13.    Lessee's Improvements for the Practice Area for Lessor.   As part of the Initial Capital Improvement Plan, Lessee shall pay to improve the building on the practice range for use by Private Instructors to include, bathrooms, lockers, etc., as well as areas for Private Instructors to eat and host meetings for Private Instructors and their participants.   Lessee shall provide refrigeration and beverage product (water/soft drinks, etc.).   Beverages will be sold at Member pricing.

## ARTICLE 6.
## PERFORMANCE BY LESSEE

6.1.    Club Operations. Lessee shall comply with, and operate the Club in accordance with, the following terms, provisions and conditions unless otherwise agreed to in writing by Lessor:

6.2.    Taxes. During the Term, Lessee shall promptly pay all taxes, assessments and other governmental levies against the Property or any part thereof, together with any interest or penalties thereon (all of which are herein called "Impositions"), Lessee may pay any Imposition in installments if payment may be so made without penalty. In the event the statement for any Imposition is received by Lessor, Lessor shall immediately deliver the same to Lessee. All Impositions assessed for the tax years in which the Term terminates shall be apportioned between Lessee and Lessor. If requested by Lessor following payment of any Imposition, Lessee shall furnish to Lessor for its inspection, official receipts of the appropriate taxing authority or other proof reasonably satisfactory to Lessor evidencing payment of the Imposition. Nothing contained in this Agreement shall require Lessee to pay any corporate, estate, inheritance, succession, capital levy or transfer tax of Lessor or any income, profits or revenue tax of Lessor.

6.2.1.    Contest. Lessee shall not be required to pay, discharge or remove any Imposition provided that (a) Lessee contests, in good faith, the amount or validity of such Imposition by appropriate proceeding which shall operate to prevent or stay the collection of the Imposition so contested and, (b) if requested by Lessor, deposits into escrow with an escrow agent acceptable to Lessor and Lessee, cash or surety in an amount reasonably calculated to pay at the conclusion of the contest, if unsuccessful, the Imposition and all accrued interest and penalties; provided, however, that no such escrow shall be required if, as a condition to bringing the contest described in (a) above, the Lessee is required to place into escrow or with a court equivalent or greater funds or surety. During such contest, Lessor shall have no right to pay the Imposition contested. Upon the termination of such

proceeding, Lessee shall pay the amount of the Imposition as finally determined and deliver proof of such payment to Lessor. Prior to commencing any such contest, Lessee shall give Lessor written notice of such contest and Lessor, at Lessee's sole expense, shall join in any such proceeding if any law shall so require. Any proceeding for contesting the validity or amount of any Imposition, or to recover any Imposition paid by Lessee, may be brought by Lessee in the name of Lessor or in the name of Lessee, or both, as Lessee may deem advisable. Lessee agrees to indemnify, defend and hold Lessor harmless from and against any and all liability, losses, costs, damages and expenses, including without limitation, reasonable attorneys' fees and costs, arising out of or from any such contest.

6.2.2. Right of Lessor to Pay. If Lessee shall default in the payment of any Imposition required to be paid hereunder by Lessee, Lessor shall have the right (unless Lessee is contesting the Imposition in accordance with Section 6.2.1) to pay the same together with any penalties and interest, in which event the amount so paid by Lessor shall be paid by Lessee to Lessor as Additional Payment (as defined below) upon demand, together with interest thereon at the Agreed Rate from the date advanced by Lessor.

6.3.    Insurance. During the Term, Lessee agrees to carry and maintain at Lessee's expense, or cause others to carry and maintain, the following insurance coverages:

6.3.1. Property Insurance. All risk casualty insurance covering the buildings, contents and other personal property, now or hereafter located on the Property in an amount not less than one hundred percent (100%) of the full replacement cost as agreed upon by Lessee, which shall not be unreasonably withheld thereof or the equivalent of Lessors risk casualty insurance coverage amounts prior to the Commencement date, or the lessor of the two. The "full replacement cost" shall mean the actual replacement cost exclusive of excavations, foundations and footings. The coverage amount offered by such policy shall be in an amount sufficient to avoid any co-insurance requirement.

6.3.2. General Comprehensive and Alcohol Liability. General comprehensive public liability insurance against claims for bodily injury, death or property damage in or about the Property (with limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate), including contractual liability, and dram shop or alcohol liability coverage, and additional umbrella coverage of not less than $5,000,000, with such increases or adjustments to the foregoing from time to time based on industry standards as reasonably determined by Lessee and approved by Lessor.

6.3.3. Worker's Compensation. Workman's compensation coverage for all persons employed by Lessee on the Property, with statutory limits, and Employers' Liability insurance in an amount of at least $1,500,000.00 bodily injury per accident; $1,000,000.00 bodily injury by disease; and $1,000,000.00 disease-per employee;

6.3.4. Club Auto Liability Insurance. Club auto liability coverage, including owned, non-owned and hired vehicles for combined single limit of bodily injury and property damage of not less than $1,000,000.00 per occurrence:

Tinaxuan Partners, LLC Lease Agreement
C:\Users\Usergxm\WideDocuments\Document... rgmmm topt hmm 31 2 2022erm mm cupy- Innnmm Partmm, LLC docr

Page 12

6.3.5. Crime. Insurance covering employee theft in an amount not less than $100,000;

6.3.7. Employment Practices Liability. Employment practices liability insurance including third party liability with limits in a minimum amount of not less than $1,000,000.00 per occurrence;

6.3.8. Insurance Policy Requirements. All insurance to be maintained by Lessee pursuant to this Agreement shall be effected under enforceable policies issued by insurers licensed to do business in Florida with a rating of A or better and assigned a financial size category of VII or larger as established by A. M. Best Company, Inc., if reasonably available, or if not available, the most nearly equivalent rating. Binders or certificates of insurance evidencing all of the policies required to be maintained by Lessee hereunder shall be furnished to Lessor on or prior to the Commencement Date. Similar evidence of renewals of such policies shall be provided to Lessor at least thirty (30) days prior to the expiration of the existing coverage. The public/general and contractual liability policy, umbrella policy and alcohol liability policy shall name Lessor as additional insureds, the property policy will name Lessor as loss payee, and all policies of insurance carried by Lessee pursuant to this Agreement shall contain an agreement by the insurer that such policy will not be canceled without at least thirty (30) days prior written notice to Lessor. All policies shall contain a Waiver of Subrogation endorsement. Lessee may provide any insurance required by this Agreement in the form of a blanket policy. All such policies described in Section 6.3 shall name Lessor as an additional insured (excluding Employment Practices Liability). All such policies shall provide Lessor thirty (30) days prior written notice of any material change or cancellation of such policy. All business interruption insurance carried by Lessee shall be for the sole benefit of Lessee.

6.3.9. Waiver of Subrogation. Lessor and Lessee agree that with respect to any property loss which is covered by insurance then being carried by Lessor or Lessee, respectively, the party carrying such insurance and suffering said loss releases the other of and from any and all claims with respect to such loss, and they further agree that their respective insurance companies shall have no right of subrogation against the other on account thereof.

6.3.10. Indemnification. Except as expressly provided herein, and subject to the provisions of Section 9.3 hereof, Lessee shall protect, indemnify, save, pay, insure and hold harmless Lessor for, from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and reasonable expenses (including, without limitation, reasonable attorneys' fees), to the maximum extent permitted by law, imposed upon or incurred by or asserted against Lessor by reason of: (a) any accident, injury to or death of persons or loss of or damage to property of third parties occurring on or about the Property or adjoining sidewalks or rights of way under Lessee's control, (b) any liability related to the refund of deposits, securities violations, or other liabilities associated with any membership documents originated by Lessee, (c) any use, misuse, condition, management, maintenance or repair by Lessee of any litigation, proceeding or claim by governmental agencies relating to such use, misuse, condition, management, maintenance, or repair thereof to which

Timaewan Partners, LLC Lease Agreement
C:\Users\BThonghsWhite\Documents\Timewan\ \signtent copy lease-11-2-2022\evatuation copy- Timewan Partners, LLC law

Page 32

Lessor is made a party, or (d) Lessee's breach of this Lease Agreement or Lessee's failure to keep or perform all of Lessee's convents, duties and obligations under this Lease Agreement; provided, however, that Lessee's obligations hereunder shall not apply to any liability, obligation, claim, damage, penalty, cause of action, cost or expense arising from any gross negligence or willful misconduct of Lessor, its employees, agents, contractors or invitees or related to the operation of the Club or ownership of the Property prior to the Commencement Date. Any such claim, action or proceeding asserted or instituted against Lessor covered under this indemnity shall be defended by counsel selected by Lessor and at no cost to Lessor. The obligations of Lessee under this Section 6.3.10 shall survive the expiration or any early termination of this Lease Agreement.

6.4.    Utilities. Lessee shall be responsible for and shall timely pay the costs of all utilities required for the operation of the Property. Lessor shall not be required to furnish to Lessee any utilities or services of any kind, including, but not limited to, water, steam, heat, gas, hot water, electricity, light, power or air conditioning. However, Lessor shall cooperate with Lessee to ensure that all necessary utilities are available to Lessee during the Term.

6.5.    Lessor's Mortgage Loan. On or before the commencement of the sixth Lease Year, Lessee, at its sole expense, shall negotiate a payoff or satisfaction of Lessor's Mortgage Loan in such a manner as to cause a release of the mortgage and other security documents related thereto (including any guarantees by Lessor or its principals to such lender). The terms of such workout of the Lessor's Mortgage Loan shall be at the sole discretion of Lessee. Lessor shall reasonably cooperate, at no cost to Lessor, with Lessee and the lender for the Lessor's Mortgage Loan related to the payoff or satisfaction of Lessor's Mortgage Loan pursuant to terms agreed to between Lessee and the lender for Lessor's Mortgage Loan.

## ARTICLE 7.
## IMPROVEMENTS

7.1.    Depreciation. During the Term, Lessee may depreciate capital improvements over the useful life of the Improvements, determined in accordance with GAAP. All references in this Lease Agreement to "capital" with reference to improvements, expenses or similar words or phrases shall be interpreted in accordance with GAAP and applicable IRS regulations.

## ARTICLE 8.
## OPERATIONAL TRANSITION

8.1.    Transition of the Property. On the Commencement Date, Lessee shall begin operating the Property. Lessee shall operate the Property as provided in this Agreement. All revenues derived from operating the Property and all expenses incurred in connection therewith shall belong to Lessee. The provisions set forth below in this Article are intended to facilitate the operational transition of the Property. The Deposit shall be used to satisfy any of Lessee's net payment obligations in this Article. If there is any amount of the Deposit remaining after satisfying Lessee's net payment obligations in this Article, then such excess shall be refunded to Lessee.

8.2.    Payables and Receivables. Except as otherwise set forth herein, all income, utilities and all other operating expenses with respect to the Property, and real estate and personal property taxes and other assessments with respect to the Property, shall be prorated to the Commencement Date with Lessor being responsible for all costs and expenses for the period prior to the Commencement Date ("Lessor's Obligations") and Lessor being entitled to all income from operation of the Property prior to the Commencement Date (except as provided in Section 8.5). All items of income and expense for the period prior to the Commencement Date will be for the account of Lessor, and all items of income and expense for the period on and after the Commencement Date will be for the account of Lessee.

8.3.    Utility Prorations. Lessor shall cause the companies and municipalities furnishing utility services to the Property to make readings on the morning of the Commencement Date, or on a date as soon thereafter as possible, and to submit final statements for the utility services to Lessor, which Lessor agrees to pay in a timely manner.

8.4.    Imposition Prorations. All Impositions payable for the then current year shall be prorated as of the Commencement Date. Lessor shall pay the prorated amount due Lessee prior to the due date for any Imposition which is subject to apportionment.

8.5.    Prepaid Deposits and Deferred Income Prorations. All security deposits and other deposits, dues, advances, fees, locker rentals, equipment storage charges and other amounts paid to Lessor by third parties, including Members, former Members and non-members of the Lessor covering any period from and after the Commencement Date shall be transferred upon the Commencement Date to Lessee and Lessee assumes obligations associated with such amounts, excluding payments of Lifetime Memberships or Multi-Year Memberships. Additionally, for any bartered membership rights, Lessor shall, on or before the Commencement Date, either terminate such rights or pay to Lessee the monetary value of such rights as a proration item.

8.6.    Accounts Payable. On or before the Commencement Date, Lessor shall pay when due all accounts payable which were incurred or accrued by Lessor in connection with the operation of the Property prior to the Commencement Date ("Accounts Payable"). In the event Lessee pays any Accounts Payable that are the responsibility of Lessor, such amounts shall be refunded to Lessee in the form of Rent Credits.

8.7.    Accounts Receivable. For any Accounts Payable not satisfied on or before the Commencement Date, Lessee shall, in the course of operating the Property after the Commencement Date, collect receivables due to Lessor arising from the operation of the Property, and pay Lessor's unpaid Accounts Payable. A listing of the Accounts Payable and Accounts Receivable as of the Commencement Date shall be incorporated herein as Exhibit J. In no event, however, shall Lessee be liable to Lessor for its failure to collect such receivables; provided, however, that if within sixty (60) days following the Commencement Date any Member of the Lessor has not paid all outstanding dues, fees and assessments due and owing to the Lessor as of the Commencement Date (as outlined on Exhibit J), Lessee shall suspend all of such Member's membership privileges in the Club beginning on such sixtieth day and continuing until such Member has paid to the Lessor all of such outstanding dues, fees and assessments. In no event shall Lessee be required to institute any legal action to collect receivables due to Lessor. All

Tinnecian Partners, LLC Lease Agreement
C/Users/WDouglasWYielf Documents/Tinaccian · vgaaaa cru Jour- 13-2-2022 tenapaten cup · Tinaccian Partners, LLC dws

Page 15

payments received shall be applied to the newest charges first. If Lessee fails to initiate legal action to collect any Seller Receivables of Lessor within (90) ninety days following the Commencement Date, then Lessor shall work cooperatively with Lessee to institute such action and retain all proceeds collected.

8.8.     Reconciliation. Lessor and Lessee agree to cooperate and use their best efforts to make any required adjustment of reconciliation on the proration of income and expenses not later than ninety (90) days after the Commencement Date (which cooperation may include permitting reasonable inspections of Lessor's or Lessee's books and records).

8.9.     ADVANCES ACCRUAL. IN THE EVENT LESSEE ADVANCES FUNDS TO PAYOFF OR SATISFY LESSOR'S ACCOUNTS PAYABLE OR ANY OTHER AMOUNT OWED BY LESSOR, LESSEE SHALL KEEP ACCOUNTING RECORDS RECORDING AND ACCRUING ANY AMOUNTS SO ADVANCED BY LESSEE ("ADVANCES") AND LESSEE SHALL BE ENTITLED TO RENT CREDITS FOR ANY ADVANCES. WHEN CALCULATING THE AMOUNTS AVAILABLE AS RENT CREDITS, ALL PRINCIPAL BALANCES OF ADVANCES SHALL BE SUBJECT TO AN INTEREST RATE EQUAL TO 7.5%. AT CLOSING, LESSOR AND LESSSEE SHALL SIGN A STATEMENT OF THE BALANCE OF RENT CREDITS AS OF CLOSING. WITHIN 60-DAYS AFTER CLOSING, LESSOR AND LESSEE WILL ADJUST THE STATEMENT FOR ANY ADJUSTMENTS AND THEREAFTER THE STATEMENT SHALL BE USED TO ADJUST RENT UNTIL THE BALANCE IS ZERO.

8.10.   Insurance. Insurance, if any, carried by Lessor on the Property, the Improvements, and the Tangible Personal Property shall be terminated effective as of Commencement Date. Lessee shall be solely responsible for acquiring insurance coverage on the Property, the Improvements, and the Tangible Personal Property effective as of the Commencement Date.

8.11.   Contracts. Any amounts prepaid or payable under any Contracts which are assumed by Lessee shall be prorated and adjusted as of the Commencement Date.

8.12.   Personal Property Taxes. Personal property taxes, if any, payable with respect to the Personal Property, shall be prorated as of the Commencement Date.

8.13.   Calendar Year. All annual prorations shall be calculated on a calendar year basis.

8.14.   Transfer of Personal Property and Inventory. Lessor agrees to Lessee's use of Improvements on the terms and conditions set forth herein. On the Commencement Date, Lessor shall execute and deliver to Lessee a Bill of Sale in the form attached as Exhibit K conveying all food, beverage, goods, tools, supplies and other merchandise owned by Lessor held for resale, excluding the golf pro shop merchandise held for resale and food and beverage inventory ("Inventory") and all Tangible Personal Property. For and in consideration of the use of the Improvements and the conveyance of Inventory, Lessee shall, on the Commencement Date, undertake the payment of the Contracts, and all liabilities and account payables listed on Exhibit L, as and when the same shall become due and payable. Any funds advanced by Lessee shall be paid in the form of credit toward Annual Rent Payments.

Timuquan Partners, LLC Lease Agreement
C:\Users\BTong\eoffice\Documents\Timuawan - signwas copy.\new 11 2 2027\com seran copy\ Timuawan Partners, LLC.docx

Page 16

8.15.   Purchase of Inventories. Lessor shall receive a credit of one-hundred percent of all resalable (non-spoiled and non-expired) Inventory at invoice price for food and beverage and golf shop retail items under 90 days with evidence of paid invoices at Closing. Lessor and Lessee shall agree to an amount for any Pro-Shop merchandise Inventory over 90 days (if applicable).

8.16.   Assignment of Warranties, Licenses, Permits. At the request of Lessee, Lessor shall assign to Lessee (to the extent assignable or transferable) all of Lessor's beneficial interest in any warranties, guaranties and bonds relating to the Property and all permits and licenses (including Lessor's liquor licenses consistent with Florida law) required by Lessee for the operation of the Property if the benefits of such licenses and permits cannot effectively be leased to Lessee pursuant to this Agreement.

8.17.   Contracts. Lessor shall assign to Lessee its interest in the Approved Contracts. The Approved Contracts shall exclude the golf carts.

8.18.   Assignment of Rights to Receive Initiation Fees, Deposits, Monthly Dues and Income. Upon Commencement Date, Lessor shall assign to Lessee (to the extent assignable or transferable) all of Lessor's beneficial interest in the right to receive initiation fees, deposits, monthly dues or other income relating to the operation and management of the Property.

8.19.   Issuance of Title's Insurance Policy. Intentionally Deleted.

8.20.   Termination of Employees. Lessor acknowledges that Lessee is leasing only the Property and is not obligated to hire any employee of Lessor, except those agreed to by and between Lessor and Lessee prior to the Commencement Date and is not assuming any employment agreement of any nature between Lessor and its employees. Lessor shall terminate the employment of all of its employees related to the operation of the Property effective on the Commencement Date, and shall pay to all employees any vacation pay, sick time pay, or other compensation due pursuant to Lessor's employee policies, or applicable federal, state, or local. Lessor shall indemnify and hold Lessee harmless and defend against any claims by any employees terminated by Lessor, including, without limitation, any claims filed with the Equal Employment Opportunity Commission. Lessor acknowledges Lessee's plan to use a third-party professional employment organization for all employees.

8.21.   Lease Termination Transfer. Upon any termination or expiration of this Agreement, any rights, personal property, accounts or any other property that was transferred or assigned to Lessee from Lessor and/or was acquired by Lessee during the term of this Agreement which is necessary for the operation of the Property or Club shall be re-assigned to Lessor as Lessor may require. If Lessee fails or refuses to promptly execute any instruments requested by Lessor in furtherance of the foregoing, Lessor shall have the right to execute any such instruments on Lessee's behalf as its agent, without any liability to Lessee.

8.22.   Closing Costs. At or prior to Closing, Lessor shall pay (i) all premium and other charges and costs, incident to the issuance of a base Commitment and the Leasehold Title Policy, (ii) all state and local deed stamps and all applicable sales, bulk sales, and transfer taxes or fees due in connection with the lease of the Property to Lessee, and (iii) one-half (½) of the Title

Timacuan Partners, LLC Lease Agreement
C:\Users\IIDouglas\One\Documents\Timacuan - signature copy Merc 11-2-2022\Timacuan copy Timacuan Partners, LLC docx

Page 17

Company's escrow fee. Lessee shall pay (i) the cost of any other additional coverages or endorsements to the Leasehold Title Policy, (ii) all recording costs (iii) one-half (½) of the Title Company's escrow fee, and (iv) additional costs associated with other additional Purchaser requested searches (such as UCC, municipal lien or mineral rights searches). Prorations shall be in accordance with the provisions of this Agreement. All other escrow and costs shall be equally shared by Lessor and Lessee; provided, however, each party shall be responsible for the payment of the fees and expenses of its respective consultants and legal counsel.

## ARTICLE 9.
## LIABILITIES AND INDEMNITIES

9.1.    Liabilities. Except as otherwise stated in this Agreement, Lessor and Lessee expressly agree and recognize that Lessor does not assume any responsibility whatsoever for any commitments, obligations, or debts made or incurred by Lessee or its successors, agents, employees or contractors arising from the operation and management of the Property or Lessee's use of the Property during the Term, regardless of whether fixed, accrued or contingent, except for any liabilities or obligations caused by Lessor or any of its employees or agents, which shall be the responsibility of Lessor.

9.2.    Lessor Liabilities. Except as otherwise stated herein, Lessor and Lessee expressly agree and recognize that Lessee does not assume any responsibility or liability whatsoever for any commitments, obligations or debts made or incurred by Lessor or its predecessors or agents, arising from the ownership, possession or operation of the Property or the Club at any time, regardless of whether fixed, accrued or contingent.

9.3.    Indemnity by Lessee. Lessee agrees to indemnify, defend and hold harmless Lessor and Lessor's agents, employees, officers, directors, shareholders (in their capacity as shareholders and not as individuals) and contractors (collectively, "Lessor's Indemnified Parties") from and against any and all claims, actions, damages, costs, expenses, fees (including reasonable attorneys' fees and costs), obligations and liabilities first arising out of, or in connection with, or relating to the use, occupancy, operation or management of the Property from and after the Commencement Date (except to the extent caused by Lessor) including, but not limited to, employee termination claims and severance obligations and liabilities. Lessee further agrees to indemnify and hold harmless Lessor's Indemnified Parties from and against any and all claims, actions, damages, costs, expenses, fees (including reasonable attorneys' fees and costs), obligations and liabilities arising out of or in connection with or relating to the corporate affairs of Lessee or the purchase, sale or transfer to any person or entity of stock in Lessee. The Indemnity by Lessee shall exclude any matters related memberships sold by Lessor prior to the Commencement Date.

9.4.    Indemnity by Lessor. Lessor agrees to indemnify, defend and hold harmless Lessee and Lessee's agents, employees, officers, directors, shareholders (in their capacity as shareholders and not as individuals), contractors (collectively, "Lessee's Indemnified Parties") from and against any and all claims, actions, damages, costs, expenses, fees (including reasonable attorney's fees and costs), obligations and liabilities arising out of, in connection with, or relating to the ownership or operation of the Property and Club, including, but not limited to, employee termination claims and severance obligations and liabilities, for the period prior to the Commencement Date, except

to the extent caused by Lessee or its Affiliates, agents, contractors or representatives. Lessor further agrees to indemnify and hold harmless Lessee's Indemnified Parties from and against any and all claims, actions, damages, costs, expenses, fees (including reasonable attorneys' fees and costs), obligations and liabilities arising out of or in connection with or relating to (i) any liability or obligation caused by Lessor or any employee or agent of Lessor after the Commencement Date, (ii) the corporate affairs of Lessor or (iii) the purchase, sale or transfer to any person or entity of an equity membership in Lessor's entity.

## ARTICLE 10.
## PERSONAL PROPERTY

10.1. Personal Property. In addition to the Tangible Personal Property conveyed by Lessor, Lessee may purchase or lease any personal property which it reasonably deems necessary for the operation of the Property. Subject to the provisions of this Agreement and any applicable Contract terms, Lessee may utilize the Tangible Personal Property for purposes of trade-in or replacement for such purchases, and with respect to any Tangible Personal Property that is worn out or obsolete, Lessee may consume, sell, discard or dispose of it in a commercially reasonable manner without any obligation to replace the same. Any personal property purchased by Lessee shall remain the property of Lessee during the Term, unless Lessor and Lessee mutually agree prior to any purchase that such property shall be Lessee's property; and upon the termination or expiration of this Agreement, as it may be extended, Lessee agrees to execute and deliver a bill of sale conveying to Lessor all such personal property not otherwise excluded from such conveyance pursuant to the terms of this Agreement, which conveyance shall be made free and clear of any encumbrance, lien, lease or claim of third parties except for financing liens and instruments approved by Lessor. In connection with Lessee's purchasing or leasing of personal property, Lessee may execute in its own name conditional sales contracts, title retention agreements, security agreements, leases and similar documents, provided, however, Lessor shall not be deemed bound by or subject to such documents and all obligation related to same shall be satisfied by Lessee prior to the expiration or termination of this Agreement.

## ARTICLE 11.
## LIENS

11.1. Liens. Except as otherwise permitted in this Agreement, neither Lessee nor Lessor shall without the consent of the other party, directly or indirectly, create or permit to be created or to remain, any deed of trust, trust deed, mortgage, lien, encumbrance or charge on, pledge of, or conditional sale or other title retention agreement with respect to, the Property or any part thereof or the party's interest therein or the sums payable by Lessee under this Agreement, other than purchase money debt for new or replacement equipment ("Approved Additional Debt"). Lessee shall be responsible for all obligations with respect to any Approved Additional Debt. In no event shall Lessee be permitted to mortgage, pledge or encumber this Lease Agreement or any of the Club, Property or Club.

Timacuan Partners, LLC Lease Agreement
C:\Users\IYDangfur\Wsdel Documents\Timacuan - signtory copy Issue 11-2-2022\formation copy Timacuan Partners, LLC.docx

Page 19

## ARTICLE 12.
## CASUALTY AND CONDEMNATION

12.1.  Fire or Other Casualty Loss.

12.1.1.  Restoration in Compliance with Laws. Any improvements or additions or changes made in connection with the restoration of the Property after a fire or other casualty shall be made in accordance with all applicable laws, rules, regulations, ordinances, building codes and restrictions imposed by any mortgagee of Lessor pursuant to its mortgage.

12.1.2.  Restoration Period. In the event that any fire or other casualty damages any portion of the Property, Tangible Personal Property or Improvements (collectively, the "Damaged Property"), and unless otherwise agreed to by Lessor, Lessee shall repair, replace and restore the Damaged Property to substantially the condition in which it was in immediately prior to the fire or other casualty within a reasonable time but only to the extent of insurance proceeds received by Lessee. Lessee shall notify Lessor within thirty (30) days after the occurrence of such fire or other casualty. Lessor may participate in meetings related to any adjustment or settlement regarding insurance proceeds with respect to the casualty or damage to the Damaged Property.

12.1.3.  Excess proceeds. Any insurance proceeds remaining after such repairs, replacements and restoration shall have been completed shall be used to pay any deductible and then, either (i) deposited into the Capital Reserve Account by Lessee and Lessor, or (ii) paid to any lender of Lessor that has a mortgage, lien or deed of trust on the Property (or any portion thereof), as determined by Lessor.

12.2.  Total or Partial Condemnation. If during the Term of this Agreement there shall be taken for any public or quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, the entire Property and Improvements or any substantial portion of the Property and Improvements which is sufficient to render the remaining portion thereof unsuitable for restoration for continued use thereof for the purposes for which it is leased hereunder (in Lessee's reasonable discretion), then this Agreement shall forthwith cease and terminate as of the date when physical possession of the Property and Improvements is taken by the condemning authority and the Annual Rent Payment payable under this Agreement shall be apportioned and paid to such date with a proportionate refund by Lessor of any Annual Rent Payment paid in advance. If such taking is not sufficient to require termination of this Agreement (in Lessee's reasonable discretion), then this Agreement shall continue in full effect notwithstanding such taking. In the event of any total or partial taking, the award or awards for such taking (whether paid by way of damages, rent or otherwise) shall be paid, to the extent it is sufficient, in the following order:

(a)  First, to the costs of repairs, replacement and restoration of the Property and Improvements if this Agreement is not terminated.

Timacuan Partners, LLC Lease Agreement
C:\Users\JF.Douglas\User\Documents\Timacuan - Operate copy lease  11-2-307 execution copy  Timacuan Partners, LLC.docx

Page 20

(b)     Second, the party prosecuting the award claim shall be reimbursed for its reasonable attorneys' fees, appraisal fees and other reasonable costs incurred in prosecuting the claim for the award.

(c)     Third, Lessee shall be paid that portion of the award allocable to the Improvements, and the unamortized balance of Lessee's rental interests in the Property determined in accordance with GAAP.

(d)     Fourth, the balance will be paid to Lessor and Lessee as their interests may appear.

12.3.   Temporary Taking. If the use or occupancy of the Property shall be temporarily (i.e., less than thirty (30) consecutive days) requisitioned by any governmental authority, civil or military, then this Agreement shall continue in full effect notwithstanding such requisition, without abatement or reduction of Annual Rent, and Lessee shall be entitled to receive the entire net award payable by reason of such temporary requisition (whether paid by way of damages, rent or otherwise) unless the period of governmental occupancy extends beyond the end of the Term of this Agreement in which case the award shall be equitably apportioned between Lessor and Lessee as of the date of the end of the Term of this Agreement.

## ARTICLE 13.
## IMPROVEMENTS AND ALTERATIONS

### 13.1.   Improvements and Alterations by Lessee.

13.1.1.   Major Alterations. Lessor acknowledges that major alterations and renovations to the Club's golf course and Improvements may be undertaken by Lessee from time to time ("Major Alterations"). Lessee shall obtain prior written consent, which consent shall not be unreasonably withheld from Lessor for any changes to the prior renovations (locker rooms) before making any such alterations. Lessor hereby agrees that Lessee shall be entitled to perform such Major Alterations on or about the Property; provided, however, that except for the items included in the Initial Capital Improvements Plan, the cost of the same shall not exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) per occurrence for all structural and material changes to the existing golf course or clubhouse, and Lessee shall provide Lessor with at least thirty (30) days prior written notice of any such work, including a detailed description of the work and the documented budgeted cost for same.

13.2.   Conditions. All of alterations done pursuant to this Article 13 shall be consistent with the use of the Improvements for the permitted use stated in Article 5 of this Agreement and made for the purpose of improving the Property for that use. All of such alterations so made by Lessee shall be for the benefit of Lessee in operating the Property and shall not be deemed to be rent paid or payable to Lessor. All work shall be performed by Lessee shall be made in compliance with all federal, state and local laws and ordinances applicable thereto.

In the event Lessee desires to perform any alteration, Lessee shall provide Lessor the following (i) copies of the drawings, plans and specifications for such work, (ii) copies of all contracts and a list of all contractors and subcontractors performing work, (iii) copies of all

Tinaucuan Partners, LLC Lease Agreement

C:\Users\BThompson\Desktop\Document\Tinaucuan   signature copy\lease- 11-2-2022 version copy- Tinaucuan Partners, LLC docx

Page 21

permits, consents and approvals for such work, (iv) lien waivers from all contractors and subcontractors upon completion of work, (v) progress reports regarding the completion of work, and (vi) an "as-built" survey or drawings of the completed work.

13.3. Mechanic's Liens. Lessor shall not be liable for any labor or materials furnished or to be furnished to Lessee upon credit and no mechanic's or other lien for any such labor or material shall attach to or affect the reversion or other interest of Lessor in and to the Property. Whenever any mechanic's or materialmen's lien shall have been filed against any portion of the Property, based upon any act of Lessee or its agents, employees, contractors or subcontractors, Lessee shall immediately take such action by bonding, deposit or payment as will remove such lien. If Lessee has not removed such lien within thirty (30) days, except any lien being contested by Lessee after notice to Lessor, Lessor may pay the amount of such lien or discharge the same by deposit and the amount so paid or deposited shall be paid by Lessee to Lessor upon demand, together with interest at the Agreed Rate from the date funds are advanced by Lessor and reasonable attorneys' fees and costs.

## ARTICLE 14.
## COVENANTS, REPRESENTATIONS AND WARRANTIES

14.1. Lessor's Covenants, Representations and Warranties. Lessor covenants, represents and warrants to Lessee as follows as of the commencement of this Agreement:

14.1.1. Title. Lessor has title to the Property, subject to general real estate taxes on the Property for the current year and the Permitted Encumbrances.

14.1.2. Litigation. Lessor does not have any pending litigation that would adversely affect Lessees right to operate the property in accordance with the terms of this Agreement.

14.1.3. Due Authorization. Lessor is duly organized and legally existing under the laws of Florida and is duly qualified to do business in the State of Florida. The execution and delivery of, and Lessor's performance under, this Agreement are within Lessor's powers and have been duly authorized by all requisite company action. The person executing this Agreement on behalf of Lessor has the authority to do so.

14.1.4. Binding Obligation of Lessor Continuance of Existence. This Agreement constitutes the legal, valid and binding obligation of Lessor and is enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights. During the term of this Agreement, Lessor shall maintain its legal existence.

14.1.5. No Parties in Possession. There are no tenants in possession of any portion of the Property.

14.1.6. Applicable Law Compliance. To Lessor's knowledge, Lessor has received no written notice that the location, construction, occupancy, operation or use of the Property (including the buildings, improvements, fixtures and equipment forming a part

Timacuan Partners, LLC Lease Agreement
C:\Users\PDouglas\White\Documents\Timacuan ... ignore copy lease-11-3-2022\timacuan copy-Timacuan Partners, LLC chen

Page 22

thereof) violates any applicable law, statute, ordinance, rule, regulation, or any restrictive covenant or deed restriction affecting the Property, including seizures or liens from any tax authority(s) (hereinafter sometimes called "Applicable Laws").

14.1.7. Wage and Hour Compliance. To Lessor's knowledge, Lessor is in compliance with all applicable federal and state wage and hour laws and regulations with regard to all employees engaged by Lessor in the operation of the Property.

14.1.8. Zoning. To Lessor's knowledge, the zoning of the Property permits the current use of the Property without any special variances and to Lessor's knowledge there is no threatened action or proceeding which could result in a modification or the termination of the present zoning of the Property.

14.1.9. Tangible Personal Property List. To Lessor's knowledge, Exhibit M attached hereto is a complete and correct list as of the date noted thereon of all the Tangible Personal Property included on the Bill of Sale.

14.1.10. Membership Lists. To Lessor's knowledge, Exhibit N attached hereto is a complete listing as of the date noted thereon, of all Members of the Club, their membership numbers, classifications and categories in the Lessor and their membership in Lessor.

14.1.11. Environmental. To Lessor's knowledge, there have been no instances of deploying or otherwise violations for use of non- environmental friendly materials or waste or any actions or inactions which violated any of the applicable environmental laws.

14.1.12. Water. Lessor (or its affiliate), if required shall assign the "registrant" under the State of Florida Registration and Withdrawal Registration for the Property and the parties shall cooperate reasonably to ensure compliance with all laws and regulations applicable to same.

14.1.13. Graveyard. No portion of the Property has been used as a graveyard.

14.1.14. Taxes. Lessor covenants that there are no outstanding taxes due on the Property.

14.1.15. Contracts. To Lessor's knowledge, there are no outstanding contracts, commitments, leases or agreements of any nature to which the Lessee or the Property is or may become subject, except for the Contracts listed on Exhibit E.

14.1.16. Waste Disposal Activities. Exhibit P ("Waste Disposal Activities") sets forth (i) all waste management activities at the Property, (ii) all communications relating to pollution or environmental concerns to or from any party with respect to the Property, (iii) all sites to which Lessor has directly or indirectly released, stored, dumped, buried, injected, treated, or otherwise disposed of, hazardous substances or hazardous waste or other toxic or hazardous material generated at the Property, and (iv) all parties with whom Lessor contracted to do the same.

Timacuan Partners, LLC Lease Agreement
C:\Users\Douglas\White\Documents\Timacuan - signmore copy lease: 11-1-2022\execution copy  Timacuan Partners, LLC docx

Page 23

Whenever a representation or warranty contained in this Section 14.1 are said to be limited "to Lessor's knowledge", such representation or warranty is based solely on the actual knowledge of the current manager(s) of Lessor after reasonable investigation and excludes any facts discovered by Lessee or disclosed in writing to Lessee during the course of its investigation and review of the Property.

14.2. Lessee's Representations and Warranties.    Lessee represents and warrants to Lessor as follows as of the date of this Agreement:

14.2.1.  Litigation.  To Lessee's knowledge, there is no pending litigation or administrative proceedings which could adversely affect the ability of Lessee to perform any of its obligations hereunder.

14.2.2.  No Required Consents.  To Lessee's knowledge, no consent or approval of any person or entity or of any governmental authority is required with respect to the execution and delivery of this Agreement by Lessee or the consummation by Lessee of the transactions contemplated hereby or the performance by Lessee of its obligations hereunder.

14.2.3.  No Breach of Other Agreements.  To Lessee's knowledge, performance of this Agreement will not result in any breach of, or constitute any default under, or result in the imposition of any lien or encumbrance upon the Property under, any agreement or other instrument to which Lessee is a party or by which Lessee might be bound.

14.2.4.  Due Authorization.  Lessee has applied or is in the process to register as a duly qualified to do business in the State of Florida. The execution and delivery of, and Lessee's performance under, this Agreement are within Lessee's powers and have been duly authorized by all requisite partnership action. The person executing this Agreement on behalf of Lessee has the authority to do so.

14.2.5.  Binding Obligation of Lessee.  This Agreement constitutes the legal, valid and binding obligation of Lessee enforceable in accordance with its terms, subject to laws applicable generally to creditor's rights.

14.2.6.  Bankruptcy.  No bankruptcy, insolvency, rearrangement, or similar action or proceeding, whether voluntary or involuntary, is pending or threatened against Lessee, or its parent corporation, and Lessee has no intention of filing or commencing any such action or proceeding.

Whenever a representation or warranty contained in this Section 14.2 are said to be limited "to Lessee's knowledge", such representation or warranty is based solely on the actual knowledge of the current officers and directors of Lessee after reasonable investigation and excludes any facts disclosed in writing to Lessor.

## ARTICLE 15.
## TRANSFER

15.1.   Assignment and Subletting. Without the prior written consent of Lessor (which may be withheld in Lessor's sole discretion), Lessee may not assign this Agreement or sublet all or any portion of the Club or Property to a third party. Notwithstanding the above, Lessee may, without the consent of Lessor, (i) (A) assign this Agreement to a third party or (B) sell or assign direct or indirect ownership interest in Lessee, provided that (x) such transactions described in (A) and/or (B) are made in connection with a sale or subleasing of multiple properties owned by Affiliates of Lessee and/or the sale of ownership interests in multiple Affiliates of Lessee (any such transaction, a "Portfolio Sale") and (y) the proposed transferee has experience in the ownership or operation of facilities comparable to the Club; or (ii) assign this Agreement to an Affiliate, including the Affiliate that Lessee contemplates forming to be the Lessee under this Agreement and provided that such Affiliate is either a Florida entity or is a foreign entity qualified to transact business in the state of Florida. Except as set forth above, Lessee shall not, without the prior written consent of Lessor, which consent may be withheld or granted in Lessor's sole discretion, assign this Agreement or sublet the whole or any part of the Property.

15.2.   Lessee Right of First Refusal. If during the Term, Lessor desires to transfer title to all or a portion of the Property to a prospective purchaser, Lessor shall give Lessee written notice of such intent together with a copy of the executed contract or, if there is no contract, a written statement outlining the purchase price and other general business terms upon which Lessor is willing to sell and the prospective purchaser is willing to purchase all or any portion of the Property (the "Proposal") together with an offer to enter into a sales contract with Lessee on the same terms and conditions ("Right of First Refusal"). If Lessee fails to accept such offer in writing within thirty (30) days after receipt of the Proposal and the offer, Lessor shall be entitled to sell the Property to the other prospective purchaser on the terms set forth in the Proposal (provided, the purchase price may be reduced by up to 10% without having to present the revised Proposal to Lessee) and subject to the terms of this Agreement which the prospective purchaser must assume and Lessee shall execute such instruments in form reasonably acceptable to Lessor evidencing the waiver of the right granted to Lessee in this Section 15.2. If the terms of the Proposal are modified in a material manner (including, without limitation, a reduction in the proposed sales price of ten percent (10%) of more), the requirements of this Section shall again be applicable and Lessor must re-offer the Property to Lessee prior to a sale to any third party. The granting of any mortgage, deed of trust or other conveyance of the Property in trust as collateral for indebtedness of Lessor shall not constitute a transaction subject to this section. **Lessees' Right of First Refusal shall survive the termination of this Agreement for a period of five (5) years.**

15.3   Lessor Sale or Assignment. Subject to the Right of First Refusal, Lessor may assign this Agreement to any purchaser of the Property who accepts and assumes Lessor's obligations and duties hereunder in writing, and upon any such assignment Lessor shall be released of all liability hereunder, and Lessee agrees to attorn to and acknowledge such assignee of Lessor's interest in this Agreement as the "Lessor" from and after the effective date of such assignment.

Timacuan Partners, LLC Lease Agreement
C:\Users\lJDouglas\iBox\Documents\Timacuan - Signature copy from- 11-1-2027\execution copy- Timacuan Partners, LLC doc+

Page 35

15.4    Lessee's Sourcing of a Buyer.  In the event Lessee sources a Buyer for the Property and the transaction closes, Lessee shall be paid a commission of six-percent (6%) of the gross sales proceeds.

15.5    Easements.  Lessor reserves the right to grant to third parties temporary or perpetual easements for utilities, drainage and access over, under and through the Property provided that such easements have been approved by Lessee (such approval not to be unreasonably withheld, conditioned or delayed) and do not materially interfere with Lessee's use of the Property for the permitted use and the instruments effecting the conveyance of such easements contain an agreement by the grantee to indemnify Lessee for injuries or damages incurred by Lessee as a result of the use of such easement by the grantee and for the grantee to be responsible for any damages to the Property. Lessee agrees to join in such easements at Lessor's request. The granting of any such easement shall not give rise to Lessee's Right of First Refusal set forth in Section 15.2.

## ARTICLE 16.
## QUIET ENJOYMENT; NONDISTURBANCE; TERMINATION

16.1.    Quiet Enjoyment. Lessor, for itself, its successors and assigns, agrees that upon the due performance and observance by Lessee of the terms, covenants and conditions contained herein, Lessee shall, and may, at all times during the Term of this Agreement, peaceably and quietly have, hold and enjoy the Club and the Property, free from hindrance, ejection, removal, prohibition, or disturbance by Lessor or any other party claiming under, through, or by right of Lessor.

16.2.    Non-disturbance Agreement. If applicable, Lessor shall obtain for Lessee from the holder of any present and any and all future mortgagee or mortgagees of the Property (excluding debt obtained by Lessee), or any portion thereof, a non-disturbance agreement in a form acceptable to Lessee (the "Non-disturbance Agreement") assuring Lessee that in the event of a default and/or foreclosure under such mortgage, Lessee's rights under this Agreement shall continue unimpaired. After the execution of a Non-disturbance Agreement by any present or future mortgagee or mortgagees of the Property, or any portion thereof, Lessor shall immediately deliver said Non-disturbance Agreement to Lessee and Lessee may cause said Non-disturbance Agreement to be recorded in the real property records of Seminole County, Florida.

16.3.    Termination.  At any time after Year 16, Lessor may terminate this Lease Agreement by delivery of written notice of termination to Lessee and payment to Lessee of the applicable Early Termination Fee (as determined below), plus the unamortized cost of capital improvements to the Property (as determined by GAAP) made by Lessee with Lessee's funds (provided such improvements were made with Lessor's prior written approval, not to be unreasonably withheld). Provided, however, Lessor may offset any amount owed to Lessee pursuant to the foregoing by any amounts due and payable by Lessee pursuant to this Agreement.

Tinacina Partners, LLC Lease Agreement
C:\Users\WDouglas\\WiveDocuments\Tinacuan - signature copy base  11-2-2022truncation copy  Tinacuan Partners, LLC.docx

Page 26

The "Early Termination Fee" after year 5, shall be based on the following schedule:

| Year 6 -9 | $2,000,000 plus the unamortized depreciation of any Improvements |
| Year 10-12 | $1,750,000 plus the unamortized depreciation of any Improvements |
| Year 12 -15 | $1,500,000 plus the unamortized depreciation of any Improvements |
| After Year 15 | $1,000,000 plus the unamortized depreciation of any Improvements |

## ARTICLE 17.
## SURRENDER UPON EXPIRATION

17.1.   Upon the expiration of the Term or the earlier termination of this Agreement in accordance with the terms of this Agreement:

(a)    Lessee shall surrender the Property to Lessor subject to reasonable wear and tear and free of liens, except for the Permitted Encumbrances, Approved Additional Debt, and the Contracts (or any replacements thereof), to the extent assignable and Lessor desires to assume same (with Lessee being responsible for all obligations accruing under the foregoing as of the date of assignment to Lessor, and any fees for such assignment or termination, as applicable).

(b)    Unless otherwise agreed to by Lessor and Lessee, any Improvements remaining on the Property following the expiration of the Term or the earlier termination of this Agreement in accordance with the terms of this Agreement shall be deemed to have been irrevocably abandoned by Lessee and Lessee shall have no further legal or equitable right or interest or claim for unjust enrichment therein without any compensation therefore payable to Lessee and Lessee shall execute, in a recordable form reasonably acceptable to Lessor, a deed and/or a bill of sale and assignment in a form similar to that contained in Exhibit K conveying to Lessor or its designee without any compensation therefore payable to Lessee, any and all personal property located on the Property or owned or used by Lessee in connection with the operation of the Property including the Inventory and Tangible Personal Property (or replacements thereof).

(c)    Lessee shall deliver to Lessor the Membership Records, Membership Agreements, Membership Plan, and the Rules and Regulations; and Lessor shall thereafter honor the Membership Agreement, the Membership Plan and the Rules and Regulations.

(d)    Lessee shall surrender all keys, access cards and other security entrance devices to the Improvements (if abandoned) to Lessor and make known to Lessor the combinations and security codes for all combination locks and alarm systems used in connection with the Property.

(e)    Lessee shall surrender to Lessor the originals or legible copies of all records, data and other information in Lessee's possession or control relating to Lessee's operation, use and management of the Property, including, without limitation, all plans and specifications of all Improvements, all inspection reports and studies of the Property (including, without limitation, any reports regarding the estimated useful life of mechanical systems or components of Improvements), all operation manuals and warranties for all

Timacuan Partners, LLC Lease Agreement
C:\Users\WDouglasWhite\Documents\Timacuan - signature copy lease- 11-3-NWTransaction copy- Timacuan Partners, LLC.docx

Page 27

personal property now or hereafter used on or in connection with the Property, and all licenses, leases, applications, permits, contracts and other agreements.

(f)     Lessee and Lessor shall execute an assignment and assumption agreement covering all licenses, warranties, leases, permits, contracts and other agreements then affecting the Property.

(g)     Lessee shall surrender to Lessor all funds in the Capital Reserve Account, from whatever source(s) derived.

(h)     Utility costs, Impositions, prepaid deposits and deferred income, accounts payable and accounts receivable shall be prorated, adjusted and accounted for in a manner similar to that contained in Section 8.

(i)     Lessor shall not be obligated to hire any employee of Lessee, except those agreed to by and between Lessor and Lessee prior to the date of expiration or termination (as applicable), and Lessor is not assuming any employment agreement of any nature between Lessee and its employees. Lessee shall terminate the employment of all of its employees related to the operation of the Property prior to the expiration or termination of this Lease Agreement (as applicable), and shall pay to all employees any vacation pay, sick time pay, or other compensation due pursuant to Lessee's employee policies, or applicable federal, state, or local policies, and any vacation, sick time pay or other compensation due Lessee's employees. Lessee shall indemnify and hold Lessor harmless and defend against any claims by any employees terminated by Lessor, including, without limitation, any claims filed with the Equal Employment Opportunity Commission.

## ARTICLE 18.
## PERMITTED CONTESTS

18.1.   Contest of Claims. In addition to the right to contest Impositions granted to Lessee in Section 6.2.1, neither party hereto shall be required to comply with any statute, law, rule, order, regulation or ordinance referred to in Section 5.7 or any other section of this Agreement, to discharge, pay or remove any lien, encumbrance or charge referred to in Sections 11.1 or 13.2 or to make any payment as provided in Section 11.1 so long as the party shall (a) contest, in good faith and at its expense, the existence, the amount or the validity thereof, or the extent of its liability therefore, by appropriate proceedings which shall operate during the pendency thereof to prevent (i) the foreclosure or other sale or loss of the Property, or any part thereof, or the rent, or any portion thereof to satisfy any lien, encumbrance, charge or payment so contested, (ii) the sale, forfeiture or loss of the Property, or any part thereof, or the rent, or any portion thereof, and (iii) any substantial and material interference with the use or occupancy of the Property or any part thereof, and (b) if requested by the non-contesting party, provides the non-contesting party with a bond in form and from a company reasonably acceptable to the non-contesting party or deposits into escrow with an escrow agent acceptable to Lessor and Lessee cash or other reasonably acceptable surety in an amount reasonably calculated to pay at the conclusion of the contest, if unsuccessful, the lien, encumbrance, charge or payment contested and all accrued interest and penalties; provided, however, that no such bond, security or escrow shall be required if, as a condition to bringing the contest described in (a) above the contesting party is required to post a

Tunacoon Partners, LLC Lease Agreement
C:\Corn\IIDongko\Wise\Documents\Documents - signers soft, Lease 11-2-2022extension expo- Tunacool Partners, LLC.docx

Page 28

bond or other security or place into escrow or with a court equivalent or greater funds or surety. While any such proceedings are pending, the other party shall not have the right to remove or cause to be discharged the lien, encumbrance or charge thereby being contested. The contesting party will pay, indemnify, defend and save the other party harmless against, any and all losses, judgments, decrees and costs (including all reasonable attorneys' fees and expenses) in connection with any such contest and will, promptly, but no later than ten business (10) days after the final settlement, compromise or determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interests, costs and expenses therefore in connection therewith. If the contesting party shall fail to do so, the non-contesting party shall have the right to use the bond, surety or cash posted by the contesting party to satisfy all of the foregoing liabilities.

## ARTICLE 19.
## DEFAULTS

19.1.  Default by Lessee. The following events shall be deemed to be events of default (herein collectively called "Events of Default" and each, an "Event of Default") by Lessee under this Agreement:

(a)     Lessee shall fail to pay off Lessor's Mortgage Loan within sixty (60) months follow commencement and have Lessor's personal guarantees on such Lessor's Mortgage Loan released. The Annual Rent Payment shall accrue at the rate set forth in 4.1 and shall be due Lessor in the event Lessee fails to pay off Lessor's Mortgage Loan.

(b)     Lessee shall fail to pay any Annual Rent Payment to Lessor when the same becomes due and payable and such failure shall continue for a period of ten (10) days after written notice thereof (specifying the amount not paid) given by Lessor to Lessee.

(c)     Lessee shall fail to remit proof of spending the Initial Capital Payments on capital improvements or deposit any sums into the Capital Reserve Account when required under Section 4.1 and such failure shall continue for a period of thirty (30) days after written notice thereof (specifying the amount Lessor calculates should have been deposited, but without waiving the right to require Lessee to deposit the full amount if Lessor's calculation is later determined to have been too low) given by Lessor to Lessee.

(d)     Lessee shall fail to pay any Imposition when the same becomes due and payable, and such failure shall continue for a period of 30 days after written notice thereof given by Lessor to Lessee.

(e)     Lessee shall fail to maintain the insurance coverage required to be maintained by Lessee under Section 6.3 of this Agreement, and such failure shall continue for a period of 30 days after written notice thereof given by Lessor to Lessee.

(f)     Lessee shall be in default under any of the Contracts (including any replacement thereof) beyond any applicable notice and cure period as a result of its failure to pay any payment to a lessor, and such failure shall continue for a period of 30 days after written notice thereof given by Lessor to Lessee.

(g)     If Lessee, without the prior written consent of Lessor, shall file a voluntary petition in bankruptcy or shall be adjudicated insolvent or bankrupt, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal, state, or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or if Lessee shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for any or all of them or of all or any substantial part of the Property; or shall make any general assignment for the benefit of creditors.

(h)     If Lessee shall fail to comply with any other term, covenant or condition contained in the Agreement and such failure shall continue for thirty (30) days after written notice thereof by Lessor to Lessee specifying the term, covenant or provision not performed and the action required to cure the failure, provided that, if Lessee takes action to cure such failure during such thirty (30) day period but is unable, by reason of the nature of the work involved, to cure the same within such period, Lessee shall not be deemed to have committed an Event of Default if Lessee commences to cure same within the initial thirty (30) days period and thereafter diligently pursues the curing of the same, but in no event shall such cure be completed later than sixty (60) days after Lessor's initial notice.

The acceptance by Lessor of partial performance of any obligation by Lessee (including payment by Lessee of less than the full amount of any rent or other sum due) shall not constitute a waiver of any Event of Default or any agreement by Lessor to accept less than full performance of Lessee's obligations (including payment in full of all rent and other sums due), and no payments marked "payment in full", "accord and satisfaction" or otherwise stating that such lesser sum constitutes full payment be enforceable against Lessor.

19.2.   Default by Lessor. The occurrence of any of the following events shall constitute a default by Lessor under this lease (herein collectively called "Lessor Defaults" and each a "Lessor Default"):

(a)     Lessor shall fail to comply with any material term, covenant or provision of this Agreement other than a failure specifically described in this Section 19.2 and such failure shall continue for thirty (30) days after written notice thereof by Lessee to Lessor specifying in detail the term, covenant or provision not performed and the action required to cure the failure, provided, that if Lessor takes action to cure such failure during such thirty (30) day period but is unable by reason of the nature of the work involved, to cure the same within such period, Lessor shall not be deemed to have committed a Lessor Default if Lessor thereafter diligently pursues the curing of the same.

(b)     If Lessor, without the consent of Lessee, shall file a voluntary petition in bankruptcy or shall be adjudicated insolvent or bankrupt, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal, state, or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or if Lessor shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator for any or all of them or of all or any substantial part of the Property; or shall make any general assignment for the benefit of creditors.

Timorican Partners, LLC Lease Agreement
C:\Users\RThomas\WMW\Documents\Documents - appears two lines: 11-5-2022 execution copy; Timorican Partners, LLC.docx

Page 30

## ARTICLE 20.
## REMEDIES UPON DEFAULT

20.1. Lessor's Remedies. If an Event of Default shall have occurred, Lessor shall have and be entitled, then or at any time thereafter while such Event of Default shall continue, to exercise any of the following remedies:

(a) Seek specific performance of Lessee's obligations;

(b) Pursue all rights and remedies at law or equity to enforce its rights under this Agreement; or

(c) Proceed to remedy the Event of Default. If Lessor shall pay any monies on behalf of Lessee, or incur any expenses in correction of any violation by Lessee of covenants herein set forth, the amounts so paid or incurred shall, at Lessor's option, and upon notice to Lessee, be considered additional payments ("Additional Payment") which will be due and payable within thirty (30) days after written demand therefore together with interest at the Agreed Rate from the date advanced by Lessor;

20.1.1. Remedy of Termination. In addition to the remedies set forth in Section 20.1 above, if any Event of Default described in clauses (a), (b), (d) and (g) of Section 19.1 shall have occurred, Lessor shall have and be entitled then or at any time thereafter while such Event of Default shall continue, to terminate this Agreement and receive a payment of $100,000 as liquidated damages. The parties agree the potential damages of Lessor in the event of a termination would be difficult to ascertain and agree such amount is a reasonable estimate of Lessor's damages and not a penalty. Seller shall have no right to terminate this Agreement following an Event of Default except as provided in Section 20.1.1.

20.2. Lessee's Remedies. If a Lessor Default shall have occurred and shall not have been cured within the applicable cure period, if any, Lessee shall have and be entitled, then or at any time thereafter, to exercise the following remedies:

(a) Seek specific performance of Lessor's obligations;

(b) Pursue its remedies (in addition to any right to terminate this Agreement) at law or, in equity, to enforce its rights under this Agreement and/or to recover damages;

(c) Terminate this Agreement by giving notice thereof to Lessor and commence an action for damages.

20.3. Remedies Cumulative. No mention in this Agreement of any specific right or remedy shall preclude either party from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled either at law or in equity except that the right of Lessor to terminate this Agreement shall be expressly limited as provided in this Article 20; and the failure of either party to insist in any one (1) or more instances upon the strict performance of any covenant of this Agreement or to exercise any option or right herein

contained shall not be construed as a waiver or relinquishment for the future to exercise or enforce such covenant, right, or option, but the same shall remain in full force and effect unless the contrary is expressed in writing by such party.

## ARTICLE 21.
## ATTORNEY'S FEES

21.1. Attorney's Fees. In the event of any action or proceeding brought by either party against the other arising out of this Agreement, or any court proceedings to enforce the terms and conditions of this Agreement or to recover damages, the prevailing party in the event of such proceeding shall be entitled to recover from the party in default reasonable attorneys' fees and costs incurred in taking such action.

## ARTICLE 22.
## NOTICES

22.1. Notices. Any notices or other communications required or permitted hereunder shall be sufficiently given if in writing and (i) delivered personally, (ii) sent by email with receipt confirmation, (iii) sent by overnight delivery service or (iv) sent by certified mail, return receipt requested, postage prepaid, addressed as shown below, or to such other address as the party concerned may substitute by written notice to the other. All notices personally delivered shall be deemed received on the date of delivery. All notices forwarded by mail shall be deemed received on a date seven (7) days (excluding Sundays and legal holidays when the U.S. mail is not delivered) immediately following date of deposit in the U.S. mail. Provided, however, the return receipt indicating the date upon which all notices were received shall be prima facie evidence that such notices were received on the date on the return receipt.

| Lessor: | Timacuan Partners, LLC |
| | 550 Timacuan Blvd. |
| | Lake Mary, Florida 32746 |
| | Attn: Claire Zhang |
| | Claire@eaglesdream.com |

| Lessee: | LINX OF LAKE MARY, LLC |
| | 14658 Gap Way #647 |
| | Haymarket, Virginia 20168 |
| | Attn: Douglas White |
| | Email: wdouglaswhite@resortdevpartners.com |

| With a copy to: | Addison Law |
| | 5429 LBJ Freeway, Suite 400 |
| | Dallas, Texas 75240 |
| | Attn: Matthew C. Martin |
| | Email: martin@addisonlaw.com |

*Timacuan Partners, LLC Lease Agreement*
C:\Users\#Dougle White\Documents\Timacuan - approve copy lines- 11 2 2022/execution copy- Timacuan Partners, LLC.docx

Page 32

No notice to either Lessor or Lessee shall be deemed given or received unless the person or entity noted "with a copy to" is also given notice in the same manner as any notice given to either Lessor or Lessee. In no event shall either party be entitled to designate, now or at any time in the future, more than three (3) persons or entities to receive notices on behalf of that party, including the party. If more than three persons, entities or addresses are provided, the party sending the notice may elect, at its discretion, to send the notice to any three of the persons, entities or addressees provided.

## ARTICLE 23.
## INDEPENDENT ENTITY

23.1. Independent Corporation. Lessor agrees that the parent or affiliated entities of Lessee may form, organize, provide services to, provide loans and funds to, negotiate for, provide personnel to, make representations on behalf of, and from time to time take actions on behalf or for the benefit of Lessee by direct dealings with Lessor or those acting for it, and that any such actions shall be deemed to be the actions of Lessee and not of the parent or affiliated entity, even if the parent or affiliated entity is paid a fee by Lessee.

## ARTICLE 24.
## ARBITRATION

24.1. Arbitration. Any controversy, claim or dispute arising out of or relating to this Agreement, including any alleged breach or threatened breach of the provisions contained in this Agreement, will, upon demand of a party to the controversy, claim, or dispute, be resolved by arbitration held in Seminole County, Florida, and administered by the AAA in accordance with the Commercial Arbitration Rules of the AAA and, to the maximum extent applicable, pursuant to the Federal Arbitration Act, 9 U.S.C. Section 1 et seq. An award rendered in any such proceeding shall be final, binding, and non-appealable, and judgment thereon may be entered in any court having competent jurisdiction. The laws of the State of Florida shall be the choice of law for any arbitration proceeding.

Notwithstanding anything to the contrary, the foregoing shall not operate to prohibit Lessor from pursuing an action in summary ejectment or eviction of Lessee from the Property through the appropriate court(s) having jurisdiction and the authority to award possession of the Property to Lessor; provided, however, no award or judgment granting Lessor possession shall be deemed to operate as a waiver of any other rights or remedies of Lessor or an election of remedies.

## ARTICLE 25.
## MISCELLANEOUS

25.1. Estoppel Certificate. Each party hereto agrees at any time and from time to time, upon not less than fifteen (15) business days' prior written notice by the other party, to execute, acknowledge and deliver, without charge, to the requesting party, or to any person designated by such party, a statement in writing stating that this Agreement is unmodified (or if there be modifications, identifying the same by the date thereof and specifying the nature thereof), that no notice of default or notice of termination of this Agreement has been served on the requesting party

Timucuan Partners, LLC Lease Agreement
C:\Users\ITDataServer\Documents\Timucuan - signature copy lines: 11-3-2022\reinstation copy Timucuan Partners, LLC docx

Page 33

(or if the representing party has served such notice, that the same has been revoked, if such be the case), that to the representing party's knowledge no Event of Default or Lessor's Default exists under this Agreement (or if any such default does exist, specifying the same), and the date to which the Annual Rent Payment has been paid by Lessee.

25.2.   Lessor Approval. Unless otherwise specifically stated in this Agreement, wherever in this Agreement the approval or consent of Lessor is required or requested (or words of similar import), such words shall mean the approval or consent of Lessor. If Lessor does not respond to Lessee within thirty (30) days after such request is submitted to Lessor in writing pursuant to the terms of this Agreement, then such requested item(s) shall be deemed approved by Lessor.

25.3.   Memorandum. If desired by Lessee, Lessor and Lessee shall execute in recordable form a memorandum of this Agreement, including reference to the Right of First Refusal. At Lessee's sole cost, such memorandum may be recorded in the real property records of Seminole County, Florida.

25.4   Force Majeure. In the event performance by Lessor or Lessee of any term, condition or covenant in this Agreement, other than the payment of money, is delayed or prevented by any act of God, pandemic or endemic, strike, walkout, shortage of material or labor, restriction by any governmental authority, civil riot, terrorist attack, flood or any other cause not within the reasonable control of the performing party (a "Force Majeure Event"), the period for performance as to such term, condition or covenant shall be extended for a period equal to the period such party is so delayed or hindered.

25.5   Conflicts. In the event of any conflict between this Agreement and or any other agreement between the parties, this Agreement shall control.

25.6   Entire Agreement. This Agreement sets forth the entire agreement between the parties and no amendment or modification of this Agreement shall be binding or valid unless expressed in writing executed by all of the parties hereto.

25.7   No Partnership or Joint Venture. Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party as creating the relationship of a partnership or a joint venture between the parties; it being understood and agreed that neither any provision contained herein, nor any act of the parties hereto shall be deemed to create any relationship between the parties other than the relationship stated herein.

25.8   No Third-Party Beneficiaries. Nothing contained in this Agreement shall be deemed to establish any rights of Members or any other third parties against the parties hereto; it being the intent that the rights and obligations set forth herein are those of the parties alone with no third-party beneficiary rights intended. No Members of Lessor or any other third parties shall have any right to enforce this Agreement against Lessee.

25.9   Paragraph Headings. The paragraph headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several paragraphs hereof.

25.10  Applicability. This Agreement shall be binding upon and shall inure to the benefit of all parties hereto and their respective legal representatives, heirs and, to the extent that any assignment is permitted by the terms and provisions of this Agreement, to their respective assigns.

25.11  Gender. Etc. In this Agreement, wherever the context so requires, the neuter gender includes the masculine and/or feminine gender, and the singular number includes the plural, and vice versa.

25.12  Brokers. Both parties report that neither has engaged a broker for this transaction and, in the event either has, the applicable party shall be solely responsible for paying any broker a fee due to an agreement between such party and a broker.

25.13  Counterparts. This Agreement may be executed in two or more counterparts all of which taken together shall constitute one fully executed instrument.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Agreement on the date first above written.

LESSOR:

TIMACUAN PARTNERS, LLC

By: _____

Name: _____

Title: _____

LESSEE:

LINX OF LAKE MARY, LLC

By: _____

Name: _____

Title: _____

Timacuan Partners, LLC Lease Agreement
C:\Users\JFDouglas\White\Documents\Timacuan - jigsaver copy lease- 11-3-2022\execution copy\ Timacuan Partners, LLC.docx

Page 1

STATE OF Florida )
COUNTY OF Seminole )

Personally appeared before me, the undersigned, a Notary Public of said State and County, We, Xie, with whom I am personally acquainted, and who acknowledged that he/she is the authorized representative of Timacuan Partners, LLC, a Florida Limited Liability Company, and is authorized to execute this instrument on behalf of the company and that as such he/she executed this instrument for the company for the purposes therein contained.

*And who produced valid FL Drivers License*

Witness my hand, at office, this 3 day of November 2022.



Notary Public

My commission expires: _____

MARY BETH KELLY
MY COMMISSION # HH 195738
EXPIRES: March 5, 2026
Bonded Thru Notary Public Underwriters

STATE OF Florida )
COUNTY OF Seminole )

Personally appeared before me, the undersigned, a Notary Public of said State and County W. Douglas W. with whom I am personally acquainted and who acknowledged that he/she is the authorized representative of LINX OF LAKE MARY, LLC, a Florida limited liability company, and is authorized to execute this instrument on behalf of the company and that as such he/she executed this instrument for the company for the purposes therein contained.

*And who produce a valid FL Driver License*

Witness my hand, at office, this 3 day of November 2022.



Notary Public

My commission expires: _____

MARY BETH KELLY
MY COMMISSION # HH 195738
EXPIRES: March 5, 2026
Bonded Thru Notary Public Underwriters

Timacuan Partners, LLC Lease Agreement
C:\Users\WDouglasWebs\Documents\Timacuan - signature copy lease- 11-2-2022\execution copy- Timacuan Partners, LLC.docx

Page 2

## EXHIBITS

A. Land
B. Definitions
C. Lessor's Mortgage Loan
D. Permitted Encumbrances
E. Contracts
F. Club Credits
G. Development Parcels
H. Capital Improvements Plan
I. Possible Existing Defects
J. Accounts Payable and Accounts Receivable
K. Bill of Sale
L. omitted
M. Tangible Personal Property
N. ommitted
O. ommitted
P. Waste and Disposal Activities and Agreements
Q. Depreciation Reporting Form

*Timacuan Partners, LLC Lease Agreement*
C:\Users\HDouglas\Fka\Documents\Documents - signature copy lease 11 2 2025\timacuan copy\ Timacuan Partners, LLC.docx

Page 57

EXHIBIT "C"



**PETITION TO THE VALUE ADJUSTMENT BOARD**
**REQUEST FOR HEARING**

Section 194.011, Florida Statutes

DR-486
R. 11/23
Rule 12D-16.002
F.A.C.
Eff. 11/23
Page 1 of 3

You have the right to an informal conference with the property appraiser. This conference is not required and does not change your filing due date. You can present facts that support your claim and the property appraiser can present facts that support the correctness of the assessment. To request a conference, contact your county property appraiser.

For portability of homestead assessment difference, use the Petition to the Value Adjustment Board – Transfer of Homestead Assessment Difference – Request for Hearing Form (DR-486PORT). For deferral or penalties, use the Petition to the Value Adjustment Board – Tax Deferral or Penalties – Request for Hearing Form (DR-486DP). Forms are incorporated, by reference, in Rule 12D-16.002, Florida Administrative Code.

| COMPLETED BY CLERK OF THE VALUE ADJUSTMENT BOARD (VAB) | | | | |
|---|---|---|---|---|
| Petition # | County **Select County** | Tax year 20___ | | Date received |

| COMPLETED BY THE PETITIONER | |
|---|---|

**PART 1. Taxpayer Information**

| Taxpayer name | Timacuan Partners, LLC (Claire Zhang) | Representative | Patrick Schneider |
|---|---|---|---|
| Mailing address for notices | 550 Timacuan Blvd Lake Mary, FL 32746 | Parcel ID and physical address or TPP account # | 05-20-30-5JR-0B00-0000 550 Timacuan Blvd, Lake Mary, 32746 |
| Phone | 7049078385 | Email | patrick@golfcopartners.com |

The standard way to receive information is by US mail. If possible, I prefer to receive information by ☑ email ☐ fax.

☐ I am filing this petition after the petition deadline. I have attached a statement of the reasons I filed late and any documents that support my statement.

☐ I will not attend the hearing but would like my evidence considered. (In this instance only, you must submit duplicate copies of your evidence to the value adjustment board clerk. Florida law allows the property appraiser to cross examine or object to your evidence. The VAB or special magistrate ruling will occur under the same statutory guidelines as if you were present.)

Type of Property ☐ Res. 1-4 units ☐ Industrial and miscellaneous ☐ High-water recharge ☐ Historic, commercial or nonprofit
☐ Commercial ☐ Res. 5+ units ☑ Agricultural or classified use ☐ Vacant lots and acreage ☐ Business machinery, equipment

**PART 2. Reason for Petition**     Check one. If more than one, file a separate petition.

☑ Real property value (check one) ☑ decrease ☐ increase      ☐ Denial of exemption Select or enter type:
☐ Denial of classification     _____
☐ Parent/grandparent reduction      ☐ Denial for late filing of exemption or classification
☐ Property was not substantially complete on January 1      (Include a date-stamped copy of application.)
☐ Tangible personal property value (You must have timely filed a      ☐ Qualifying improvement (s. 193.1555(5), F.S.) or change of
return required by s.193.052. (s.194.034, F.S.))      ownership or control (s. 193.155(3), 193.1554(5), or
☐ Refund of taxes for catastrophic event      193.1555(5), F.S.)

☐ Check here if this is a joint petition. Attach a list of units, parcels, or accounts with the property appraiser's determination that they are substantially similar. (s. 194.011(3)(e), (f), and (g), F.S.)

[15] Enter the time (in minutes) you think you need to present your case. Most hearings take 15 minutes. The VAB is not bound by the requested time. For single joint petitions for multiple units, parcels, or accounts, provide the time needed for the entire group.

☐ My witnesses or I will not be available to attend on specific dates. I have attached a list of dates.

You have the right to exchange evidence with the property appraiser. To initiate the exchange, you must submit your evidence directly to the property appraiser at least 15 days before the hearing and make a written request for the property appraiser's evidence. At the hearing, you have the right to have witnesses sworn.

You have the right, regardless of whether you initiate the evidence exchange, to receive from the property appraiser a copy of your property record card containing information relevant to the computation of your current assessment, with confidential information redacted. When the property appraiser receives the petition, he or she will either send the property record card to you or notify you how to obtain it online.

Your petition will not be complete until you pay the filing fee. When the VAB has reviewed and accepted it, they will assign a number, send you a confirmation, and give a copy to the property appraiser. Unless the person filing the petition is completing part 4, the taxpayer must sign the petition in part 3. Alternatively, the taxpayer's written authorization or power of attorney must accompany the petition at the time of filing with the signature of the person filing the petition in part 5 (s. 194.011(3), F.S.). **Please complete one of the signatures below.**

DR-486
R. 11/23
Page 2 of 3

**PART 3. Taxpayer Signature**

Complete part 3 if you are representing yourself or if you are authorizing a representative listed in part 5 to represent you without attaching a completed power of attorney or authorization for representation to this form.
Written authorization from the taxpayer is required for access to confidential information from the property appraiser or tax collector.

☑ I authorize the person I appoint in part 5 to have access to any confidential information related to this petition.
Under penalties of perjury, I declare that I am the owner of the property described in this petition and that I have read this petition and the facts stated in it are true.

| _(signature)_ | Claire Zhang | 8/29/2025 |
|---|---|---|
| Signature, taxpayer | Print name | Date |

**PART 4. Employee, Attorney, or Licensed Professional Signature**

Complete part 4 if you are the taxpayer's or an affiliated entity's employee or you are one of the following licensed representatives.

I am (check any box that applies):

☐ An employee of _____ (taxpayer or an affiliated entity).

☐ A Florida Bar licensed attorney (Florida Bar number _____ ).

☐ A Florida real estate appraiser licensed under Chapter 475, Florida Statutes (license number _____ ).

☐ A Florida real estate broker licensed under Chapter 475, Florida Statutes (license number _____ ).

☐ A Florida certified public accountant licensed under Chapter 473, Florida Statutes (license number _____ ).

I understand that written authorization from the taxpayer is required for access to confidential information from the property appraiser or tax collector.

Under penalties of perjury, I certify that I have authorization to file this petition on the taxpayer's behalf, and I declare that I am the owner's authorized representative for purposes of filing this petition and of becoming an agent for service of process under s. 194.011(3)(h), Florida Statutes, and that I have read this petition and the facts stated in it are true.

| _____ | _____ | _____ |
|---|---|---|
| Signature, representative | Print name | Date |

**PART 5. Unlicensed Representative Signature**

Complete part 5 if you are an authorized representative not listed in part 4 above.

☐ I am a compensated representative not acting as one of the licensed representatives or employees listed in part 4 above AND (check one)

☐ Attached is a power of attorney that conforms to the requirements of Part II of Chapter 709, F.S., executed with the taxpayer's authorized signature OR ☐ the taxpayer's authorized signature is in part 3 of this form.

☑ I am an uncompensated representative filing this petition AND (check one)

☐ the taxpayer's authorization is attached OR ☑ the taxpayer's authorized signature is in part 3 of this form.

I understand that written authorization from the taxpayer is required for access to confidential information from the property appraiser or tax collector.

Under penalties of perjury, I declare that I am the owner's authorized representative for purposes of filing this petition and of becoming an agent for service of process under s. 194.011(3)(h), Florida Statutes, and that I have read this petition and the facts stated in it are true.

| _(signature)_ | PATRICK O Schneider | 8/29/2025 |
|---|---|---|
| Signature, representative | Print name | Date |

Case 6:24-bk-06781-GER   Doc 219   Filed 02/20/26   Page 68 of 117

INFORMATION FOR THE TAXPAYER

DR-486
R. 11/23
Page 3 of 3

Keep this information for your files. Do not return this page to the VAB clerk.

## Informal Conference with Property Appraiser

You have the right to an informal conference with the property appraiser. This conference is not required and does not change your filing due date. You can present facts that support your claim and the property appraiser can present facts that support the assessment. To request a conference, contact your county property appraiser.

## PART 1. Taxpayer Information

If you will not attend the hearing but would like your evidence considered, you must submit two copies of your evidence to the VAB clerk before the hearing. The property appraiser may respond or object to your evidence. The ruling will occur under the same statutory guidelines as if you were present.

The information in this section will be used by the VAB clerk to contact you regarding this petition.

## PART 2. Petition Information and Hearing

Provide the time you think you will need on page 1. The VAB is not bound by the requested time.

Exchange of Evidence Rule 12D-9.020(1)(a)-(c), F.A.C.:

(1)(a)1. At least 15 days before a petition hearing, the petitioner shall provide to the property appraiser a list of evidence to be presented at the hearing, a summary of evidence to be presented by witnesses, and copies of all documentation to be presented at the hearing.

2. To calculate the fifteen (15) days, the petitioner shall use calendar days and shall not include the day of the hearing in the calculation, and shall count backwards from the day of the hearing. The last day of the period shall be included unless it is a Saturday, Sunday, or legal holiday, in which event the period shall run until the end of the next previous day that is neither a Saturday, Sunday, or legal holiday.

(b) A petitioner's noncompliance with paragraph (1)(a) does not affect the petitioner's right to receive a copy of the current property record card from the property appraiser as described in s. 194.032(2)(a), F.S.

(c) A petitioner's noncompliance with paragraph (1)(a) does not authorize a value adjustment board or special magistrate to exclude the petitioner's evidence. However, under s. 194.034(1)(h), F.S., if the property appraiser asks in writing for specific evidence before the hearing in connection with a filed petition, and the petitioner has this evidence and knowingly refuses to provide it to the property appraiser a reasonable time before the hearing, the evidence cannot be presented by the petitioner or accepted for consideration by the board or special magistrate. Reasonableness shall be determined by whether the material can be reviewed,

investigated, and responded to or rebutted in the time frame remaining before the hearing. These requirements are more specifically described in subsection (8) of this rule and in paragraphs 12D-9.025(4)(a) and (f), F.A.C.

If you provide this evidence and make a written request for the property appraiser's evidence, the property appraiser must give you his or her evidence at least seven days before the hearing.

At the hearing, you have the right to have witnesses sworn.

## ADDITIONAL INFORMATION

### Required Partial Payment of Taxes (Section 194.014, F.S.)

You are required to make a partial payment of taxes if you have a VAB petition pending on or after the payment delinquency date (normally April 1, following the assessment year under review). If the required partial payment is not made before the delinquency date, the VAB will deny your petition. The last day to make a partial payment before the delinquency date is generally March 31. Review your tax bill or contact your tax collector to determine your delinquency date.

You should be aware that even if a special magistrate's recommended decision has been issued, a partial payment is still required before the delinquency date. A special magistrate's recommended decision is not a final decision of the VAB. A partial payment is not required only if the VAB makes a final decision on your petition before April 1. The payment amount depends on the type of petition filed on the property. The partial payment requirements are summarized below.

### Value Appeals:

For petitions on the value of property and portability, the payment must include:

* * All of the non-ad valorem assessments, and
* * A partial payment of at least 75 percent of the ad valorem taxes,
* * Less applicable discounts under s. 197.162, F.S.

### Other Assessment Appeals:

For petitions on the denial of a classification or exemption, or based on an argument that the property was not substantially complete on January 1, the payment must include:

* All of the non-ad valorem assessments, and
* The amount of the ad valorem taxes the taxpayer admits in good faith to owe,
* Less applicable discounts under s. 197.162, F.S.

EXHIBIT "D"

# NARDELLA

Phone: 407-966-2680
Fax: 407-966-2681
aballentine@nardellalaw.com

February 13, 2026

**VIA FEDEX 8887 7253 0472**
**AND EMAIL**
LINX OF LAKE MARY, LLC
Attn: Douglas White
14658 Gap Way #647
Haymarket, Virginia 20168
Email: wdouglaswhite@resortdevpartners.com

**Re: Notice of Termination of Lease Agreement, dated October 9, 2022**

Dear Mr. White:

This Notice of Termination ("Notice") is delivered by Timacuan Partners, LLC ("Lessor") to Linx of Lake Mary, LLC ("Lessee") pursuant to the terms and conditions of that certain Lease Agreement dated October 9, 2022 (the "Lease"), concerning the property commonly known as the Timacuan Golf Club, located on the Land described in Exhibit A to the Lease (the "Property"). Lessor hereby provides formal notice of termination of the Lease as set forth herein.

## *Recitals*

Lessor is the fee simple owner of the Timacuan Golf Club, and Lessee leases the Property from Lessor pursuant to the terms of the Lease for a term of fifty (50) years commencing on November 15, 2022. The Lease expressly provides that it is a "triple net" or "absolute net" lease, whereby Lessee is obligated to pay all costs and expenses incurred with respect to the Property, including all taxes and assessments, utility charges, insurance costs, maintenance costs, and all other charges, costs, and expenses of any kind related to the Property.

Lessee filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code on December 13, 2024 (the "Petition Date"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Case No. 6:24-bk-06781-GER (the "Bankruptcy Case"). On August 27, 2025, the Bankruptcy Court entered its Agreed Order Granting Debtor's Motion to Assume Unexpired Non-Residential Lease with Timacuan Partners, LLC, [ECF No. 172] (the "Agreed Order"), under which Lessee assumed the Lease post-petition. The Agreed Order modified, among other terms, Paragraph 4.1 of the Lease to include an obligation for Lessee to make monthly payments as provided in Sections 4.1 and 6.5 of the Lease. [ECF No. 172 at 2, ¶ 4.i.]. Additionally, the Agreed Order provided that Lessee and Lessor released any claims between one another prior to August 27, 2025. *Id.* at 4, ¶ 6. On September 15, 2025, the Bankruptcy Court confirmed Lessee's Final Subchapter V Plan of Reorganization (the "Plan") and ordered that all payments required under the Plan be made by the Debtor, with the Subchapter V Trustee monitoring performance. [ECF No. 181]. A default under the Agreed Order is also a default under Debtor's Final Subchapter V Plan of Reorganization, which incorporates the Agreed Order by reference. [ECF No. 180 at 16–17](the "Plan")

Andrew S. Ballentine
Partner

135 W Central Boulevard
Suite 300
Orlando, FL 32801



Linx of Lake Mary, LLC - Notice of Termination
February 13, 2026
Page 2

### *Events of Default*

Lessor hereby declares the following Events of Default under the Lease:

### I.    Failure to Pay Impositions (Property Taxes)

Pursuant to Section 6.2 of the Lease, during the Term, Lessee is obligated to promptly pay all taxes, assessments, and other governmental levies against the Property or any part thereof, together with any interest or penalties thereon (collectively, "Impositions"). The Lease further provides that if any statement for any Imposition is received by Lessor, Lessor shall immediately deliver the same to Lessee, and Lessee shall be responsible for prompt payment. Merriam-Webster defines "promptly" to mean "without delay" or "exactly at a particular time or the correct time." Section 197.333, Florida Statutes, provides that "[a]ll taxes shall be due and payable on November 1 of each year or as soon thereafter as the certified tax roll is received by the tax collector."

On November 1, 2025, the Taxes were imposed against the Property. As of the date of this notice, Lessee has not paid the Taxes.

Under Section 19.1(d) of the Lease, it constitutes an Event of Default if "Lessee shall fail to pay any Imposition when the same becomes due and payable, and such failure shall continue for a period of 30 days after written notice thereof given by Lessor to Lessee". Lessee has failed to pay the real estate property taxes due on the Property, and such failure has continued beyond the applicable notice-and-cure period.

Lessee's failure to satisfy the Impositions on the Property, i.e., the Taxes, as they became due, constitutes an Event of Default under Section 19.1(d) of the Lease.

### II.    Failure to Pay Rent

The Lease—as modified by the Agreed Order—requires Lessee to make monthly payments to the lender, HLI Investments and Funding-Fund 2, LLC ("HLI"). Under the note with HLI, Lessee was required to make monthly payments on the 15th of each month to HLI for the interest that accrued on the note, which is approximately $5,244.75 per month. The Plan provides that Lessee will make a monthly payment to HLI on an undisputed secured claim of $709,092.20 (accruing at 10.5% interest), plus reasonable attorney's fees and costs, which are undetermined. [ECF No. 180 at 14]. To keep current with accruing interest, Lessee would need. to make a monthly payment of at least $6,204.55. The Plan was confirmed on August 26, 2025, which would result in the first post-confirmation payment to HLI by Lessee due on September 15, 2025. *See* [ECF No. 181]. Based on your statements at the hearing held in the bankruptcy case on January 15, 2026, admitting that Lessee has not made any payment to HLI since the Plan was confirmed. Accordingly, Lessee is in default of the Plan and the Agreed Order as of September 15, 2025, and each month thereafter. The amount due to HLI under the Agreed Order and the Plan is a minimum of $31,022.75, based on monthly payments of at least $6,204.55. Pursuant to the terms of the Agreed Order, Plan, and the order confirming the Plan, Lessee's failure to make any payment to HLI is a default under the Plan and Agreed Order and, as such, a default under the terms of the Lease.

Linx of Lake Mary, LLC - Notice of Termination
February 13, 2026
Page 3

The terms of the Agreed Order provide that default as a result of Lessee's non-payment to HLI "shall give rise to termination under the TP Lease." [ECF No. 172 at 2, ¶ 4.i.]. As such, Lessee's default of this term results in a termination of the Lease.

### III.  Voluntary Bankruptcy Filing Without Lessor Consent

In addition to the foregoing, Section 19.1(g) of the Lease provides that it is an Event of Default if, without the prior written consent of Lessor, Lessee shall file a voluntary petition in bankruptcy or shall be adjudicated insolvent or bankrupt, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors.

On December 13, 2024, Lessee filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code without the prior written consent of Lessor. This filing constitutes an independent Event of Default under Section 19.1(g) of the Lease.

### Termination of the Lease

While not an Allowed Claimholder under the Plan, Timacuan gave notice to Lessee on January 15, 2026, of Lessee's failure to make the payments to HLI as required by the Plan and Agreed Order. Lessee failed to provide proof of any payments within the 15-business day period set forth in Article VII, Paragraph R. of the Plan, and is therefore in default of both the Lease and the Plan.

Pursuant to Section 20.1.1 of the Lease, in addition to the remedies set forth in Section 20.1, if any Event of Default described in clauses (a), (d), and (g) of Section 19.1 shall have occurred, Lessor shall have and be entitled, then or at any time thereafter while such Event of Default shall continue, to terminate the Lease and receive a payment of $100,000.00 as liquidated damages. The parties agreed that potential damages to Lessor in the event of termination would be difficult to ascertain and that such amount is a reasonable estimate of Lessor's damages and not a penalty.

Accordingly, based upon the foregoing Events of Default, Lessor hereby exercises its right under Section 20.1.1 of the Lease and **TERMINATES** the Lease Agreement effective March 1, 2026, consistent with Section 83.57(3), Florida Statutes. You shall have until February 28, 2026 to vacate the Property. This action is taken for the foregoing reasons.

### IV.  Lessee's Obligations Upon Termination

Pursuant to Article 17 of the Lease, upon the termination of this Agreement, Lessee is obligated to surrender the Property to Lessor, subject to reasonable wear and tear and free of liens, except for Permitted Encumbrances and Approved Additional Debt. Specifically, Lessee shall:

1.  **Surrender the Property.** Lessee shall surrender the Property to Lessor subject to reasonable wear and tear and free of liens, except for Permitted Encumbrances, Approved

Additional Debt, and the Contracts (or any replacements thereof), to the extent assignable and Lessor desires to assume same.

2.    **Convey Improvements and Personal Property.** Unless otherwise agreed, any Improvements remaining on the Property following termination shall be deemed irrevocably abandoned by Lessee, and Lessee shall execute a deed and/or a bill of sale and assignment conveying to Lessor any and all personal property located on the Property, including the Inventory and Tangible Personal Property.

3.    **Deliver Membership Records.** Lessee shall deliver to Lessor the Membership Records, Membership Agreements, Membership Plan, and the Rules and Regulations, and Lessor shall thereafter honor the Membership Agreement, the Membership Plan, and the Rules and Regulations.

4.    **Surrender Keys and Security Devices.** Lessee shall surrender all keys, access cards, and other security entrance devices to the Improvements to Lessor and make known to Lessor the combinations and security codes for all combination locks and alarm systems used in connection with the Property.

5.    **Surrender Records.** Lessee shall surrender to Lessor the originals or legible copies of all records, data, and other information in Lessee's possession or control relating to Lessee's operation, use, and management of the Property, including all plans and specifications of all Improvements, all inspection reports and studies, all operation manuals and warranties for all personal property, and all licenses, leases, applications, permits, contracts, and other agreements.

6.    **Execute Assignment and Assumption.** Lessee and Lessor shall execute an assignment and assumption agreement covering all licenses, warranties, leases, permits, contracts, and other agreements then affecting the Property.

7.    **Surrender Capital Reserve Account.** Lessee shall surrender to Lessor all funds in the Capital Reserve Account, from whatever source(s) derived.

8.    **Prorate Expenses.** Utility costs, Impositions, prepaid deposits and deferred income, accounts payable, and accounts receivable shall be prorated, adjusted, and accounted for in a manner similar to that contained in Section 8 of the Lease.

9.    **Terminate Employees.** Lessee shall terminate the employment of all of its employees related to the operation of the Property prior to the termination of the Lease and shall pay to all employees any vacation pay, sick time pay, or other compensation due pursuant to Lessee's employee policies or applicable federal, state, or local policies. Lessee shall indemnify and hold Lessor harmless and defend against any claims by any employees terminated by Lessee.

Linx of Lake Mary, LLC - Notice of Termination
February 13, 2026
Page 5

## Demand for Liquidated Damages

Pursuant to Section 20.1.1 of the Lease, Lessor hereby demands payment of One Hundred Thousand Dollars ($100,000.00) as liquidated damages resulting from the termination of the Lease due to the Events of Default described herein. Such payment shall be due and payable immediately.

## Reservation of Rights

Lessor expressly reserves all rights and remedies available under the Lease, at law, and in equity, including but not limited to the right to pursue claims for any unpaid Annual Rent Payments, unpaid Impositions, and any other amounts due and owing under the Lease. No mention in this Notice of any specific right or remedy shall preclude Lessor from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled either at law or in equity. Additionally, pursuant to Section 21.1 of the Lease, in the event of any action or proceeding brought by either party arising out of the Lease, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred in taking such action.

This Notice of Termination does not waive or release any of Lessor's claims, causes of action, rights of setoff, or other legal or equitable defenses against Lessee. Lessor expressly reserves the right to seek all damages, costs, expenses, and attorneys' fees to which it may be entitled.

## *Governing Law and Dispute Resolution*

Pursuant to Article 24.1 of the Lease, Lessor is exercising its right to pursue an action in summary ejectment or eviction of Lessee from the Property through the appropriate court(s) having jurisdiction and the authority to award possession of the Property to Lessor.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Sincerely,

Andrew S. Ballentine, Esq.

ASB/rs

CC:
Justin Luna, Esq. (via email)
Addison Law, Attn: Matthew C. Martin, 5429 LBJ Freeway, Suite 400, Dallas, TX 75240 (via email)

EXHIBIT "E"

August 18, 2025


Timacuan Partners LLC dba Timacuan Golf Club
550 Lake Mary Blvd
Lake Mary, FL 32746


Dexter DuBose, CFE
Robert Lytle
Seminole County Property Appraiser's Office
1101 E. 1st Street
Sanford FL, 32771-1468

Re:    Timacuan Golf Club, Parcel ID 05-20-30-5JR-0B00-0000

Dear Mr. Dubose,

Please allow this letter to serve as formal authorization for Greg Christovich, President of Christovich and Associates, LLC, and/or Patrick Schneider, Managing Partner, Golfco Partners, LLC, to serve as our representative to present and discuss the assessed value and related information for the Golf Club.

Thank you, please feel free to contact me if you have any questions.


Sincerely,

Claire Zheng
President
Timacuan Partners, LLC
612-735-8537
Claire.eyou@gmail.com

EXHIBIT "F"

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

**LINX OF LAKE MARY, LLC,**

           **CASE NO. 6:24-bk-06781-GER**
           **CHAPTER 11**

           *Subchapter V Election*

    Debtor.

_____/

## NOTICE OF FILING

    **LINX OF LAKE MARY, LLC** ("Debtor") by and through its undersigned Counsel,

hereby files the following document, as attached:

    1.    Final Subchapter V Plan of Reorganization

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true copy of the forgoing has been furnished either electronically or by U.S. First Class, postage prepaid mail to: **Linx of Lake Mary LLC**, 550 Lake Mary Blvd., Lake Mary, Florida 32746; all parties entitled to receive electronic noticing via CM/ECF; all creditors as shown on the matrix attached to the original of this pleading filed with the Court; **Subchapter V Trustee, Aaron R. Cohen**, PO Box 4218, Jacksonville, Florida 32201; **United States Trustee, c/o Audrey M Aleskovsky,** 400 W. Washington St., Suite 1100, Orlando, FL 32801;  this 11th day of September 2025.

                    /s/ Justin M. Luna
                    **Justin M. Luna, Esq.**
                    Florida Bar No. 0037131
                    jluna@lathamluna.com
                    **LATHAM, LUNA, EDEN & BEAUDINE, LLP**
                    201 S. Orange Ave., Suite 1400
                    Orlando, Florida 32801
                    Tel: 407-481-5800
                    Fax: 407-481-5801
                    *Attorney for the Debtor*

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

**LINX OF LAKE MARY, LLC**

**Debtor.**

**CASE NO. 6:24-bk-06781-GER**
**CHAPTER 11**

*Subchapter V Election*

_____/

COUNSEL FOR THE DEBTOR

JUSTIN M. LUNA, ESQ.
L. WILLIAM PORTER III, ESQ.
LATHAM, LUNA, EDEN & BEAUDINE, LLP
201 S. ORANGE AVE., SUITE 1400
ORLANDO, FLORIDA 32801

September 10, 2025

<center>

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

</center>

In re:

**LINX OF LAKE MARY, LLC**

**CASE NO. 6:24-bk-06781-GER**
**CHAPTER 11**

*Subchapter V Election*

Debtor.

_____/

<center>

## FINAL SUBCHAPTER V PLAN OF REORGANIZATION

</center>

**LINX OF LAKE MARY, LLC** (hereinafter referred to as the "**Debtor**"– where appropriate), by and through its undersigned counsel, hereby proposes the following *Final Subchapter V Plan of Reorganization* (the "**Final Plan**").

## ARTICLE I – DEFINITIONS

1.      **Administrative Claim** shall mean a Claim for payment of an administrative expense of a kind specified in §§ 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, the actual, necessary costs and expenses incurred after the commencement of the Bankruptcy Case in connection with preserving the Debtor's Estate and operating the Debtor's business, including wages, salaries, or commissions for services, compensation for legal and other services and reimbursement of expenses awarded under §§ 330(a) or 331 of the Code, and all fees and charges assessed against the Estate under Title 28 of the United States Code.

2.      **Administrative Claims Bar Date** means the date by which all Administrative Claims must be filed with the Bankruptcy Court to be allowed. The Administrative Claims Bar Date will be established by the Bankruptcy Court as a specific date prior to the Confirmation Date.

3.      **Allowed Administrative Claim** means all or any portion of an Administrative Claim that has been or becomes allowed by Order of the Bankruptcy Court.

<center>2</center>

4.     **Allowed Claim** means a Claim (a) with respect to which a Proof of Claim has been filed with the Bankruptcy Court in accordance with the provisions of Bankruptcy Code § 501 and Bankruptcy Rule 3001 and within any applicable period of limitation fixed by Rule 3003 or any notice or Final Order of the Bankruptcy Court; (b) deemed filed pursuant to Bankruptcy Code § 1111(a) by virtue of such Claim having been scheduled in the list of Creditors prepared and filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Code § 521(1) and Rule 1007(b) and not listed as disputed, contingent, or unliquidated; or (c) deemed an Allowed Claim (including Allowed Secured Claims and Allowed Unsecured Claims) pursuant to the provisions of the Plan or any Final Order of the Bankruptcy Court. Unless otherwise provided in the Plan or unless deemed or adjudicated an Allowed Claim pursuant to the provisions of the Plan or any Final Order of the Bankruptcy Court, an Allowed Claim shall not include any Claim as to which an objection to or proceeding challenging the allowance thereof has been interposed by the Debtor within any applicable period of limitation fixed by the Plan, by Rule 3003, or any Final Order of the Bankruptcy Court, until such objection or proceeding has been overruled, dismissed, or settled by entry of a Final Order. Notwithstanding the filing of any such objection or the commencement of any such proceeding, a Claim may be temporarily allowed for voting purposes pursuant to the provisions of Rule 3018(a).  Unless otherwise specified in the Plan or any Final Order of the Bankruptcy Court, an Allowed Claim shall not include or accrue interest on the amount of such Claim maturing, incurred otherwise or arising subsequent to the Petition Date.

5.     **Allowed Interest** means an Interest (a) with respect to which a proof of Interest has been filed with the Bankruptcy Court within the applicable period of limitation fixed by Rule 3001 or a Final Order; or (b) that has been scheduled in the list of equity security holders prepared and filed by the Debtor with the Bankruptcy Court pursuant to Rule 1007(b); and in either case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Rule 3001 or any Final Order of the Bankruptcy Court.

6.    **Allowed Priority Claim** means a Priority Claim pursuant to §507, exclusive of §507(a)(8) of the Bankruptcy Code; to the extent such Priority Claim is or becomes an Allowed Claim.

7.    **Allowed Priority Tax Claim** means a Priority Claim pursuant to § 507(a)(8) of the Bankruptcy Code; to the extent such Priority Claim is or becomes an Allowed Claim.

8.    **Allowed Unsecured Claim** means an Unsecured Claim to the extent such Unsecured Claim is or becomes an Allowed Claim.

9.    **Appeal Period** means the time for filing a notice of appeal as specified in Rule 8002 of the Bankruptcy Rules.

10.    **Assets** means each and every item of Property of the Estate and every interest of the Debtor and its respective Estate as of the Effective Date, whether tangible or intangible, legal or equitable, liquidated or unliquidated, whether or not controlled by the Debtor, and includes without limitation:  (a) all real and personal property and Cash; (b) all rights, Claims, demands, or Causes of Action, whether arising by statute or common law, and whether arising under the laws of the United States, other countries, or applicable state or local law; (c) any and all amounts owed to the Debtor, including accounts receivable, contract rights, or other rights, including without limitation rights to payment, contribution or distribution from Insiders, whether due prior or subsequent to the Petition Date; (d) all of the Debtor's books, records, and privileges; and (e) all Executory Contracts, and other contracts, agreements, licenses, and leases.

11.    **Bankruptcy Case(s)** means the Debtor's bankruptcy case that is pending before the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, pursuant to Chapter 11 of the Bankruptcy Code, Case Number 6:24-bk-06781-GER.

12.    **Bankruptcy Code** or **Code** means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., including any amendments thereto, in effect during the Bankruptcy Cases.

13.     **Bankruptcy Court** or **Court** means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, in which the Bankruptcy Case is pending, and any Court having jurisdiction to hear appeals or certiorari proceedings therefrom.

14.     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure promulgated under Title 28, United States Code, § 2075, including any amendments thereto, as they may be amended from time to time during the Bankruptcy Case.

15.     **Bar Date** means the date fixed by Order of the Bankruptcy Court as the last date for the filing of Claims in the Bankruptcy Case.

16.     **Business Day** means every day except Saturdays, Sundays, federal holidays, and Florida state holidays observed by the Bankruptcy Court.

17.     **Cash** means cash or cash equivalents, including, but not limited to, checks, bank deposits, negotiable instruments, or other similar items.

18.     **Causes of Action** means any and all of the Estate's and the Debtor's actions, Claims, demands, rights, defenses, counterclaims, cross-claims, suits, causes of action, liabilities, obligations, debts, judgments, remedies, damages, recoupments, setoffs, cross claims, counterclaims, third party claims, indemnity claims, contribution claims, and any other claims, whether known or unknown, foreseen or unforeseen, direct or indirect/derivative, choate or inchoate, in law, equity or otherwise, including but not limited to the right to recover transfers voidable or recoverable under Bankruptcy Code §§ 502, 542, 543, 544, 545, 547, 548, 549, 550, 551, and/or 553, and any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including any and all claims against any Insiders, members, officers, directors, managers or employees of the Debtor, including any claims for contribution or indemnification for any unauthorized post-petition obligations or transactions and any transaction or obligation incurred by the Debtor not otherwise approved by the Bankruptcy Court; provided, however, that, when used in the Plan, the term Causes of Action does not include any Claims, obligations, suits, judgments,

damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived pursuant to the terms of the Plan or by a Final Order of the Bankruptcy Court. A Cause of Action will not under any circumstances be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan, and nothing in the Plan operates as a release of any of the Causes of Action except as specifically provided in the Plan.

19. **Claim** means, "claim" as defined in Bankruptcy Code § 101(5).

20. **Class** means any Class into which Claims or Interests are classified pursuant to the Plan.

21. **Class 1 Claim, Class 2 Claim, Class 3 Claim,** etc., shall mean the specific Class into which Claims or Interests are classified in the Plan.

22. **Confirmation** means the process leading to confirmation of the Plan, including the entry of the Confirmation Order pursuant to Bankruptcy Code § 1129 and/or § 1191.

23. **Confirmation Date** means the date of entry of the Confirmation Order by the Bankruptcy Court on the Court's docket.

24. **Confirmation Hearing** means the date set by the Bankruptcy Court for the hearing on confirmation of the Plan, as may be continued from time to time.

25. **Confirmation Order** means the Final Order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of the Bankruptcy Code.

26. **Contingent** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which or the obligation to make payment on which is dependent upon a future event that may or may not occur.

27. **Creditor(s)** means "Creditor" as defined in Bankruptcy Code § 101(1).

28. **Debtor** refers to **LINX OF LAKE MARY, LLC.**

29. **Disallowed** means, when referring to a Claim, a Claim or any portion of a Claim that has been disallowed or expunged by a Final Order of a Court.

6

30.     **Disposable Income** shall have the same definition and meaning as the same term is defined under 11 U.S.C. § 1191(d).

31.     **Disputed Claim** means every Claim or portion thereof, that is not an Allowed Claim and that has not yet been Disallowed.

32.     **Disputed Equity Interest** shall mean an Interest in the Debtor which is not an Allowed Interest and which has not been disallowed by a Final Order or the Bankruptcy Court.

33.     **Distribution** means a distribution under the terms of the Plan to the Holders of Allowed Claims.

34.     **Effective Date** means the first Business Day following expiration of the Appeal Period with respect to the Confirmation Order without the filing of a notice of appeal of the Confirmation Order; provided, however, that, if an appeal of the Confirmation Order is filed but no stay is granted in connection with the appeal, the Debtor may elect in writing to permit the Effective Date to occur notwithstanding the pendency of the appeal. The Effective Date shall automatically occur without further order of the Bankruptcy Court, provided that all of the conditions to effectiveness of the Plan set forth herein have been met.

35.     **Estate(s)** means the bankruptcy estate of the Debtor created under Bankruptcy Code § 541.

36.     **Equity Interest** means any and all issued or authorized equity interests, common stock, stock options, membership interests and warrants in the Debtor.

37.     **Executory Contract** means every unexpired lease to which the Debtor is a party, and every other contract that is subject to being assumed or rejected by the Debtor under Bankruptcy Code § 365, pursuant to the Plan or pursuant to separate motion.

38.     **Final Decree** means the Bankruptcy Court's final decree pursuant to Bankruptcy Code § 350(a) and Bankruptcy Rule 3022 closing the Bankruptcy Case after the Estate has been fully administered.

39.     **Final Order** means an Order or judgment of the Bankruptcy Court that is no longer subject to appeal or *certiorari* proceedings and as to which no appeal or *certiorari* proceeding is pending.

40.     **Holder** means the holder of a Claim or Interest, as applicable.

41.     **Impaired Class** means any Class whose members are Holders of Claims or Interests that are impaired within the meaning of Bankruptcy Code § 1124.

42.     **Insider** means "insider" as defined in Bankruptcy Code § 101(31).

43.     **Interest(s)** means an issued or authorized outstanding equity interest, membership interest, warrant or warrants for the issuance of such equity interests, or any other equity instruments in the Debtor.

44.     **Lien** shall mean any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtor but only to the extent that such interest is recognized as valid by a court of competent jurisdiction if the validity or scope of such interest is challenged by the Debtor or any other party with stand to bring such challenge.

45.     **Nonordinary Course Administrative Claim** shall mean an Administrative Claim other than an Ordinary Course Administrative Claim.

46.     **Order** shall mean a determination, decree, adjudication or judgment issued or entered by the Bankruptcy Court.

47.     **Ordinary Course Administrative Claim** shall mean an Administrative Claim incurred in the ordinary course of business of the Debtor; provided, however, that any due and unpaid, post-petition payment in respect of rejected, or to be rejected, executory contracts or unexpired leases shall not be an Ordinary Course Administrative Claim.

48.     **Payment** shall mean the Cash to be paid under the Plan to the holders of Allowed Claims.

49.     **Person** means "person" as defined in Bankruptcy Code § 101(41).

50.     **Personal Property** means all tangible personal property of the Debtor.

51.     **Petition Date** means December 13, 2024, the date on which Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

52.     **Plan** means this Chapter 11 Plan of Reorganization, in accordance with the terms hereof or in accordance with the Bankruptcy Code.

53.     **Plan Payments** means payments made by the Debtor pursuant to the terms of the Plan.

54.     **Prepetition** means the period of time preceding the Petition Date and concluding on the Petition Date.

55.     **Priority Claim** means an Unsecured Claim, other than an Administrative Claim, to the extent such Unsecured Claim is entitled to priority in payment under Bankruptcy Code § 507.

56.     **Priority Tax Claim** means every Unsecured Claim or portion thereof that is entitled to priority pursuant to Bankruptcy Code § 507(a)(8).

57.     **Priority Unsecured Claim** means every Unsecured Claim or portion thereof that is not an Administrative Claim or a Priority Tax Claim, and that is entitled to priority under any applicable provision of Bankruptcy Code § 507.

58.     ***Pro Rata*** means proportionate, and when applied to a Claim means the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of consideration distributed on account of all Allowed Claims in such Class.

59.     **Professional** means: (i) any professional retained by the Debtor in the Bankruptcy Case pursuant to an order of the Bankruptcy Court in accordance with Bankruptcy Code §§ 327 or 1103; (ii) any attorney or accountant seeking compensation or reimbursement of expenses pursuant to Bankruptcy Code § 503(b); and (iii) any entity whose fees and expenses are subject to approval by the Bankruptcy Court as reasonable pursuant to Bankruptcy Code § 1129(a)(4).

60. **Professional Fees** means the Administrative Claims for compensation and reimbursement submitted pursuant to Bankruptcy Code §§ 328, 330, 331, or 503(b) of Professionals (i) employed pursuant to an order of the Bankruptcy Court under Bankruptcy Code §§ 327 or 328; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 503(b) or by other Final Order.

61. **Proof of Claim** means the form filed in the Bankruptcy Court by a Creditor on which the specifics of a Claim are set forth as required by the Bankruptcy Code and the Bankruptcy Rules.

62. **Property of the Estate** means "property of the estate" as defined in Bankruptcy Code § 541.

63. **Reorganized Debtor** means the Debtor upon the Effective Date of the Plan.

64. **Schedules** means the schedules of assets and liabilities and any amendments thereto filed by the Debtor with the Bankruptcy Court in accordance with Bankruptcy Code § 521(1).

65. **Security Interest** means "security interest" as defined in Bankruptcy Code § 101(51).

66. **Subchapter V Trustee** means Aaron R. Cohen who was appointed pursuant to 11 U.S.C. § 1183.

67. **Unimpaired Class** means any Class the members of which are the holders of Claims or Interests, which are not impaired within the meaning of Bankruptcy Code § 1124.

68. **Unsecured Claim** means every Claim or portion thereof, regardless of the priority of such Claim, which is not a Secured Claim.

69. **United States Trustee** shall have the meaning ascribed to it in 28 U.S.C. § 581, *et. Seq*. and, as used in the Plan, means the office of the United States Trustee for Region 21 located in the Middle District of Florida.

## ARTICLE II – BRIEF HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

Debtor owns and operates an elite championship golf course located in Lake Mary, Florida known as the "Timacuan Club." The golf course was recently renovated with new greens, tee boxes and improvements to the irrigation system. The Debtor also has a 24,000 square foot clubhouse, is also a popular venue for social and corporate events and the grill is a frequent spot for lunch. The Debtor leases the grounds from Timacuan Partners, LLC, a non-affiliated entity, under a long-term lease.

In November 2022, the Debtor took out a loan with HLI Investments and Funding-Fund 2, LLC ("HLI") on a senior secured basis in the amount of approximately $630,000.00. The loan was a short term, high-interest loan. The loan matured in November 2024. As of the Petition Date, HLI and the Debtor could not agree to terms on the extension of the loan based on a former owner refusing to sign the required paperwork. Furthermore, the Debtor's prior management and owners did not provide and withheld vital financial information about the club. After a capital call, those owners were diluted to no ownership or management in the Debtor. Additionally, the Debtor incurred unsecured debt to ensure the continued operations of the company. The Debtor's revamped and improved course along with new management shall provide a successful path for the Debtor's continue operations with the hopes of resolving disputes with its creditors and ensure the Debtor's long-term success for the benefit of Lake Mary and the Central Florida community.

## ARTICLE III - CLASSIFICATION OF CLAIMS AND INTERESTS

All Claims and Interests treated under Articles V of the Plan are divided into the following classes, which shall be mutually exclusive:

A.  Secured Claims.

   1.  Class 1 – Allowed Secured Claim of HLI Investments and Funding-Fund 2, LLC ("HLI")

B.  Unsecured Claims.

11

1.      Class 2 – Allowed General Unsecured Claims.

C.      Equity Interests.

2.      Class 3 – Equity Interests.

## ARTICLE IV – ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS.

A.      Administrative Expense Claims.

In full and final satisfaction, settlement, release and discharge of each Allowed Administrative Claim, Holders of an Allowed Administrative Expense Claim shall be paid in full on the Effective Date, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Bankruptcy Court. The Allowed Administrative Claims shall be paid from cash on hand, through pre- and post-petition retainers or monthly installments paid pursuant to Bankruptcy Court order, proceeds from the Debtor's continued operation and collection on accounts receivable or proceeds from any Cause of Action pursued by the Debtor. The Debtor estimates Administrative Claims to be approximately $50,000.00 before deducting pre-petition retainers. It is anticipated that the Administrative Claims will be held by Debtor's bankruptcy counsel and the Subchapter V Trustee.

B.      Priority Claims.

1.      Allowed Priority Tax Claims.

Except to the extent that the Holder and the Debtor have agreed or may agree to different treatment, in full satisfaction of each Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of such Claim, payment(s) equal to the Allowed Amount of such Claim over a period extending not later than 5 years after the Petition Date at the 6%. Payment on account of Allowed Priority Tax Claims will commence on the later of the Effective Date or on such dates as a respective Priority Claim becomes Allowed. Specifically, the amount of the Florida Department of Revenue's Allowed Priority Tax Claim is deemed allowed.

12

2. <u>Allowed Priority Claims.</u>

Except to the extent that the Holder and the Debtor has agreed or may agree to different treatment, in full satisfaction of each Priority Claim, exclusive of Priority Tax Claims under 11 U.S.C. §507(a)(8), each Holder of an Allowed Priority Claim shall receive (at the Debtor's election): (i) payment of such Claim in full on the Effective Date; (ii) payment over a period not extending later than 5 years after the Petition Date; (iii) or the date on which such Priority Claim becomes Allowed. There are approximately $91,000.00 in filed Priority Tax Claims.

3. <u>United States Trustee Fees.</u>

If applicable, all fees required to be paid by 28 U.S.C. § 1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the Effective Date will be paid when due in the ordinary course. The Debtor, which is proceeding under Subchapter V, does not anticipate the accrual of any United States Trustee Fees in connection with the Bankruptcy Case.

## **ARTICLE V – TREATMENT OF IMPAIRED CLASSES.**

A. <u>Determination of Allowed Amounts.</u>

Treatment prescribed for Claims and Interests in the following sections of this Article V shall in all events refer exclusively to the Allowed Amount of each respective Claim. In the event the Allowed Amount of any Claim is not determined by agreement or otherwise prior to the Effective Date, then the treatment prescribed shall be deemed effective as of the date of the determination of such Claim by agreement or Final Order or as otherwise provided under the Plan. A lien not otherwise expressly preserved by the Plan. Notwithstanding Confirmation of the Plan, the Debtor reserves the right to object to any Claim (other than Claims deemed in the Plan to be Allowed Claims) for any reason authorized by applicable bankruptcy and non-bankruptcy law, as well as the right to assert that any such Claim includes amounts subject to equitable subordination or other equitable relief. The designations and labeling used in each Class of Claims to describe the

13

treatments therein are not conclusive and are not to be construed as final determinations of the type or amount of such Claim.

Entry of the Confirmation Order shall be deemed to be recognition that the Bankruptcy Court expressly retains jurisdiction as to determination of all such issues pursuant to Article VII, Section I, of this Plan, and other applicable law.

There are currently Three (3) Classes of Claims and Interests. Treatment for these classes is as follows:

B.    <u>Secured Claims</u>.

1.    <u>Class 1- Allowed Secured Claim of HLI Investments and Funding-Fund 2, LLC ("HLI")</u>.

Class 1 consists of the Allowed Secured Claim of HLI. Debtor stipulates that, as of August 18, 2025, the undisputed amount of the Class 1 Allowed Secured Claim of HLI is $709,092.20, plus such additional reasonable attorneys' fees that may be incurred and interest that accrues through entry of the Confirmation Order and said Class 1 Allowed Secured Claim of HLI shall be deemed Allowed. The Allowed Class 1 Claim is secured by a lien on Debtor's personal property and leasehold of the real property that the Debtor leases pursuant to signed lease from Timucuan Partners, LLC, as well as the other property described in the Mortgage that secures HLI's Claim, including Timucuan Partners, LLC's fee interest in the real property and fixtures thereto (the "Class 1 Collateral"). In full satisfaction of its Allowed Class 1 Claim, HLI shall retain its lien against the Class 1 Collateral and shall receive an Allowed Secured Claim in the amount set forth above, which will be repaid in equal monthly payments based on monthly interest only payments based on 10.5%, until June 2028. In June 2028, if not previously satisfied in full, the Debtor shall pay the remaining balance of the Allowed Secured Claim in full. The Debtor, Timucuan Partners, LLC, and any other parties with any interest in any of the property described in the Mortgage that secures HLI's Claim shall execute loan documents with the foregoing terms, which loan documents shall relate back to

the recording of HLI's original Mortgage. There shall be no pre-payment penalty or fee associated with any payoff of the Allowed Class 1 Claim prior to the end of June 2028. Payments shall commence on the Effective Date. Class 1 is Impaired.

    C.    <u>Unsecured Claims</u>.

        1.    <u>Class 2 – Allowed General Unsecured Claims</u>.

Class 2 consists of all Allowed General Unsecured Claims against the Debtor. In full satisfaction of the Allowed Class 2 General Unsecured Claims, Holders of Class 2 Claims shall receive a *pro rata* share of the greater of the Debtor's actual net income or the Debtor's projected Disposable Income for three (3) years following the Effective Date paid quarterly. The first distribution will occur the first quarter after the Effective Date. The quarterly distribution amount for projected disposable income, which is based on the Debtor's projections admitted into evidence on this matter (the listed projected disposable income for year 1 shall have the same meaning as net operating income under year 2 and 3), shall be no less than $2,500.00 a quarter. The total projected disposable income is $80,000.00 over the three year period. In addition to the quarterly distributions outlined herein, Class 2 Claimholders shall also receive a *pro rata* share of the net proceeds recovered from all Causes of Action after payment of professional fees and costs associated with such collection efforts, and after Administrative Claims and Priority Claims are paid in full. The maximum Distribution to Class 2 Claimholders shall be equal to the total amount of all Allowed Class 2 General Unsecured Claims. Class 2 is Impaired. Seven days after the later of the claims' objection deadline or the resolution of any objection litigation, the Debtor shall file a Distribution Schedule to identify the pro rata amounts to be remitted to each allowed claim.

All non-insider unsecured allowed claims shall be paid in full during the Plan Term.

    D.    <u>Equity Interests</u>.

        1.    <u>Class 3 – Equity Interests.</u>

Class 3 consists of all equity interests in the Debtor. The Class 3 Interest

Holders shall retain their respective Interest in the Debtor, in the same proportion such Interest were held as of the Petition Date. Class 3 is Unimpaired.

## ARTICLE V – UNEXPIRED LEASES AND EXECUTORY CONTRACTS.

      A.      <u>Assumption or Rejection of Unexpired Leases and Executory Contracts</u>.

      To the extent the Debtor rejects any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim pursuant to Section 365 of the Code arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease. Allowed Claims resulting from rejection shall be Class 2 General Unsecured Claims, respectively, except as otherwise provided herein. The Debtor shall have until the completion of the hearing on Confirmation to assume or reject any unexpired lease or executory contract. In the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. The Debtor's position is that the executory contracts listed on its Schedule of Executory Contracts filed pursuant to Rule 1007 are the only executory contracts to which the Debtor was a party as of the Petition Date. The Debtor will assume all leases and unexpired contracts listed on Schedule G through this Plan and does not believe there are any non-monetary amounts to cure in order to assume the leases except as stated below.

      The Debtor leases the grounds from Timacuan Partners, LLC, under a long-term lease executed on or about October 3, 2022 (the "**Lease**"). Debtor has filed a Motion to assume the Lease at Docket No.: 51 (the "Motion to Assume"). A copy of the Lease is attached to the Motion to Assume. The Lease currently provides for a lease term expiring fifty years from the commencement date of November 15, 2022. The Motion to Assume was granted (Doc. No. 172)(the "Assumption

Order"). The terms and conditions of the Assumption Order are incorporated by reference into this Plan.. .

## ARTICLE VI – MEANS OF IMPLEMENTATION.

A. <u>Business Operations.</u>

The Plan contemplates the Debtor will continue to manage and operate its business in the ordinary course, but with restructured debt obligations. Please see attached **<u>Exhibit "A"</u>** which outlines the projected income from Debtor's post-confirmation operations following the estimated Effective Date.

B. <u>Funds Generated During Chapter 11</u>.

Funds generated from the Debtor's operations through the Effective Date will be used for Plan Payments; however, the Debtor's cash on hand as of Confirmation will be available for payment of Administrative Expenses. For a complete report detailing the funds generated from the Debtor's operations through the Effective Date, please refer to the monthly operating and financial reports filed with the Bankruptcy Court in the Bankruptcy Case. Copies of the Debtor's monthly operating reports are available upon request to the Debtor's undersigned counsel.

C. <u>Management and Control and Operation of the Debtor</u>.

The management and operations of the Debtor will continue to be overseen by the Debtor's current Managing Members, Patrick Schneider, and Ron Carlton, who will continue to cultivate the Debtor's existing business. The powers of Mr. Schneider and Mr. Carlton, as it pertains to the Reorganized Debtor, shall be substantially the same as they were prior to the Petition Date. The Debtor was previously authorized to pay $5,000.00 per month to the Carlton Group of Orlando, LLC for the pre-confirmation management services performed by Mr. Carlton. After confirmation, the Debtor will compensate Mr. Carlton this same amount through the life of the plan for his services.

17

In the event of a liquidation of the Debtor's estate in Chapter 7, Mr. Schneider and Mr. Carlton would likely conclude their management and involvement with the Debtor which would dramatically affect the Debtor's business and hinder its ability to conduct business.

D.    Membership Guarantee

The Debtor's members shall be jointly and severally liable to cover any monthly operating shortfalls or defaults under payments to Class 2 Creditors under the Plan. The members shall sign documents necessary to evidence their ability to commit to such payments on or before the Effective Date.

E.    Procedures for Resolving Disputed Claims.

1.    Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtor, or Reorganized Debtor as the case may be, shall have the exclusive right to make and file objections to all Claims, other than those claims deemed as "Allowed" under the terms of the Plan. All objections commenced prior to the Confirmation Date shall be finished by the Reorganized Debtor.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims shall be filed with the Bankruptcy Court and served upon the Holders of each of the Claims to which objections are made within 90 days after the Effective Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Confirmation Order, or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that either of the Debtor had immediately prior to the commencement of the Bankruptcy Cases against or with respect to any Claim or Equity Interest, with the exception of claims against any creditor who holds a stipulated and Allowed Claim under the Plan. Except as set forth in the Plan,

18

upon Confirmation the Reorganized Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that either Debtor had immediately prior to the commencement of the Bankruptcy Case as if the Bankruptcy Case had not been commenced.

      2.     <u>Estimation of Claims</u>.

Pursuant to the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim pursuant to § 502(c) of the Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court estimates any contingent, disputed, or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

      3.     <u>Cumulative Remedies</u>.

In accordance with the Plan, all of the aforementioned Claims objections, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  Until such time as an Administrative Claim, Claim, or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim, or Disputed Equity Interest for purposes related to allocations, distributions, and voting under the Plan.

4.      Payments and Distributions on Disputed Claims.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid by the Reorganized Debtor such that the Holder of such Allowed Claim receives all payments and distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question. Except as otherwise provided in the Plan, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of such dispute by settlement or Final Order. Distributions which may be attributable to a Disputed Claim will be held by the Reorganized Debtor and retained until the Disputed Claim is resolved, and funds retained may be redistributed to holders of Allowed Claims in the event a Disputed Claim is not ultimately deemed to be Allowed. Unless otherwise agreed to by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a distribution until such dispute is resolved by settlement or Final Order.

5.      Allowance of Claims and Interests.

(i)      Disallowance of Claims.

According to the Plan, all Claims held by entities against whom the Debtor has obtained a Final Order establishing liability for a Cause of Action under §§ 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Code shall be deemed disallowed pursuant to § 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to the Debtor.  Debtor reserves and shall have the exclusive right and authority to bring any Causes of Action before and after the Effective Date.

(ii)      <u>Allowance of Claims</u>.

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Bankruptcy Cases, unless and until such Claim or Equity Interest is deemed Allowed under the Code or the Bankruptcy Court enters a Final Order in the Bankruptcy Cases allowing such Claim or Equity Interest.

6.      <u>Controversy Concerning Impairment</u>.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan and designation of impairment shall govern.

## <u>ARTICLE VII – MISCELLANEOUS</u>.

A.      <u>Authority to Effectuate the Plan</u>.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides that all matters provided for under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan.

B.      <u>Post-Confirmation Status Report</u>.

Pursuant to the Plan, within 90 days of the entry of the Confirmation Order, the Debtor will file a status report with the Bankruptcy Court attaching a detailed accounting of all payments made under the Plan and explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee, and those

parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

The Debtor's case will remain open until entry of a Final Decree. The Debtor's obligation to file quarterly post-confirmation operating reports is terminated upon the entry of the Final Decree. The Debtor shall file quarterly with the Bankruptcy Court a financial report or statement of disbursements for each quarter (or portion thereof) that this chapter 11 case remains open, in a format prescribed by the United States Trustee. These reports shall also include any disbursements made from the sale or refinance of any real property ("Quarterly Reports"). The Debtor shall also attach to the Quarterly Report copies of all bank statements, refinancing and/or sale closing documents for any property sold during the applicable period. The Quarterly Reports are due by the 21st day after the end of each calendar quarter. Additionally, within seven (7) days after the end of the first quarter following the Effective Date, the Debtor shall file a list of all Class 2 Claims that may be entitled to distribution with their applicable *pro rata* distribution percentage. Creditors shall have fourteen (14) days from such filing to object to such schedule. If an objection is filed, the Bankruptcy Court retains jurisdiction to resolve any dispute pertaining to the distribution schedule..

C.    Preservation, Prosecution, and Defense of Causes of Action.

Except as set forth herein, upon Confirmation, the Reorganized Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, including all pending adversary proceedings, whether or not such causes of action have been commenced as of the Effective Date, and shall be substituted as the real party-in-interest in any such actions commenced by or against the Debtor or Bankruptcy Estate, except as otherwise modified by the Plan. The Reorganized Debtor shall prosecute or defend, as appropriate, such actions through final judgment, any appeals deemed necessary and appropriate by the Reorganized Debtor and post-judgment

collections; provided, however, that the Reorganized Debtor shall be authorized at any point in any litigation (a) to enter into such settlements as the Reorganized Debtor deem to be in the best interest of creditors, subject to Bankruptcy Court approval after notice and a hearing in accordance with Bankruptcy Rule 9019; or (b) to abandon, dismiss and/or decide not to prosecute any such litigation if the Reorganized Debtor deems such action to be in the best interest of creditors without Bankruptcy Court or other approval. The pursuit of any Cause of Action outside of Bankruptcy Court shall not result in the waiver, release, or relinquishment of the Debtor's right to address Claims through the Plan. For the avoidance of doubt, all pre-petition Claims asserted against the Debtor which are reduced to judgment (if any) shall be addressed solely through the Plan and not by any means which may exist under non-bankruptcy law.

D.     Retention of Professionals.

The Reorganized Debtor may retain and compensate professionals on such terms as it deems reasonable without Bankruptcy Court approval.

E.     Conditions to Effectiveness.

The Effective Date shall occur upon the conditions set forth in this Plan. However, the Effective Date shall not occur until the entry of the Confirmation Order by the Bankruptcy Court in form and content acceptable to the Debtor and expiration of the appeal period with respect to the Confirmation Order without the filing of a notice of appeal of such Order; *provided, however*, that, if an appeal of the Confirmation Order is filed but no stay is granted in connection with the appeal, the Debtor may in writing elect to permit the Effective Date to occur notwithstanding the pendency of the appeal.  The Effective Date shall automatically occur without further order of the Bankruptcy Court, provided that all of the conditions to effectiveness of the Plan set forth herein have been met. The Reorganized Debtor shall file a *Notice of Effective Date* with the Bankruptcy Court within three (3) days of the Effective Date.

23

F.      Police Power.

Nothing in this Article VII shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtor for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to § 1141 of the Code.

G.      Revocation and Withdrawal of this Plan.

The Debtor reserves the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.      Modification of Plan.

The Debtor may seek to amend or modify the Plan in accordance with § 1193 of the Code to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtor may issue, execute, deliver, or file with the Bankruptcy Court, or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

I.      Retention of Jurisdiction.

After the Effective Date, the Reorganized Debtor will be free to perform all functions assigned to it herein without approval of the Bankruptcy Court, except as specifically set forth herein. The itemization below is in no way meant to limit, restrict, or circumscribe the inherent

24

jurisdictional authority of the Bankruptcy Court. Confirmation of the Plan acts as consent of the parties to agree to the Bankruptcy Court's ability to enter binding final judgments and rulings as the Bankruptcy Court will continue to retain jurisdiction in this Bankruptcy Case to determine or take the following actions:

1.      All objections to the allowance of Claims and Interests and the compromise of Claims;

2.      All applications for allowance of compensation and reimbursement of out-of-pocket expenses of professionals retained by the Debtor by Order of the Bankruptcy Court to the extent that such compensation and out-of-pocket expenses relate to services performed before the Confirmation Date; provided, however, that fees of professionals for services rendered after the Effective Date may be paid by the Debtor or the Reorganized Debtor, as applicable, in the ordinary course of business without a Bankruptcy Court order; provided, further, however, in the event that an objection is made as to post-Confirmation Date requested fees or expenses, application shall be made to the Bankruptcy Court for allowance of such fees and expenses;

3.      Any adversary proceedings or contested matters or other Causes of Action brought by the Debtor or the Reorganized Debtor, the proceedings then pending or thereafter brought pursuant to §§ 544, 545, 547, 548, 549, and 550 of the Code, or other proceedings calculated to generate payments to Holders of Allowed Class 1 Claims;

4.      All controversies and disputes arising under or in connection with the performance of obligations created under the Plan, and the right to Distributions under the Plan;

5.      The enforcement and interpretation of the provisions of the Plan;

6.      To issue such orders in aid of execution and consummation of the Plan as may be necessary and appropriate;

7.　　Any motion to modify the Plan in accordance with Code § 1193, or to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or any Confirmation Order as may be necessary to carry out the purposes of the Plan;

8.　　All Claims arising from the rejection of any executory contract or lease;

9.　　Such other matters as may be provided for in the Code or the Plan;

10.　　To protect the Property of the Estate from adverse claims or interference inconsistent with the Plan;

11.　　To ensure that Distributions are accomplished as provided herein and to resolve any dispute concerning the right of any person to a Distribution hereunder, applicable law or under a contract or agreement; and

12.　　To hear and determine any action or controversy by or against the Reorganized Debtor or concerning or relating to the performance of obligations created under the Plan.

J.　　<u>Headings</u>.

Article, Section, and Paragraph headings used herein are for convenience only and shall not affect the interpretation or construction of any provision of this Plan.

K.　　<u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown."</u>

Debtor reserves its right to confirm using cramdown procedures set forth under 11 U.S.C. §§ 1129(b) and 1191(b).

L.　　<u>Notices</u>.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by facsimile transmission or mailed by United States Mail to the following:

Counsel for Debtor:

Justin M. Luna, Esq.
Latham, Luna, Eden & Beaudine, LLP
201 S. Orange Ave., Suite 1400
Orlando, Florida 32801

United States Trustee:

Audrey M. Aleskovsky
Office of the United States Trustee
400 W. Washington Street
Suite 1100
Orlando, Florida 32801

Subchapter V Trustee:

Aaron R. Cohen
P.O. Box 4218
Jacksonville, Florida 32201

M.     Manner of Payment.

Pursuant to 11 U.S.C. § 1194, the Reorganized Debtor shall make all payments and distributions required under the terms of this Plan regardless of whether the plan is confirmed under §§ 1191(a) or 1191(b).

N.     Compliance with Tax Requirements.

In connection with this Plan, and to the extent applicable, the Reorganized Debtor in making Distributions shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. The Reorganized Debtor may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides to the Reorganized Debtor, the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Reorganized Debtor to the appropriate authority. If the Holder of an Allowed Claim fails to provide to the Reorganized Debtor the information necessary to comply with any withholding requirements of any governmental unit

27

within six months after the date of first notification by the Reorganized Debtor to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then the Holder's Distribution shall be treated as an undeliverable distribution in accordance with the below. The payment of all taxes on all Distributions shall be the sole responsibility of the distributee.

      O.   <u>Transmittal of Distributions to Parties Entitled Thereto</u>.

      All Distributions by check shall be deemed made at the time such check is duly deposited in the United States mail, postage prepaid. All Distributions by wire transfer shall be deemed made as of the date the Federal Reserve or other wire transfer is made. Except as otherwise agreed with the holder of an Allowed Claim in respect thereof or as provided in this Plan, any property to be distributed on account of an Allowed Claim shall be distributed by mail upon compliance by the Holder with the provisions of this Plan to (i) its address set forth in its proof of claim, (ii) the latest mailing address filed for the holder of an Allowed Claim entitled to a distribution, (iii) the latest mailing address filed for a holder of a filed power of attorney designated by the Holder of such Allowed Claim to receive distributions, (iv) the latest mailing address filed for the Holder's transferee as identified in a filed notice served on the Debtor pursuant to Bankruptcy Rule 3001(e), or (v) if no such mailing address has been filed, the mailing address reflected on the Schedules or in the Debtor's books and records. If any Distribution is returned by mail or otherwise, the Reorganized Debtor may keep said returned Distribution money.

      P.   <u>Distribution of Unclaimed Property</u>.

      Except as otherwise provided in this Plan, any property (Cash or otherwise) to be distributed under this Plan that is unclaimed after six months following the relevant distribution date shall be forfeited, and such distribution, together with all interest earned thereon, shall become an Asset to be distributed and conveyed to Holders of Class 2 Claims in accordance with the provisions of this Plan. However, checks issued by the Reorganized Debtor with respect to Allowed Class 2

Claims will be null and void if not cashed within sixty days of the date of issuance and such unclaimed distribution shall vest with the Debtor. Requests for re-issuance of any such check shall be made in writing to the Reorganized Debtor by the Holder of the Claim with respect to the check originally issued.

Q.    Transfer Taxes.

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery, or recording of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by, or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R.    Default and Remedies of Allowed Claimholders.

In the event any Allowed Claimholder is not timely paid in accordance with the Plan, such Allowed Claimholder shall provide the Debtor and the Subchapter V Trustee with written notice of said payment default (the "Default"). The Debtor shall have fifteen (15) Business Days from receipt of the Default notice to cure the Default. If the Debtor fails to timely cure the Default, the Allowed Claimholder may seek relief from the Bankruptcy Court to enforce this Plan, file for such relief related to the Plan in any state court of competent jurisdiction or such further relief that may be available to such Allowed Claimholder under Federal or applicable state law or as stated elsewhere in the Plan. Allowed Claimholders shall seek relief from the Bankruptcy Court first before filing for relief in any other competent jurisdiction.

## VIII.   CONCLUSION

If the Plan is *not* confirmed and consummated, the Debtor believes the most likely alternative is a liquidation of its assets under Chapter 7 of the Code. In a Chapter 7 liquidation, the Debtor's operations would cease as a Chapter 7 trustee appointed in such case would likely be unable to operate the Debtor's business. In a Chapter 7 scenario, the Debtor's revenue opportunities would be lost along with the value of its goodwill and business holdings. Further, a Chapter 7 trustee would incur additional Administrative Expenses that would be paid before any distribution to creditors and would result in no additional value to claimholders after a significant devaluation of the Debtor's assets. A liquidation of the Debtor's estate would also result in additional rejection damages claims which would dilute the recoveries to all creditors.

In light of the foregoing, Debtor believes that liquidation of its assets in a Chapter 7 case would dramatically reduce the value of Distributions to Creditors as compared to reorganization under this Plan in Chapter 11. As such, the Debtor recommends that holders of Claims and Interests vote to accept the Plan. Please refer to the liquidation analysis attached hereto as **Exhibit "B"** for an overview of potential distributions to creditors in the event of a Chapter 7 liquidation of the Debtor's Estate.

**RESPECTFULLY SUBMITTED** this 29 day of August 2025.

/s/ Justin M. Luna
**Justin M. Luna, Esq.**
Florida Bar No. 0037131
jluna@lathamluna.com
**L. William Porter III, Esq.**
Florida Bar No. 0116882
bporter@lathamluna.com
**LATHAM, LUNA, EDEN & BEAUDINE, LLP**
201 S. Orange Ave., Suite 1400
Orlando, Florida 32801
Tel: 407-481-5800
Fax: 407-481-5801
*Attorney for the Debtor*

# EXHIBIT "A"

7:56 AM
01/24/25
Accrual Basis

# Linx of Lake Mary LLC dba Timacuan Club
## Financial Projections: Month 1-12

Month 1 is September 2025, etc.

| | 36 Month Budget | Beginning Cash | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | | |
| 100 · Dues | 360,000.00 | **$60,000.00** | 28,654.00 | 30,060.55 | 56,368.59 | 56,848.59 | 55,154.62 | 43,048.01 | 43,850.96 | 30,027.42 | 43,194.73 | 46,503.82 | 32,681.72 | 32,660.41 | 360,000.00 |
| **200 · Golf** | | | | | | | | | | | | | | | |
| 210 Green Fees | 440,000.00 | | 25,015.40 | 34,150.48 | 48,928.25 | 48,150.68 | 30,748.58 | 30,710.83 | 38,283.12 | 26,214.42 | 37,759.88 | 35,013.00 | 27,942.10 | 27,360.28 | 440,000.00 |
| 220 Cart Fees | 72,000.00 | | 682.24 | 5,606.08 | 6,004.44 | 7,879.23 | 6,149.72 | 6,251.95 | 6,281.57 | 4,269.32 | 6,170.60 | 5,729.40 | 4,572.24 | 4,523.54 | 72,000.00 |
| 230 Gas/Seating Expenses | 180,000.00 | | 341.12 | 460.51 | 552.01 | 697.20 | 512.48 | 521.80 | 1,043.59 | 714.64 | 1,036.45 | 1,171.23 | 762.06 | 1,430.06 | 180,000.00 |
| 240 Other Golf (Range, M/C Fees, Other) | 60,000.00 | | | | | | | | 307.47 | | 514.22 | 553.82 | 477.45 | 381.03 | 60,000.00 |
| **Total 200 · Golf** | 1,052,000.00 | | 59,909.54 | 81,031.16 | 90,785.23 | 115,124.33 | 89,854.19 | 91,468.43 | 62,878.20 | 90,165.42 | 97,067.49 | 83,712.90 | 66,807.02 | 66,355.04 | 1,052,000.00 |
| **300 · Food & Beverage** | 480,000.00 | | 27,289.32 | 37,200.33 | 44,160.66 | 53,376.28 | 40,898.11 | 41,743.77 | 28,597.55 | 41,137.83 | 44,288.35 | 38,196.00 | 30,482.29 | 30,442.29 | 480,000.00 |
| **Total 300 · Food & Beverage** | 480,000.00 | | 27,289.32 | 37,200.33 | 44,160.66 | 53,376.28 | 40,898.11 | 41,743.77 | 28,597.55 | 41,137.83 | 44,288.35 | 38,196.00 | 30,482.29 | 30,442.29 | 480,000.00 |
| **Total Income** | 2,036,000.00 | | 115,753.06 | 157,792.24 | 187,314.37 | 226,404.37 | 222,807.17 | 173,900.31 | 177,063.17 | 123,301.26 | 174,492.88 | 187,860.66 | 162,014.70 | 129,295.72 | 2,036,000.00 |
| Cost of Goods Sold | 244,320.00 | | 18,935.07 | 21,477.72 | 27,168.52 | 26,738.96 | 20,868.94 | 24,247.56 | 21,247.58 | 14,596.15 | 20,099.16 | 22,541.26 | 19,515.49 | 14,320.00 | 244,320.00 |
| **Gross Profit** | 1,791,680.00 | | 101,862.69 | 138,807.17 | 164,836.65 | 196,255.84 | 196,070.31 | 153,032.27 | 155,815.59 | 106,746.11 | 153,535.02 | 165,317.39 | 142,572.94 | 113,780.23 | 1,791,680.00 |
| **Expense** | | | | | | | | | | | | | | | |
| **600 · Payroll** | | | | | | | | | | | | | | | |
| 610 · Salary and Wages | 730,000.00 | | 41,552.81 | 56,075.80 | 67,160.85 | 81,176.42 | 79,886.66 | 62,351.29 | 63,485.32 | 43,462.10 | 62,583.79 | 67,356.72 | 58,089.75 | 48,336.48 | 730,000.00 |
| 620 · Payroll Taxes | 58,400.00 | | 3,323.23 | 4,526.06 | 5,372.87 | 6,494.11 | 6,390.93 | 4,988.10 | 5,078.83 | 3,479.37 | 5,006.70 | 5,388.54 | 4,647.18 | 3,706.68 | 58,400.00 |
| 630 · Workers Comp Ins | 12,000.00 | | 682.24 | 930.01 | 1,164.01 | 1,334.41 | 1,313.21 | 1,024.95 | 1,043.59 | 714.94 | 1,035.83 | 1,107.23 | 954.90 | 762.06 | 12,000.00 |
| 640 · Payroll Administration Expenses | 6,000.00 | | 341.12 | 460.51 | 552.01 | 697.20 | 656.60 | 512.48 | 521.80 | 357.47 | 514.22 | 553.82 | 477.45 | 381.03 | 6,000.00 |
| **660 · Contract Labor** | | | | | | | | | | | | | | | |
| Total 660 · Contract Labor - Ron Carlton | 19,992.00 | | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 19,992.00 |
| **Total 600 · Payroll** | 826,392.00 | | 47,512.40 | 64,162.89 | 75,855.74 | 91,338.14 | 89,913.40 | 70,542.82 | 71,795.54 | 49,769.88 | 70,777.56 | 70,072.11 | 65,835.28 | 52,876.25 | 826,392.00 |
| **700 · Non-Payroll Expenses** | | | | | | | | | | | | | | | |
| 1010 · Marketing and Advertising | 10,000.00 | | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 833.33 | 10,000.00 |
| 1020 · Utilities | | | | | | | | | | | | | | | |
| 1021 · Electric and Gas | 78,000.00 | | 4,434.55 | 6,006.65 | 7,176.09 | 8,673.64 | 6,652.19 | 6,783.36 | 4,647.10 | 6,684.90 | 7,197.02 | 6,206.86 | 4,953.37 | 7,668.00 | 78,000.00 |
| 1022 · Water & Sewage | 23,400.00 | | 1,330.36 | 1,813.33 | 2,152.83 | 2,560.75 | 1,996.66 | 2,035.01 | 1,394.13 | 2,005.47 | 2,159.11 | 1,862.06 | 1,486.01 | 23,400.00 | 23,400.00 |
| **Total 1020 · Utilities** | 101,400.00 | | 5,764.91 | 7,856.81 | 9,328.92 | 11,275.74 | 11,086.59 | 8,650.85 | 8,818.37 | 6,041.23 | 8,090.37 | 9,356.13 | 8,668.91 | 6,439.38 | 101,400.00 |
| 1030 · Other Administration Expense | | | | | | | | | | | | | | | |
| 1033 · TV Internet / Phone | 12,000.00 | | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000.00 |
| 1034 · Pest Control | 6,000.00 | | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| 1037 · Repairs & Maintenance-Buildings | 19,200.00 | | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 19,200.00 |
| **Total 1030 · Building Services** | 48,000.00 | | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 48,000.00 |
| **1040 · Travel** | | | | | | | | | | | | | | | |
| 1041 · Meals | 5,800.00 | | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 | 5,800.00 |
| 1042 · Airfare | 300.00 | | 300.00 | | | | | 150.00 | | | | | 150.00 | | 300.00 |
| 1043 · Automobile | 600.00 | | | | | | | 300.00 | | | | | 300.00 | | 600.00 |
| 1044 · Hotels / Lodging | 1,200.00 | | | | | | | 300.00 | | | | | 600.00 | | 1,200.00 |
| 1045 · Other Travel | 600.00 | | | | | | | 300.00 | | | | | 600.00 | | 600.00 |
| **Total 1040 · Travel** | 3,500.00 | | | | | | 1,650.00 | | | | | | 1,650.00 | | 3,500.00 |
| **1050 · Administration Expense** | | | | | | | | | | | | | | | |
| 1052 · Monthly Merchant Card Expense | 30,000.00 | | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 |
| 1053 · Other Bank Charges | 1,200.00 | | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 1,200.00 |
| **Total 1050 · Banking Services** | 31,200.00 | | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 31,200.00 |
| **1060 · Back Office Services** | | | | | | | | | | | | | | | |
| 1062 · Professional Fees | 6,000.00 | | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| 1063 · Software | 12,000.00 | | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000.00 |
| **Total 1060 · Back Office Services** | 19,200.00 | | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 19,200.00 |
| **1070 · Taxes** | | | | | | | | | | | | | | | |
| 1071 · Property Taxes Real Estate | 60,000.00 | | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 60,000.00 |
| 1074 · Sales Tax on Leased Equipment | 2,400.00 | | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,400.00 |
| **Total 1070 · Taxes** | 62,400.00 | | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 5,200.00 | 62,400.00 |
| **1080 · Insurance** | | | | | | | | | | | | | | | |
| 1081 · Dues & Subscriptions | 900.00 | | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 900.00 |
| 1082 · Clubhouse Supplies | 1,200.00 | | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 1,200.00 |
| 1083 · Insurance | | | | | | | | | | | | | | | |
| 1083.1 · First Ins Funding - Liab/Prop | 144,000.00 | | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000.00 |
| **Total 1083 · Insurance** | 144,000.00 | | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000.00 |
| 1085 · Business Licenses | 1,440.00 | | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 1,440.00 |
| **Total 1080 · Other Administration Expense** | 147,540.00 | | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 12,295.00 | 147,540.00 |

7:56 AM
01/24/28
Accrual Basis

## Linx of Lake Mary LLC dba Timacuan Club

## Financial Projections: Month 1-12 Continued

| | 36 Month Budget | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total 1000 - Administration | 444,640.00 | 34,093.24 | 36,186.94 | 37,657.25 | 39,606.07 | 39,424.92 | 38,639.18 | 37,146.71 | 34,369.56 | 37,016.70 | 37,684.46 | 36,397.24 | 36,417.72 | 444,640.00 |
| | | 6% | 7% | 8% | 11% | 11% | 10% | 10% | 9% | 9% | 7% | 6% | 6% | 100% |
| 700 - Maintenance Department | | | | | | | | | | | | | | |
| 710 - Chemicals and Pesticides | 24,000.00 | 1,440.00 | 1,680.00 | 2,640.00 | 2,640.00 | 2,640.00 | 2,400.00 | 2,160.00 | 2,160.00 | 2,160.00 | 1,680.00 | 1,440.00 | 1,440.00 | 24,000.00 |
| 720 - Fertilizer | 56,000.00 | 3,360.00 | 3,920.00 | 6,160.00 | 6,160.00 | 5,600.00 | 5,600.00 | 5,040.00 | 5,040.00 | 5,040.00 | 3,920.00 | 3,360.00 | 3,360.00 | 56,000.00 |
| 730 - Sand, Seed, & Dressing | 27,000.00 | 1,620.00 | 1,890.00 | 2,970.00 | 2,970.00 | 2,700.00 | 2,700.00 | 2,430.00 | 2,430.00 | 2,430.00 | 1,890.00 | 1,620.00 | 1,620.00 | 27,000.00 |
| 740 - Fuel & Oil | 46,500.00 | 2,790.00 | 3,255.00 | 3,720.00 | 4,125.00 | 5,115.00 | 4,650.00 | 3,750.00 | 3,375.00 | 3,375.00 | 3,255.00 | 2,790.00 | 2,250.00 | 46,500.00 |
| 745 - Irrigation | 37,500.00 | 2,250.00 | 2,625.00 | 3,000.00 | 4,125.00 | 3,750.00 | 4,650.00 | 3,750.00 | 3,375.00 | 3,375.00 | 2,625.00 | 2,250.00 | 2,250.00 | 37,500.00 |
| 750 - Supplies | 1,500.00 | 90.00 | 105.00 | 165.00 | 165.00 | 165.00 | 150.00 | 135.00 | 135.00 | 135.00 | 105.00 | 90.00 | 90.00 | 1,500.00 |
| 770 - Repairs and Maintenance-Equipment | 18,000.00 | 1,080.00 | 1,260.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,800.00 | 1,620.00 | 1,620.00 | 1,620.00 | 1,260.00 | 1,080.00 | 1,080.00 | 18,000.00 |
| 780 - Course and Grounds Maintenance | 19,000.00 | 1,140.00 | 1,330.00 | 1,520.00 | 2,090.00 | 2,090.00 | 1,900.00 | 1,900.00 | 1,710.00 | 1,710.00 | 1,330.00 | 1,140.00 | 1,140.00 | 19,000.00 |
| 790 - Other Maintenance Expense | 12,000.00 | 720.00 | 840.00 | 960.00 | 1,320.00 | 1,320.00 | 1,200.00 | 1,200.00 | 1,080.00 | 1,080.00 | 840.00 | 720.00 | 720.00 | 12,000.00 |
| Total 755 - Maintenance Department | 241,500.00 | 14,490.00 | 16,905.00 | 19,320.00 | 26,565.00 | 26,565.00 | 24,150.00 | 24,150.00 | 21,735.00 | 21,735.00 | 16,905.00 | 14,490.00 | 14,490.00 | 241,500.00 |
| 805 - Golf Department | | | | | | | | | | | | | | |
| 830 - Handicap Service | 3,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,000.00 |
| 835 - Cart Lease Expense | 7,200.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,200.00 |
| 840 - Equipment Lease | 66,000.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 66,000.00 |
| 850 - Driving Range | 59,700.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 59,700.00 |
| 890 - Other Golf | 6,000.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| Total 805 - Golf Department | 140,700.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 11,725.00 | 140,700.00 |
| 905 - Food & Beverage | | | | | | | | | | | | | | |
| 910 - Events | 4,800.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 4,800.00 |
| 920 - F&B Supplies | 7,200.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,200.00 |
| 940 - Leases - Kitchen Equipment | 4,800.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 4,800.00 |
| 990 - Other Food & Beverage | 24,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000.00 |
| Total 905 - Food & Beverage | 40,800.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 40,800.00 |
| Total 700 - Non-Payroll Expenses | 867,640.00 | 63,708.24 | 68,216.94 | 72,102.25 | 81,296.07 | 81,114.92 | 77,914.18 | 76,421.71 | 71,229.56 | 73,876.70 | 69,714.46 | 66,012.24 | 66,032.72 | 867,640.00 |
| Total Operating Expense | | | | | | | | | | | | | | |
| 999 Reserve for Continued Operations | 20,000.00 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 1,666.67 | 20,000.00 |
| Other Chapter 11/5 Plan Payments: | | | | | | | | | | | | | | |
| Allowed Class 1 Claim | 70,000.00 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 70,000.00 |
| Priority Tax Claim (IRS) | 233.00 | 233.00 | | | | | | | | | | | | 233.00 |
| Priority Tax Claim (FL DOR) | 30,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 |
| Allowed Admin Claim | 5,000.00 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 5,000.00 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Operating Expense | -27,585.00 | 121,870.31 | 142,796.59 | 158,376.68 | 183,848.88 | 181,444.69 | 158,973.67 | 158,633.91 | 131,356.11 | 155,072.93 | 156,203.24 | 9,114.15 | 142,264.19 | -27,585.00 |
| Projected Disposable Income | | -20,007.62 | -3,309.33 | 16,186.96 | 14,625.33 | -5,941.40 | -2,818.32 | -24,611.00 | -1,519.11 | 308.75 | | -15,540.40 | 129,325.63 | |
| Capital Contributions (As Necessary) | 10,000.00 | 10,000.00 | | | | | | | | | | | | 10,000.00 |
| Ending Cash | 1,919,265.00 | $39,992.38 | $36,683.05 | $42,515.04 | $58,702.01 | $73,327.33 | $67,485.93 | $64,667.61 | $50,056.61 | $48,537.50 | $57,651.65 | $37,960.40 | $42,415.00 | 1,919,265.00 |

7:56 AM
01/24/25
Accrual Basis

# Linx of Lake Mary LLC dba Timacuan Club
## Financial Projections: Month 13-24

| | 36 Month Budget | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | | 542,415.00 | 532,246.68 | 514,416.82 | 541,061.22 | 560,334.46 | 577,304.84 | 570,973.39 | 577,860.07 | 549,696.24 | 557,956.63 | 567,783.86 | 567,783.98 | |
| **Ordinary Income/Expense** | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | |
| 100 · Dues | 569,520.00 | 33,279.02 | 44,138.43 | 52,368.50 | 63,330.95 | 62,324.72 | 48,644.25 | 49,328.99 | 33,930.99 | 33,650.04 | 32,548.32 | 45,319.55 | 36,197.24 | 569,520.00 |
| 200 · Golf | | | | | | | | | | | | | | |
| 210 · Green Fees | 406,800.00 | 23,127.87 | 23,127.87 | 31,527.45 | 37,426.07 | 44,517.66 | 34,745.90 | 35,377.65 | 24,236.42 | 34,964.31 | 37,535.23 | 32,371.11 | 25,633.74 | 406,800.00 |
| 220 · Cart Fees | 432,000.00 | 24,560.57 | 33,480.47 | 39,744.50 | 45,236.59 | 44,517.66 | 36,898.30 | 37,560.40 | 25,777.79 | 37,024.05 | 39,860.42 | 34,378.40 | 27,434.06 | 432,000.00 |
| 230 · Merchandise | 81,360.00 | 6,305.49 | 7,485.21 | 9,907.28 | 48,038.65 | 4,271.39 | 4,647.28 | 7,075.57 | 4,847.28 | 6,972.86 | 7,507.05 | 12,916.87 | 25,833.74 | 81,360.00 |
| 240 · Other Golf (Range, MC Fees, Other) | 203,400.00 | 11,933.94 | 15,763.72 | 18,715.04 | 22,018.20 | 22,236.83 | 17,372.95 | 17,688.70 | 12,118.22 | 17,442.16 | 18,167.81 | 16,185.06 | 12,916.87 | 203,400.00 |
| Total 200 · Golf | 1,123,560.00 | 63,877.96 | 87,077.13 | 96,940.52 | 124,940.52 | 123,959.41 | 95,964.32 | 97,711.74 | 66,990.59 | 97,371.56 | 99,263.58 | 83,407.29 | 69,402.22 | 1,123,560.00 |
| 300 · Food & Beverage | 542,400.00 | 30,837.16 | 42,036.60 | 49,901.43 | 60,315.19 | 59,356.89 | 46,327.86 | 47,170.46 | 32,315.22 | 46,485.75 | 50,046.97 | 43,161.48 | 34,444.99 | 542,400.00 |
| **Total Income** | 2,235,480.00 | 127,994.13 | 173,252.15 | 199,210.45 | 248,586.66 | 244,637.02 | 190,936.44 | 194,411.18 | 133,165.92 | 191,685.18 | 206,065.59 | 177,888.32 | 141,985.63 | 2,235,480.00 |
| **Cost of Goods Sold** | 15,251.00 | 20,780.26 | 24,650.01 | 29,830.40 | 24,650.01 | 22,615.61 | 22,219.31 | 23,329.34 | 22,650.17 | 22,060.17 | 24,751.09 | 17,035.64 | 17,035.64 | 268,527.60 |
| **Gross Profit** | 1,967,222.40 | 111,942.83 | 152,461.90 | 180,986.75 | 218,756.26 | 215,280.58 | 168,020.82 | 171,081.84 | 194,411.18 | 169,535.79 | 181,314.59 | 156,341.72 | 124,028.01 | 1,967,222.40 |
| **Expense** | | | | | | | | | | | | | | |
| 600 · Payroll | | | | | | | | | | | | | | |
| 610 · Salary and Wages | 770,150.00 | 43,785.47 | 59,697.47 | 70,054.70 | 85,641.12 | 84,261.42 | 65,780.61 | 66,977.01 | 45,984.17 | 71,061.34 | 71,061.34 | 61,264.69 | 48,908.20 | 770,150.00 |
| 620 · Payroll Taxes | 61,612.00 | 3,502.84 | 4,775.00 | 5,668.38 | 6,851.29 | 6,742.43 | 5,262.45 | 5,358.16 | 3,670.73 | 5,280.38 | 5,694.91 | 4,902.77 | 3,912.66 | 61,612.00 |
| 630 · Workers Com Ins | 12,660.00 | 719.76 | 981.16 | 1,164.73 | 1,407.80 | 1,381.43 | 1,081.33 | 1,100.99 | 754.26 | 1,168.13 | 1,057.42 | 803.97 | 12,660.00 | 12,660.00 |
| 640 · Payroll Administration | 6,330.00 | 359.86 | 490.56 | 582.37 | 703.90 | 692.72 | 540.66 | 550.50 | 377.13 | 542.51 | 584.07 | 503.71 | 401.99 | 6,330.00 |
| 660 · Contract Labor | | | | | | | | | | | | | | |
| 664 · Contract Labor - Ron Carlton | 19,992.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 19,992.00 |
| Total 660 · Contract Labor | 19,992.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 1,666.00 | 19,992.00 |
| Total 600 · Payroll | 870,744.00 | 50,033.95 | 67,600.21 | 79,936.18 | 96,270.11 | 94,767.00 | 74,331.05 | 75,652.66 | 52,532.29 | 74,978.70 | 80,164.45 | 69,364.59 | 55,692.81 | 870,744.00 |
| 700 · Non-Payroll Expenses | | | | | | | | | | | | | | |
| 1005 · Administration | | | | | | | | | | | | | | |
| 1010 · Marketing and Advertising | 10,550.00 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 879.17 | 10,550.00 |
| 1020 · Utilities | | | | | | | | | | | | | | |
| 1021 · Electric and Gas | 82,290.00 | 4,678.45 | 6,377.70 | 7,508.99 | 9,150.70 | 9,005.31 | 7,015.45 | 7,152.57 | 4,907.73 | 7,052.87 | 7,592.86 | 6,544.91 | 5,221.46 | 82,290.00 |
| 1022 · Water & Sewage | 24,687.00 | 1,403.53 | 1,913.27 | 2,271.23 | 2,745.21 | 2,701.59 | 2,108.56 | 2,146.93 | 1,470.61 | 2,115.77 | 2,277.86 | 1,964.47 | 1,567.74 | 24,687.00 |
| Total 1020 · Utilities | 106,977.00 | 6,081.98 | 8,290.83 | 9,642.01 | 11,895.90 | 11,706.90 | 9,137.20 | 9,303.38 | 6,373.50 | 9,168.34 | 9,870.71 | 8,512.69 | 6,793.56 | 106,977.00 |
| 1030 · Building Services | | | | | | | | | | | | | | |
| 1033 · TV / Internet / Phone | 12,660.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 1,055.00 | 12,660.00 |
| 1035 · Pest Control | 10,128.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 844.00 | 10,128.00 |
| 1037 · Repairs & Maintenance-Buildings | 96,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 96,000.00 |
| Total 1030 · Building Services | 118,788.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 9,899.00 | 118,788.00 |
| 1040 · Travel | | | | | | | | | | | | | | |
| 1041 · Meals | 3,300.00 | | | | | | 150.00 | 150.00 | | 150.00 | | 150.00 | | 3,300.00 |
| 1042 · Airfare | 300.00 | 300.00 | | | | | 300.00 | 300.00 | | 300.00 | | 300.00 | | 300.00 |
| 1043 · Automobile | 600.00 | | | | | | 300.00 | 300.00 | | 300.00 | | 300.00 | | 600.00 |
| 1044 · Hotels / Lodging | 1,200.00 | | | | | | 600.00 | 600.00 | | 600.00 | | 600.00 | | 1,200.00 |
| 1045 · Other Travel | 600.00 | | | | | | 300.00 | 300.00 | | 300.00 | | 300.00 | | 600.00 |
| Total 1040 · Travel | 3,300.00 | | | | | 1,650.00 | | | | | | 1,650.00 | | 3,300.00 |
| 1050 · Banking Expenses | | | | | | | | | | | | | | |
| 1052 · Monthly Merchant Card Expense | 31,650.00 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 2,637.50 | 31,650.00 |
| 1053 · Other Bank Charges | 1,200.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 1,200.00 |
| Total 1050 · Banking Expenses | 32,850.00 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 2,737.50 | 32,850.00 |
| 1060 · Back Office Services | | | | | | | | | | | | | | |
| 1061 · Professional Fees | 48,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 48,000.00 |
| 1062 · Software and Services | 13,200.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 13,200.00 |
| 1063 · Contract Repairs & Services | 61,200.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 5,100.00 | 61,200.00 |
| Total 1060 · Back Office Services | | | | | | | | | | | | | | |
| 1070 · Taxes | | | | | | | | | | | | | | |
| 1071 · Property Taxes Real Estate | 54,000.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 54,000.00 |
| 1074 · Sales Tax on Leased Equipment | 2,400.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,400.00 |
| Total 1070 · Taxes | 56,400.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 4,700.00 | 56,400.00 |
| 1080 · Other Administration Expense | | | | | | | | | | | | | | |
| 1081 · Dues & Subscriptions | 949.50 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 79.13 | 949.50 |
| 1082 · Clubhouse Supplies | 1,266.00 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 105.50 | 1,266.00 |
| 1083 · Insurance | | | | | | | | | | | | | | |
| 1083.1 · First Ins Funding - Liab/Prop | 144,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000.00 |
| Total 1083 · Insurance | 144,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000.00 |
| 1086 · Business Licenses | 3,600.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 3,600.00 |

7:56 AM
01/24/25
Accrual Basis

# Inv of Lake Marv LLC dba Timarron Club

## Financial Projections: Month 13-24 Continued

| | 36 Month Budget | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 705 · Maintenance Department | | | | | | | | | | | | | | |
| Total 1000 · Other Administration Expense | | | | | | | | | | | | | | |
| **Total 1000 · Administration** | 519,860.50 | 41,982.27 | 44,091.13 | 45,642.30 | 47,696.20 | 47,507.19 | 46,587.49 | 45,105.87 | 42,173.79 | 44,968.63 | 45,671.00 | 44,313.90 | 44,243.84 | 539,880.50 |
| | | 6% | 7% | 8% | 11% | 11% | 10% | 10% | 9% | 9% | 7% | 6% | 6% | 100% |
| 708 · Maintenance Department | | | | | | | | | | | | | | |
| 710 · Chemicals and Pesticides | 25,320.00 | 1,519.20 | 1,772.40 | 2,025.60 | 2,785.20 | 2,532.00 | 2,532.00 | 2,278.80 | 2,278.80 | 2,278.80 | 1,772.40 | 1,519.20 | 1,519.20 | 25,320.00 |
| 720 · Fertilizer | 59,080.00 | 3,544.80 | 4,135.60 | 4,726.40 | 6,498.80 | 5,908.00 | 5,908.00 | 5,317.20 | 5,317.20 | 5,317.20 | 4,135.60 | 3,544.80 | 3,544.80 | 59,080.00 |
| 730 · Sand, Seed, & Dressing | 28,485.00 | 1,709.10 | 1,993.95 | 2,278.80 | 3,133.35 | 2,848.50 | 2,848.50 | 2,563.65 | 2,563.65 | 2,563.65 | 1,993.95 | 1,709.10 | 1,709.10 | 28,485.00 |
| 740 · Fuel & Oil | 49,057.50 | 2,943.45 | 3,434.03 | 3,924.60 | 5,396.33 | 4,905.75 | 4,905.75 | 4,415.18 | 4,415.18 | 4,415.18 | 3,434.03 | 2,943.45 | 2,943.45 | 49,057.50 |
| 745 · Supplies | 39,562.50 | 2,373.75 | 2,789.38 | 3,165.00 | 4,351.88 | 3,956.25 | 3,956.25 | 3,560.63 | 3,560.63 | 3,560.63 | 2,789.38 | 2,373.75 | 2,373.75 | 39,562.50 |
| 750 · Supplies | 1,562.50 | 94.95 | 110.78 | 126.60 | 174.08 | 158.25 | 158.25 | 142.43 | 142.43 | 142.43 | 110.78 | 94.95 | 94.95 | 1,562.50 |
| 760 · Supplies | 22,000.00 | 1,320.00 | 1,540.00 | 1,760.00 | 2,420.00 | 2,200.00 | 2,200.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,540.00 | 1,320.00 | 1,320.00 | 22,000.00 |
| 770 · Repairs and Maintenance Equipment | | | | | | | | | | | | | | |
| 780 · Course and Grounds Maintenance | 22,000.00 | 1,320.00 | 1,540.00 | 1,760.00 | 2,420.00 | 2,200.00 | 2,200.00 | 1,980.00 | 1,980.00 | 1,980.00 | 1,540.00 | 1,320.00 | 1,320.00 | 22,000.00 |
| 790 · Other Maintenance Expense | 12,600.00 | 759.00 | 886.20 | 1,012.80 | 1,392.60 | 1,392.60 | 1,260.00 | 1,260.00 | 1,139.40 | 1,139.40 | 698.20 | 759.00 | 759.00 | 12,600.00 |
| **Total 705 · Maintenance Department** | 259,747.50 | 18,192.33 | 18,192.33 | 20,709.75 | 28,572.23 | 25,974.75 | 25,974.75 | 23,377.28 | 23,377.28 | 23,377.28 | 18,192.33 | 18,192.33 | 15,594.85 | 259,747.50 |
| 800 · Golf Department | | | | | | | | | | | | | | |
| 905 · Food & Beverage | 5,064.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 5,064.00 |
| 910 · Events | 7,596.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 7,596.00 |
| 830 · Handicap Service | 3,165.00 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 263.75 | 3,165.00 |
| 835 · Cart Lease Expense | 66,000.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 66,000.00 |
| 840 · Equipment Rental | 7,596.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 633.00 | 7,596.00 |
| 850 · Equipment Lease | 5,064.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 422.00 | 5,064.00 |
| 880 · Driving Range | 59,700.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 4,975.00 | 59,700.00 |
| 890 · Other Golf | 6,330.00 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 527.50 | 6,330.00 |
| **Total 800 · Golf Department** | 141,525.00 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 11,793.75 | 141,525.00 |
| 990 · Food & Beverage | | | | | | | | | | | | | | |
| 990 · Other Food & Beverage | 25,320.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 25,320.00 |
| **Total 990 · Food & Beverage** | 25,320.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 2,110.00 | 25,320.00 |
| 700 · Non-Payroll Expenses | | | | | | | | | | | | | | |
| 999 · Reserve For Continued Operations | 40,000.00 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 3,333.33 | 40,000.00 |
| **Total 700 · Non-Payroll Expenses** | 984,197.00 | 72,647.87 | 77,054.20 | 81,802.85 | 91,649.17 | 91,460.16 | 87,042.99 | 80,931.82 | 83,726.66 | 83,726.66 | 79,224.58 | 75,209.44 | 73,209.44 | 984,197.00 |
| Other Chapter 11/Plan Payments | | | | | | | | | | | | | | |
| Allowed Class 1 Claim | 70,000.00 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 70,000.00 |
| Priority Tax Claim (IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Priority Tax Claim (FL DOR) | 30,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 |
| Allowed Admin Claim | 5,000.00 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 5,000.00 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Operating Expense** | 1,959,941.00 | 134,965.16 | 157,337.75 | 173,822.36 | 200,002.61 | 198,310.50 | 174,357.37 | 174,195.17 | 145,397.44 | 170,380.68 | 171,481.96 | 167,753.98 | 142,985.59 | 1,959,941.00 |
| **Net Ordinary Income** | -32,718.00 | -23,122.32 | -4,875.95 | -7,164.39 | 18,753.64 | 16,970.08 | -4,351.54 | -3,113.33 | -26,163.83 | -1,790.21 | 10,032.73 | -164.79 | -16,007.56 | -32,718.60 |
| Capital Contributions (As Necessary) | | 10,000.00 | 10,000.00 | | | | 10,000.00 | 10,000.00 | | | | | | 40,000.00 |
| **Ending Cash** | 329,292.68 | 34,416.82 | 41,581.22 | 560,334.86 | 577,304.94 | 577,890.07 | 549,696.24 | 557,900.00 | 567,938.76 | 567,753.98 | 549,696.40 | | | |

7:16 AM
01/24/25
Accrual Basis

**Linx of Lake Mary LLC dba Timacuan Club**

**Financial Projections: Month 25-36**

| | 36 Month Budget | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | |
| **100 · Golf** | | | | | | | | | | | | | | |
| Beginning Cash | | $49,886.40 | $28,287.51 | $28,275.47 | $42,726.36 | $71,046.67 | $97,923.18 | $97,296.15 | $100,333.23 | $73,680.18 | $83,954.61 | $107,162.22 | $114,287.05 | |

| 700 · Maintenance Department | | | | | | | | | | | | | | |
| 710 · Chemicals and Pesticides | 26,939.20 | 1,810.35 | 1,876.74 | 2,147.14 | 2,552.21 | 2,883.92 | 2,883.92 | 2,415.53 | 2,415.53 | 1,878.74 | 1,810.35 | 1,810.35 | | 26,939.20 |

7:36 AM
01/28/23
Accrual Basis

**Linx of Lake Mary LLC dba Timacuan Club**

# Financial Projections: Month 25-36 Continued

| | 36 Month Budget | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 720 · Fertilizer | 62,624.80 | 3,757.49 | 4,383.74 | 5,009.98 | 6,888.73 | 6,262.48 | 6,262.48 | 6,636.23 | 5,636.23 | 5,009.98 | 4,383.74 | 3,757.49 | 3,757.49 | 62,624.80 |
| 730 · Sand, Seed & Dressing | 30,194.10 | 1,811.65 | 2,113.59 | 2,415.53 | 3,321.35 | 3,019.41 | 3,019.41 | 3,201.47 | 2,717.47 | 2,717.47 | 2,113.59 | 1,811.65 | 1,811.65 | 30,194.10 |
| 740 · Fuel & Oil | 52,000.00 | 3,120.06 | 3,640.07 | 4,160.08 | 5,720.10 | 5,200.10 | 5,200.10 | 5,200.10 | 4,680.09 | 4,680.09 | 3,640.07 | 3,120.06 | 3,120.06 | 52,000.00 |
| 745 · Irrigation | 41,936.25 | 2,516.18 | 2,935.54 | 3,354.90 | 4,612.99 | 4,193.63 | 4,193.63 | 3,774.26 | 3,774.26 | 2,935.54 | 2,516.18 | 2,516.18 | 41,936.25 |
| 750 · Supplies | 1,677.45 | 100.65 | 117.42 | 134.20 | 184.52 | 167.75 | 167.75 | 150.97 | 150.97 | 117.42 | 100.65 | 100.65 | 1,677.45 |
| 770 · Repairs and Maintenance-Equipment | 23,320.00 | 1,399.20 | 1,632.40 | 1,865.60 | 2,565.20 | 2,332.00 | 2,332.00 | 2,098.80 | 2,098.80 | 1,632.40 | 1,399.20 | 1,399.20 | 23,320.00 |
| 775 · Courses and Grounds Maintenance | 13,459.60 | 805.18 | 939.37 | 1,073.57 | 1,476.16 | 1,341.96 | 1,341.96 | 1,207.76 | 1,207.76 | 939.37 | 805.18 | 805.18 | 13,459.60 |
| 780 · Non-Payroll Expenses | | | | | | | | | | | | | | |
| 790 · Other Maintenance Expense | | | | | | | | | | | | | | |
| Total 700 · Maintenance Department | 275,332.35 | 16,519.94 | 19,273.26 | 22,026.59 | 30,286.56 | 27,533.24 | 27,533.24 | 24,779.91 | 24,779.91 | 19,273.26 | 16,519.94 | 16,519.94 | 275,332.35 |
| 800 · Golf Department | | | | | | | | | | | | | | |
| 830 · Handicap Service | 3,354.90 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 279.58 | 3,354.90 |
| 835 · Cart Lease Expense | 66,000.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 5,500.00 | 66,000.00 |
| 845 · Equipment Leases | 4,975.00 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 414.58 | 4,975.00 |
| 846 · Equipment Lease | 6,709.80 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 559.15 | 6,709.80 |
| 850 · Driving Range | | | | | | | | | | | | | | |
| 890 · Other Golf | 87,748.50 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 7,312.46 | 87,748.50 |
| Total 800 · Golf Department | | | | | | | | | | | | | | |
| 900 · Food & Beverage | | | | | | | | | | | | | | |
| 910 · Events | 5,367.84 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 5,367.84 |
| 920 · F&B Supplies | 8,051.76 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 670.98 | 8,051.76 |
| 940 · Leases - Kitchen Equipment | 5,367.84 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 447.32 | 5,367.84 |
| 990 · Other Food & Beverage | 26,839.20 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 2,236.60 | 26,839.20 |
| Total 900 · Food & Beverage | 45,626.64 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 3,802.22 | 45,626.64 |
| Total 999 · Non-Payroll Expenses | 976,796.62 | 76,762.34 | 78,762.34 | 81,762.27 | 91,436.86 | 87,550.64 | 88,128.01 | 86,746.27 | 83,226.34 | 78,687.27 | 74,074.89 | 74,102.03 | 976,796.62 |
| 999 · Reserve For Continued Operations | 150,000.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 12,500.00 | 150,000.00 |
| **Other Chapter 11/5 Plan Payments** | | | | | | | | | | | | | | |
| Allowed Class 1 Claim | 746,696.67 | | | | | | | | | | | | 746,696.67 | 746,696.67 |
| Priority Tax Claim (IRS) | 0.00 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | 5,833.33 | | | 0.00 |
| Priority Tax Claim (FL DOR) | 30,000.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 0.00 | 30,000.00 |
| FL DOR Property Taxes | 5,000.00 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 416.67 | 5,000.00 |
| Allowed Admin Claim | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Operating Expenses** | 2,930,205.61 | 145,983.96 | 167,072.49 | 214,623.56 | 213,129.92 | 187,540.60 | 187,467.67 | 198,910.28 | 89,606.56 | 87,596.46 | 178,758.23 | 105,117.56 | 146,403.18 | 2,930,205.61 |
| **Net Ordinary Income** | -440,944.47 | -21,408.89 | | 28,644.21 | 26,566.61 | 537.03 | -36,469.06 | -23,257.80 | 23,257.80 | 87,596.48 | -8,415.12 | 68,469.08 | -440,944.47 |
| Capital Contributions (As Necessary) | 0.00 | 0.00 | | | | | | 700,000.00 | 700,000.00 | | | | 700,000.00 |
| **Net Operating Income** | | | | | | | | | | | | | | |
| **Ending Cash** | | 82.96 | 93.37 | | | | | | | | | | |

# EXHIBIT "B"

**LINX OF LAKE MARY, LLC**
**Case No.: 24-bk-06781-GER**

**LIQUIDATION ANALYSIS**

| Asset | Estimated Liquidation Value[1] |
|---|---|
| Cash, cash equivalents, and financial assets | $21,215.00 |
| Deposits and prepayments | $5,280.00 |
| FF&E | $35,250.00 |
| Inventory | $22,113.33 |
| **TOTAL LIQUIDATION** | **$83,858.33** |
| | |
| Secured Debt | $630,000.00 |
| Administrative: Chapter 7 | $5,000.00 |
| Administrative: Chapter 11 (including Subchapter V Trustee Fees Before Application of Retainers) | $50,000.00 |
| Unsecured Debt | $1,484,607.13 |
| **TOTAL DEBT** | **$2,169,607.13** |
| **AVAILABLE FOR GENERAL UNSECURED CREDITORS** | **$0.00** |

---

[1] The Debtor filed its Schedules and Statement of Financial Affairs on January 10, 2025, at Doc. No. 31. In the event of a Liquidation, the Debtor's first priority secured creditor, HLI Investments and Funding, would take possession of its collateral which includes all of Debtor's personal property.